No. 20-15654

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

CENTER FOR BIOLOGICAL DIVERSITY,

*Plaintiff-Appellee,*

v.

UNITED STATES FISH AND WILDLIFE SERVICE,

*Defendant-Appellee,*

v.

ROSEMONT COPPER COMPANY, *et al.*,

*Intervenor-Defendant-Appellant.*

On Appeal from the United States District Court for the District of Arizona

Case Nos. 4:17-cv-00475-JAS, 4:17-cv-00576-JAS, 4:18-cv-00189-JAS

The Honorable James A. Soto

## OPENING BRIEF OF APPELLANT ROSEMONT COPPER COMPANY

Norman D. James
FENNEMORE CRAIG, P.C.
2394 East Camelback Road, Suite 600
Phoenix, AZ 85016
Telephone: (602) 916-5346
Facsimile: (602) 916-5546
njames@fclaw.com

Lauren M. Kole
GIBSON, DUNN & CRUTCHER LLP
1801 California Street
Denver, CO 80202-2642
lkole@gibsondunn.com

Theodore J. Boutrous, Jr.
Julian W. Poon
Bradley J. Hamburger
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: (213) 229-7000
Facsimile: (213) 229-7520
tboutrous@gibsondunn.com
jpoon@gibsondunn.com
bhamburger@gibsondunn.com

*Counsel for Intervenor-Defendant-Appellant Rosemont Copper Company*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, the undersigned counsel for Intervenor-Defendant-Appellant Rosemont Copper Company ("Rosemont") states that Rosemont is a wholly-owned subsidiary of Hudbay Minerals, Inc., a Canadian corporation. Hudbay Minerals, Inc. is a publicly traded company (NYSE: HBM; TSE: HBM).

Dated: December 23, 2021

*s/ Julian W. Poon*
Julian W. Poon

**TABLE OF CONTENTS**

INTRODUCTION .................................................................................1

STATEMENT OF JURISDICTION..................................................4

STATEMENT OF THE ISSUES.........................................................5

STATEMENT OF THE CASE.............................................................5

    I.    The Rosemont Project ...........................................................5

    II.    The Jaguar Species and Conservation Efforts.....................7

        A.    The Jaguar Species and Its Range...............................7

        B.    The Listing of the Jaguar Species as "Endangered".................9

        C.    The Designation of Critical Habitat for Jaguars in the United States ..............................................................10

    III.    Procedural History...............................................................15

STATUTORY AND REGULATORY BACKGROUND......................18

STANDARD OF REVIEW .................................................................21

SUMMARY OF ARGUMENT ...........................................................22

ARGUMENT .......................................................................................24

    I.    The District Court Erred in Upholding the Service's Arbitrary and Capricious Designation of "Critical Habitat" That Is Not "Essential to the Conservation of the Species.".................................24

        A.    The Service Designated "Critical Habitat" That Is Not "Essential."...........................................................24

        B.    The Service Improperly Designated "Critical Habitat" Beneficial, at Most, to Conserving a Small Group of Jaguars in the NRU. .............................................42

    II.    The District Court Erred in Failing to Vacate the Critical-Habitat Designations Despite the Service's Arbitrary and

i

Capricious Failure to Follow the Two-Step Analysis Mandated by Its Own Regulations. ........................................................46

A.    The Service's Regulations Require a Step-Wise Approach. ...................................................................47

B.    The Service Failed to Follow the Required Step-Wise Process in Designating the Challenged "Critical Habitat." ......52

III.   The District Court Erred By Failing to Remand to the Service to Reconsider Its Economic-Impact Analysis. ........................................55

CONCLUSION ...........................................................................59

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*All. for the Wild Rockies v. Lyder*,
728 F. Supp. 2d 1126 (D. Mont. 2010).............................................36

*Allentown Mack Sales & Serv., Inc. v. NLRB*,
522 U.S. 359 (1998)..........................................................................22

*Altera Corp. & Subsidiaries v. Comm'r of Internal Revenue*,
926 F.3d 1061 (9th Cir. 2019) ....................................................25, 26

*Argo Dutch Indus. Ltd. v. U.S.*,
508 F.3d 1024 (Fed. Cir. 2007) ........................................................27

*Ariz. Cattle Growers' Ass'n v. Salazar*,
606 F.3d 1160 (9th Cir. 2010) ..........................................................19

*Auer v. Robbins*,
519 U.S. 452 (1997)..........................................................................48

*Bassiri v. Xerox Corp.*,
463 F.3d 927 (9th Cir. 2006) ............................................................48

*Bear Valley Mut. Water Co. v. Jewell*,
790 F.3d 977 (9th Cir. 2015) ......................................................29, 49

*Bear Valley Mut. Water Co. v. Salazar*,
2012 WL 5353353 (C.D. Cal. Oct. 17, 2012) ...................................29

*Betansos v. Barr*,
928 F.3d 1133 (9th Cir. 2019) ..........................................................50

*Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*,
467 U.S. 837 (1984)....................................................................25, 32

*Ctr. for Biological Diversity v. Kempthorne*,
607 F. Supp. 2d 1078 (D. Ariz. 2009) .........................................11, 37

iii

*Ctr. for Biological Diversity v. Zinke*,
  900 F.3d 1053 (9th Cir. 2018) .............................................................50

*E. Bay Sanctuary Covenant v. Garland*,
  994 F.3d 962 (9th Cir. 2020) ..............................................................46

*F.C.C. v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009)..............................................................................37

*Fla. Power & Light Co. v. Lorion*,
  470 U.S. 729 (1985)..............................................................................58

*Garcia v. Holder*,
  659 F.3d 1261 (9th Cir. 2011) .............................................................41

*Gifford Pinchot Task Force v. U.S. Fish & Wildlife Service*,
  378 F.3d 1059 (9th Cir. 2004) .............................................................34

*Home Builders Ass'n of N. Cal. v. U.S. Fish & Wildlife Serv.*,
  616 F.3d 983 (9th Cir. 2010) ...............................................19, 33, 34

*Kelton Arms Condo. Owners Ass'n v. Homestead Ins. Co.*,
  346 F.3d 1190 (9th Cir. 2003) .............................................................53

*Kisor v. Wilkie*,
  139 S. Ct. 2400 (2019)..........................................................................25

*Lagandaon v. Ashcroft*,
  383 F.3d 983 (9th Cir. 2004) ...............................................................27

*Levy v. Sterling Holding Co., LLC*,
  544 F.3d 493 (3d Cir. 2008) ..........................................................50, 51

*In re Lovin*,
  652 F.3d 1349 (Fed. Cir. 2011) ...........................................................51

*Markle Interests, L.L.C. v. U.S. Fish & Wildlife Serv.*,
  848 F.3d 635 (5th Cir. 2017) ...............................................................20

*Markle Interests, L.L.C. v. U.S. Fish & Wildlife Serv.*,
  827 F.3d 452 (5th Cir. 2016) ...............................................................30

iv

*McDonnell Douglas Corp. v. U.S. Dep't of the Air Force*,
   375 F.3d 1182 (D.C. Cir. 2004) ............................................................41

*MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.*,
   512 U.S. 218 (1994) ................................................................26, 27, 35

*Michigan v. EPA*,
   576 U.S. 743 (2015) ..............................................................................22

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) .........................................................................22, 41

*N.M. Farm & Livestock Bureau v. U.S. Dep't of Interior*,
   2021 WL 275535 (D.N.M. Jan. 27, 2021) ...........................................54

*N.M. Farm & Livestock Bureau v. U.S. Dep't of Interior*,
   952 F.3d 1216 (10th Cir. 2020) ...................................................*passim*

*Nat'l Cable & Telecomms. Ass'n. v. Brand X Internet Servs.*,
   545 U.S. 967 (2005) ........................................................................32, 50

*Nw. Ecosystem All. v. U.S. Fish & Wildlife Serv.*,
   475 F.3d 1136 (9th Cir. 2007) .............................................................21

*Otay Mesa Prop., L.P. v. U.S. Dep't of Interior*,
   646 F.3d 914 (D.C. Cir. 2011) ......................................................33, 41

*Otay Mesa Prop., L.P. v. U.S. Dep't of Interior*,
   344 F. Supp. 3d 355 (D.D.C. 2018) ..............................................40, 41

*Safe Air for Everyone v. EPA*,
   488 F.3d 1088 (9th Cir. 2007) .............................................................58

*San Luis & Delta-Mendota Water Auth.*,
   776 F.3d 971 (9th Cir. 2014) ...............................................................22

*Shahinyan v. Holder*,
   518 F. App'x 545 (9th Cir. 2013) ........................................................51

*Udall v. Tallman*,
   380 U.S. 1 (1965) ..................................................................................51

*Weyerhaeuser Co. v. U.S. Fish & Wildlife Service*,
    139 S. Ct. 361 (2018) ....................................................................28, 29

*Yates v. United States*,
    574 U.S. 528 (2015) ..................................................................................27

**Statutes**

5 U.S.C. § 551 *et seq.*............................................................................21

5 U.S.C. § 706(2)(A)..............................................................................21

16 U.S.C. § 1531 *et seq.*........................................................................18

16 U.S.C. § 1532 .............................................................................*passim*

16 U.S.C. § 1533 .............................................................................*passim*

16 U.S.C. § 1536 ......................................................................................6

**Regulations**

50 C.F.R. § 424.12 ....................................................................3, 20, 46, 47

61 Fed. Reg. 4,722 (Feb. 7, 1996) .........................................................43

78 Fed. Reg. 53,058 (Aug. 28, 2013)......................................................21

81 Fed. Reg. 7,414 (Feb. 11, 2016) ........................................................48

84 Fed. Reg. 45,020 (Aug. 27, 2019) .....................................................48

86 Fed. Reg. 38,570 (July 22, 2021)........................................................54

86 Fed. Reg. 49,985 (Sept. 7, 2021) ...............................................10, 18

**Other Authorities**

Black's Law Dictionary (10th ed. 2014) ...........................................26, 28

H.R. Rep. No. 95-1625, 95th Cong., 2d Sess. 16, reprinted in 1978
    U.S. Code Cong. & Admin. News 9453......................................31, 32

Merriam-Webster's Collegiate Dictionary (10th ed. 2000)..............26, 27

vi

Oxford English Dictionary (online) (Sept. 2021) ...............................................26, 28

S. Rep. No. 95-874, 95th Cong. 2d Sess. 10............................................................31

Webster's II New College Dictionary (1995)...........................................................28

Webster's New Universal Unabridged Dictionary (2d ed. 1983) ...............26, 27, 28

Webster's Third New International Dictionary (1968) ..............................26, 28, 43

## INTRODUCTION

This appeal challenges a portion of the U.S. Fish and Wildlife Service's designation of 700,000-plus acres of land in southern Arizona and southwestern New Mexico as "critical habitat" for the jaguar—a species that lives almost entirely outside of the United States. The land designated includes approximately 50,000 acres in the northern Santa Rita Mountains, where Appellant Rosemont Copper Company has obtained approval for a major cutting-edge copper mine and mineral-processing facilities, and over 12,000 acres for a "travel corridor" connecting the northern Santa Rita Mountains and the northern Whetstone Mountains. But none of this purported "critical habitat" is critical at all, and the Service's critical-habitat designations contravened both the Endangered Species Act ("ESA") and the Service's own regulations. The District Court, glossing over most of Rosemont's arguments in a few conclusory footnotes, deferred to the Service's arbitrary and capricious critical-habitat designations. This Court should reverse.

The ESA defines "critical habitat" as areas "*essential* to" or "*essential* for the conservation of the species." 16 U.S.C. § 1532(5)(A)(i)–(ii) (emphases added). The plain meaning of "essential" is that which is *indispensable* or *necessary*, as confirmed by every source of statutory construction. The Service nonetheless designated, and the District Court upheld the designation of, "critical habitat" without ever defining what "essential" means. The Service's designations, however,

reveal that it believed habitat is "critical" to preserving the entire jaguar species if it may be helpful to conserving a small group of jaguars in northern Mexico. That contravenes the plain meaning of "essential." By implicitly treating "essential" as meaning merely "nice to have," the Service's critical-habitat designations violate the ESA.

There are more than 30,000 jaguars in the wild, but only a handful of jaguars have been recorded in the United States since 1960, and no breeding pair of jaguars has ever been recorded. The Service thus conceded, in a 2006 finding, that "the range of the jaguar in the United States is not enough area to provide for the conservation (i.e., recovery) of the jaguar or even make a significant contribution to the conservation of the jaguar, and cannot be defined as essential to the conservation of the species." 4-ER-783. It is only by adopting a watered-down and standardless understanding of "essential" that the Service has now reversed course.

The Service further contravened the ESA by arbitrarily and capriciously treating the relatively small number of genetically non-distinct jaguars in the Northwestern Recovery Unit (a geographic area located almost entirely in Mexico) as a species unto itself. Specifically, the Service designated habitat beneficial to conserving just *those* particular jaguars, rather than critical habitat "essential to the conservation of the *species*" *as a whole*. 16 U.S.C. § 1532(5)(A)(i)–(ii) (emphasis added). The Service's designations thus rest on an atextual and unreasonable

understanding of "species" that would dramatically expand the scope of the ESA beyond what Congress ever intended.

In designating the "critical habitat" challenged here, the Service contravened not only the statute but also its own regulations—specifically, 50 C.F.R. § 424.12. As the Tenth Circuit has explained, the version of Section 424.12 in effect when the Service designated critical habitat for the jaguar required the Service to first consider whether designating any areas *occupied* by the species would be sufficient to conserve the species *before* the Service could then consider designating any *unoccupied* areas as critical habitat. *See N.M. Farm & Livestock Bureau v. U.S. Dep't of Interior*, 952 F.3d 1216, 1228–29 (10th Cir. 2020). The Service acknowledged as much in its Final Rule: "If, *after* identifying occupied areas, a determination is made that those areas are inadequate to ensure conservation of the species . . . we *then* consider" designating unoccupied areas. 2-ER-233 (emphases added). Yet the Service then inexplicably ignored this requirement and collapsed these two inquiries into one.

Finally, the Service failed to follow the ESA's requirement that it "tak[e] into consideration the economic impact" before designating critical habitat. 16 U.S.C. § 1533(b)(2). While the Service nominally considered economic impacts, and concluded they would not be significant, its analysis turned on a proposition that the District Court rejected: that Rosemont's mining project would not adversely modify

3

the jaguar's "critical habitat." Having eliminated that predicate for the Service's economic-impact analysis, the District Court should have then, as a matter of law and logic, vacated the Service's designations and instructed the Service to reassess the potential economic impacts of the designations. The court instead upheld the designations. That is yet another reason to reverse.

The ESA and the Service's own regulations set forth a process the Service should have followed in designating critical habitat. The Service failed to abide by that process here in designating, as "critical habitat," large expanses of land in Arizona and New Mexico for a species living almost entirely outside of the United States. By upholding the Service's arbitrary and capricious designations, the District Court erred. This Court should therefore reverse.

## STATEMENT OF JURISDICTION

The District Court had jurisdiction over this action under 28 U.S.C. §§ 1331, 1346. On February 10, 2020, the District Court denied Rosemont's cross-motion for summary judgment and granted Plaintiff Center for Biological Diversity's and Defendant U.S. Fish and Wildlife Service's cross-motions for summary judgment on Rosemont's cross-claims. Rosemont timely appealed. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

I.     Did the Fish and Wildlife Service arbitrarily and capriciously designate the northern Santa Rita Mountains and Subunit 4b as "critical habitat" for the jaguar, even though the designated areas are not "essential to the conservation of the species," and did the District Court err in upholding those designations?

II.     Did the Service arbitrarily and capriciously fail to follow its own regulations requiring that it first consider the adequacy of designating any *occupied* areas as "critical habitat" before it could then consider designating areas *unoccupied* by the species as "critical habitat," and did the District Court err in upholding the Service's designations?

III.     Did the District Court err in failing to vacate the Service's challenged critical-habitat designations and failing to remand to the Service for reconsideration after eliminating the key predicate underlying the Service's economic-impact analysis?

## STATEMENT OF THE CASE

### I. The Rosemont Project

Rosemont Copper Company is developing a state-of-the-art copper mine and related mineral-processing facilities in the northern Santa Rita Mountains in Pima County, Arizona. 2-ER-154–55. The site of the Rosemont Project is within the Rosemont and Helvetia Mining Districts, an area that has been explored and mined extensively since the 1880s. 2-ER-154. The Project is expected to last

between 25 and 30 years. 2-ER-89–90; 3-ER-385. Over that time, it is expected to produce 5.88 billion pounds of copper, 194 million pounds of molybdenum, and 80 million ounces of silver. 2-ER-155.

A 2012 economic analysis estimated that the mine would increase local economic activity by approximately $1.2 billion annually, directly create around 500 jobs and indirectly support over 3,300 more jobs, and generate approximately $25.7 million in local-government revenue. 3-ER-348. The analysis further estimated that production activities would increase economic activity in Arizona, and national economic activity, by approximately $1.4 billion and $2.5 billion annually. 3-ER-358.

In applying for federal authorizations and permits, Rosemont consulted twice with the Forest Service, Fish and Wildlife Service, and Army Corps of Engineers, as required by Section 7(a)(2) of the ESA, 16 U.S.C. § 1536(a)(2). 2-ER-156; 3-ER-369.[1] During both consultation processes, the Service considered whether the Project was likely to destroy or adversely modify critical habitat. 2-ER-190–97; 3-ER-473–87. Both consultations resulted in opinions (the "2013 Biological

---

[1] Section 7(a)(2) instructs federal agencies to consult with the Service to "insure that any action authorized, funded, or carried out by such agency is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined . . . to be critical." 16 U.S.C. § 1536(a)(2).

Opinion" and "2016 Biological Opinion") in which the Service concluded that the Project was "not likely [to] destroy or adversely modify" critical habitat for the jaguar. 2-ER-198; 3-ER-490.

The Forest Service granted final approval of Rosemont's mining plan of operations in March 2019. 2-ER-46. The District Court overturned that approval by vacating the agency actions on which it relied, and Rosemont's and the Government's appeals from that decision remain pending before this Court. *See Ctr. for Biological Diversity, et al. v. U.S. Fish & Wildlife Serv. v. Rosemont Copper Co.*, Nos. 19-17585, 19-17586 (9th Cir.).[2]

## II. The Jaguar Species and Conservation Efforts

### A. The Jaguar Species and Its Range

The jaguar (*Panthera onca*) is the largest cat species native to the Western Hemisphere. 4-ER-710, 712. More than 30,000 jaguars live in the wild, according to experts. 4-ER-724. Approximately 600 jaguars are found in northwestern Mexico, the northernmost portion of its currently occupied range, with the remainder in other parts of Mexico, and in 17 Central and South American nations: Argentina, Belize, Bolivia, Brazil, Columbia, Costa Rica, Ecuador, French Guiana, Guatemala, Guyana, Honduras, Nicaragua, Panama, Paraguay, Peru,

---

[2] The briefing in those consolidated appeals provides additional information regarding the Rosemont Project and the extensive environmental review conducted by federal, state, and local authorities. *See id.* at Dkt. 29, 74.

Suriname, and Venezuela. 4-ER-724. The jaguar's current range spans approximately 3.4 million square miles. *Id*. According to experts, "[t]he probability of long-term survival of the jaguar is considered high in 70 percent of the currently occupied range." *Id*. The following graphic depicts the jaguar's current occupied



range:

4-ER-767.[3]

No breeding population of jaguars has existed in the United States for over 100 years. Only three records of female jaguars with cubs have *ever* been

---

[3] While the Recovery Outline labels this graphic as a depiction of the Pan American Recovery Unit, it clearly depicts the jaguar's full range. *See* 4-ER-767; *see also* 4-ER-724–25.

documented in the United States, most recently in 1910. 4-ER-726. The most recent record of any female jaguar in the United States is from 1963, and the validity of that record is disputed. *Id*. By 1972, "jaguars in the United States had declined to such an extent . . . as to be effectively eliminated." 2-ER-231. According to the Service, between 1960 and 2013, there were undisputed Class I records[4] of only six or seven unique jaguars (all solitary males) within the United States. 2-ER-222–23. Moreover, no breeding pair of jaguars has been documented in the United States. 3-ER-529.

Experts who consider southern Arizona and southwestern New Mexico part of the jaguar's range agree that they are "at the northern edge of the northernmost jaguar population." 4-ER-727. "Jaguars in the United States are understood to be individuals dispersing north from Mexico . . . , where the closest breeding population occurs about 210 km (130 mi) south of the U.S.-Mexico border." 2-ER-231.

## B. The Listing of the Jaguar Species as "Endangered"

The Service first listed the jaguar as an endangered species on March 30, 1972, pursuant to the Endangered Species Conservation Act of 1969, a precursor to the ESA that provided for separate lists of endangered species found within and

---

[4] A "Class I record" is one substantiated by physical evidence (e.g., skin, skull, photograph, track), as reviewed and accepted by a relevant authority such as the Arizona Game and Fish Department. 2-ER-222.

outside the United States. 2-ER-224; 4-ER-710. At the time of its 1972 listing, "the jaguar was included only on the foreign species list," given the paucity of jaguars in the United States. 90-Day Finding on a Petition to Revise Critical Habitat for the Jaguar, 86 Fed. Reg. 49,985, 49,986 (Sept. 7, 2021).

The Service issued a proposed rule to list the jaguar species as endangered within the United States in 1980, but withdrew it in 1982. 4-ER-796; 4-ER-795. The Service ultimately listed the jaguar as endangered in the United States on July 22, 1997. 4-ER-784. Nevertheless, the Service treats March 30, *1972* as the jaguar's listing date within the United States, based on the Service's "assert[ion] that it was always [its] intent . . . to consider the jaguar endangered throughout its entire range when it was listed as endangered in 1972." 2-ER-224.

### C. The Designation of Critical Habitat for Jaguars in the United States

In its 1997 regulation extending the endangered-species listing to jaguars within the United States, the Service considered whether—and decided not—to designate critical habitat for the species. It determined "that designation of critical habitat is not prudent" because "the primary threat to the species in the United States is direct taking rather than habitat destruction," and the "[p]ublication of detailed critical habitat maps and descriptions in the Federal Register would" be counterproductive. 4-ER-792.

In 2006, pursuant to a settlement of litigation, the Service reconsidered whether to designate critical habitat for the jaguar and again declined to do so:

> Because the area used by jaguars in the United States is such a small part of the overall range of the species and because of nomadic use by jaguars, . . . [it] is not enough area to provide for the conservation (i.e., recovery) of the jaguar or even make a significant contribution to the conservation of the jaguar, and cannot be defined as essential to the conservation of the species.

4-ER-783. The Service explained that any measures necessary to the species' conservation "will need to be implemented in Mexico and Central and South America." *Id*.; *see also* 4-ER-711 ("The rationale for this determination was that for the purposes of formal recovery planning, the jaguar qualifies as an exclusively foreign species.").

In 2009, the District of Arizona vacated the Service's 2006 determination not to designate critical habitat. *Ctr. for Biological Diversity v. Kempthorne*, 607 F. Supp. 2d 1078, 1094 (D. Ariz. 2009). On remand, the Service reversed its long-held position and stated that "the designation of critical habitat for the jaguar *would* be beneficial" to the species' conservation. 4-ER-770 (emphasis added).

Recognizing that "information currently available for northern jaguars is scant," the Service in 2010 "convened a binational Jaguar Recovery Team" comprised of "jaguar experts, large-cat experts, and stakeholders from the United States and Mexico." 2-ER-248. The Jaguar Recovery Team was tasked with "synthesiz[ing] information on the jaguar, focusing on [the] area comprising jaguars

11

in the northernmost portion of their range." *Id*. In April 2012, the team issued a "Recovery Outline for the Jaguar," which set forth "interim recovery goals, objectives, and actions for the [jaguar] species." 4-ER-709, 711.

The Recovery Outline divided the jaguar's range into two "recovery units": the Northwestern Recovery Unit ("NRU") and the Pan American Recovery Unit. 4-ER-728. Each unit consisted of "core areas" and "secondary areas." *Id*. "Core areas" are those with "persistent verified records of jaguar occurrence over time and recent evidence of reproduction." *Id*. "[S]econdary areas" are those which "contain jaguar habitat with historical and/or recent records of jaguar presence [but] with no recent record or very few records of reproduction." 4-ER-728–29.

The Recovery Outline focused on the NRU, which is almost entirely in Mexico and includes just two of the 90 "core areas." 4-ER-729, 747, 750. The NRU also includes "secondary areas," including one that lies to the north of the northernmost core area and extends into Arizona and New Mexico. 4-ER-731, 766. The U.S. portion of this secondary area contains approximately 12,386 square miles, which represents roughly 0.36% of the jaguar's current range, but the areas designated as critical habitat within the United States constitute just 0.04% of the jaguar's range. *Id*. The Recovery Outline also explained that secondary areas "are of particular interest when they occur between core areas and can be used as transit areas through which dispersing individuals can move, reach adjacent other core

12

areas," but the secondary area that extends into the United States is at the northernmost edge of the NRU and thus does not connect two core areas, as the following map shows.  4-ER-729, 731.



4-ER-766.

The Recovery Outline identified but did not focus on the Pan American Recovery Unit, which "extends from Mexico to Argentina and encompasses 88 [out of 90] core areas and all corridors connecting these areas."  4-ER-750.  The stated purpose of the Jaguar Recovery Team's work was to "address in significant detail the actions necessary to conserve jaguars in the northwestern portion of their range (i.e., within the NRU)," which contains less than 3% of the jaguar's current range.  4-ER-731, 747.

Relying on the Recovery Outline as "the best scientific and commercial data" available, 2-ER-250, the Service published a proposed rule in 2012 designating approximately 838,000 acres of land in southern Arizona and southwestern New Mexico as "critical habitat" for the jaguar. 4-ER-680. The proposed critical habitat was revised in 2013. 3-ER-512.

The proposed critical habitat contained several "units" and "subunits." By far the largest among these was Unit 3 (the "Patagonia Unit") which covered approximately 366,000 acres, including the Santa Rita Mountains, Patagonia Mountains, Huachuca Mountains, and Empire Mountains. 3-ER-516. Approximately two-thirds of the Rosemont Project site was included in the proposed Unit 3. The Service also proposed designating, as "Subunit 4b," a travel corridor connecting the Whetstone Mountains and the Santa Rita Mountains. 3-ER-517. Subunit 4b extends from the northern Whetstone Mountains to the northeast side of the Santa Rita Mountains.

Rosemont submitted comments regarding the proposed rule and requested that the portion of Unit 3 within the northern Santa Rita Mountains where the Project is located, along with Subunit 4b, be excluded from the critical-habitat designations. 4-ER-540, 557.

The Arizona Game and Fish Department also objected to the designation of critical habitat for the jaguar in Arizona. 3-ER-527-28. The agency explained that

there was no credible basis for doing so given that "recovery of the jaguar is <u>entirely</u> reliant on conservation action in the 99+% of its habitat found south of the international border" and thus "[t]he less than 1% of potential jaguar habitat in the U.S. does not and cannot contribute substantially to the recovery of the species." 3-ER-528. The agency also expressed concern that the few jaguars sporadically observed in the United States could represent an ecological "sink," i.e., low-quality habitat that is harmful to a species' overall conservation. 3-ER-529.

On March 5, 2014, the Service issued the Final Rule challenged in this appeal, designating 764,207 acres of land in Arizona and New Mexico as "critical habitat" for the jaguar. 2-ER-215. It designated Unit 3, which included the northern Santa Rita Mountains, as "occupied" critical habitat and Subunit 4b as "unoccupied" critical habitat. 2-ER-234–35. While it excluded other areas that had originally been included in the proposed designations, it did not exclude the areas requested by Rosemont. 2-ER-243–44. The Service explained that the Rosemont Project had undergone consultation under Section 7(a)(2) of the ESA and therefore would not be affected by designating critical habitat over and around the mine site. 2-ER-239, 243.

### III.   Procedural History

On September 25, 2017, the Center for Biological Diversity ("CBD") brought the underlying action against the Forest Service and the Fish and Wildlife Service in

the District Court. 2-ER-111–44. CBD alleged that the Fish and Wildlife Service had violated the ESA and the Administrative Procedure Act ("APA") by issuing the 2016 Biological Opinion, and that the Forest Service had violated the ESA by relying on the 2016 Biological Opinion in issuing and approving the 2017 Record of Decision. 2-ER-112.

Rosemont intervened as a defendant and filed cross-claims against the Fish and Wildlife Service, alleging that the Service violated the ESA and the APA by designating, as "critical habitat" for the jaguar species, the portion of Unit 3 in the northern Santa Rita Mountains, as well as Subunit 4b. 2-ER-63–110. Rosemont argued, *inter alia*, that the Service had unlawfully determined that the northern Santa Rita Mountains were "occupied" critical habitat because they were not occupied at the time of listing and because they lacked features essential to the jaguar's conservation. 2-ER-71. Rosemont also argued that the northern Santa Rita Mountains and Subunit 4b were not properly designated as "unoccupied" critical habitat, because they were not essential to the conservation of the species and because the Service had failed to follow the step-wise process mandated by its own regulations. 2-ER-91. Rosemont also argued that the Service had improperly focused on conserving the small group of jaguars within the NRU, treating that group as if it were the jaguar species. 2-ER-103.

On February 10, 2020, the District Court granted the Service's and CBD's cross-motions for summary judgment with respect to Rosemont's cross-claims, and denied Rosemont's cross-motion. 1-ER-3. The court agreed with Rosemont that the Service had erred in determining that the northern Santa Rita Mountains were "occupied" by jaguars, but it held that the Service had properly designated both Unit 3 (including the northern Santa Rita Mountains) and Subunit 4b as *unoccupied* critical habitat. 1-ER-40. The court relegated several of Rosemont's major arguments to footnotes and rejected them in a largely conclusory fashion, including Rosemont's arguments regarding the meaning of the statutory term "essential," the mandatory step-wise process the Service had failed to follow, and the Service's improper focus on jaguars within the NRU rather than the species as a whole. 1-ER-40–41. The District Court also granted summary judgment to CBD, and against the Service, on CBD's claim that the 2016 Biological Opinion improperly used a heightened standard in determining that the Rosemont Project was not likely to destroy or adversely modify critical habitat for the jaguar. 1-ER-13–14.

Rosemont timely appealed. 5-ER-801. On November 11, 2020, Rosemont filed a petition with the Service requesting that the critical-habitat designations be revised to exclude the Rosemont Project site. *See* Ex. A to Request for Judicial Notice. This Court stayed Rosemont's appeal pending the Service's ruling on that petition. Dkt. 15. On September 7, 2021, the Service denied Rosemont's petition,

and this Court subsequently lifted its stay. 90-Day Finding on a Petition to Revise Critical Habitat for the Jaguar, 86 Fed. Reg. 49,985, 49,986 (Sept. 7, 2021); Dkt. 25.

## STATUTORY AND REGULATORY BACKGROUND

The Endangered Species Act, 16 U.S.C. § 1531 *et seq.*, lies at the heart of this appeal. It directs the Secretary of the Interior to "determine whether any species is an endangered species or a threatened species." 16 U.S.C. § 1533(a)(1). An "endangered species" is "any species which is in danger of extinction throughout all or a significant portion of its range," and a "threatened species" is "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." *Id.* at § 1532(6), (20). A "species" includes "any subspecies of fish or wildlife or plants, and any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature." *Id*. at § 1532(16). The Secretary "shall publish in the Federal Register a list of all species determined by him . . . to be endangered species and a list of all species determined by him . . . to be threatened species." 16 U.S.C. § 1533(c)(1).

If the Secretary determines that a species should be listed as endangered or threatened, the Secretary "shall" "concurrently" "designate any habitat of such species which is then considered to be critical habitat." *Id*. at § 1533(a)(3)(A)(i). The ESA defines critical habitat as areas "essential to" or "essential for" the "conservation of the species." *Id*. § 1532(5)(A)(i)–(ii). The standard differs,

however, depending on whether an area is occupied by the species at the time the species is listed. *Id.* An "occupied" area may be designated as critical habitat if it contains "*physical or biological features* (I) *essential* to the conservation of the species and (II) which may require special management considerations or protection." *Id*. § 1532(5)(A)(i) (emphasis added). An unoccupied area may be designated as critical habitat "upon a determination by the Secretary that such *areas are essential* for the conservation of the species." *Id*. § 1532(5)(A)(ii) (emphasis added). The standard for designating unoccupied critical habitat is "a more demanding standard than that of occupied critical habitat." *Home Builders Ass'n of N. Cal. v. U.S. Fish & Wildlife Serv.*, 616 F.3d 983, 990 (9th Cir. 2010); *see also Ariz. Cattle Growers' Ass'n v. Salazar*, 606 F.3d 1160, 1163 (9th Cir. 2010) ("The statute . . . impos[es] a more onerous procedure on the designation of unoccupied areas.").[5]

---

[5] Judge Jones of the Fifth Circuit has provided the following helpful explanation: "Suppose a eucalyptus tree is located in my yard. Whether the tree—a feature of my homestead—is essential to koala bear conservation would require an analysis of the tree's attributes only. But whether my homestead—a specific 'area'—is 'essential' to the species' conservation would be a more substantial undertaking. That analysis would assess not only the tree's attributes, but also the attributes of every constituent part—essential to the species' conservation or not—of my homestead. The analysis of an entire (unoccupied) area thus entails a broader and more complex investigation than an analysis of two or three features present in an area already occupied by the species." *Markle Interests, L.L.C. v. U.S. Fish & Wildlife Serv.*, 848 F.3d 635, 646–47 (5th Cir. 2017) (Jones, J., dissenting from denial of rehearing en banc).

The Fish and Wildlife Service has promulgated regulations under the ESA governing the designation of critical habitat. The regulations in effect when the Service made the challenged designations provided that: "The Secretary shall designate as critical habitat areas outside the geographical area presently occupied by a species *only when a designation limited to its present range would be inadequate to ensure the conservation of the species*." 4-ER-775 (emphasis added).

Finally, Section 4(b)(2) of the ESA, codified at 16 U.S.C. § 1533(b)(2), requires the Service to weigh the "economic" and "other" "impact[s]" of designating critical habitat. Specifically, the statute provides that the Secretary "shall designate critical habitat, and make revisions thereto, . . . on the basis of the best scientific data available and after taking into consideration the economic impact, the impact on national security, and any other relevant impact, of specifying any particular area as critical habitat." 16 U.S.C. § 1533(b)(2). The Secretary may then "exclude any area from critical habitat if he determines that the benefits of such exclusion outweigh the benefits of specifying such area as part of the critical habitat," as long as the exclusion will not result in the extinction of the species. *Id.*

In 2013, the Service issued a regulation adopting the "'incremental analysis' or 'baseline approach'" it uses in "compar[ing] the impacts with and without the designation." Revisions to the Regulations for Impact Analyses of Critical Habitat, 78 Fed. Reg. 53,058, 53,062 (Aug. 28, 2013). Under this approach, "the costs that

stem from listing are simply not relevant, except as setting the baseline against which to measure the incremental impacts of designation." *Id*. at 53,067.

## STANDARD OF REVIEW

The Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*, governs judicial review of agency action. Under the APA, an agency action should be set aside "if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Nw. Ecosystem All. v. U.S. Fish & Wildlife Serv.*, 475 F.3d 1136, 1140 (9th Cir. 2007) (quoting 5 U.S.C. § 706(2)(A)). Agency action is arbitrary and capricious when, *inter alia*, the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency," or rendered a decision "so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *see also Michigan v. EPA*, 576 U.S. 743, 750 (2015) ("Not only must an agency's decreed result be within the scope of its lawful authority, but the process by which it reaches that result must be logical and rational.") (quoting *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374 (1998)).

This Court reviews a grant of summary judgment *de novo*. *San Luis & Delta-Mendota Water Auth.*, 776 F.3d 971, 991 (9th Cir. 2014).

## SUMMARY OF ARGUMENT

The Service's designation of the northern Santa Rita Mountains (which fall within Unit 3) and Subunit 4b as "critical habitat" for the jaguar was arbitrary and capricious, yet the District Court upheld those designations. This Court should reverse for at least three independent reasons.

First, the Service and the District Court both disregarded the plain meaning of "essential" in the ESA's definition of "critical habitat" as habitat "essential to" or "essential for" "the conservation of the species." 16 U.S.C. § 1532(5)(A)(i)–(ii). The plain meaning of "essential" denotes that which is *indispensable* or *necessary*, as confirmed by multiple dictionary definitions of that term, the ESA's surrounding statutory text, judicial interpretations of "essential," and the ESA's legislative history. By refusing to actually define what "essential" means and implicitly assuming that it encompasses anything that would be merely convenient or helpful to conserving a small group of jaguars, the Service contravened the plain meaning of "essential." The Service also acted contrary to the plain meaning of "species," as defined by the ESA, by focusing on habitat it considered helpful to conserving the NRU jaguars, as opposed to habitat essential to conserving the jaguar species as a whole. The NRU contains less than 3% of the jaguar's worldwide habitat. The critical habitat designated in the United States constitutes just 1.4% of the NRU and less than 0.04% of the jaguar's total habitat. Yet the Service relied on

the purported benefits to the 600 jaguars in the NRU—just 2% of the total jaguar population—to justify its critical-habitat designations.

Second, the District Court erred in upholding the Service's arbitrary and capricious designation of unoccupied areas as "critical habitat" without adhering to the "step-wise" process mandated by its own regulations. Under the Service's two-step approach, it must first examine whether designating occupied areas as "critical habitat" will suffice to conserve the species before then considering whether expanding the designation to include unoccupied areas would be essential to the species' conservation. The Service failed to comply with this process here, instead collapsing these two sequential inquiries into one.

Finally, the District Court eliminated the key predicate underlying the Service's economic-impact analysis, but left the outcome of that analysis undisturbed. The court should have instead taken the only step that could have followed, as a matter of law and logic, from its elimination of that predicate: vacating the Service's challenged designations and remanding for further consideration of economic impacts.

## ARGUMENT

**I.** **The District Court Erred in Upholding the Service's Arbitrary and Capricious Designation of "Critical Habitat" That Is Not "Essential to the Conservation of the Species."**

The ESA defines "critical habitat" as habitat "essential to" or "essential for" "the conservation of the species." 16 U.S.C. § 1532(5)(A)(i)-(ii). But designating the over 62,000 acres at issue would, at most, be helpful, rather than *essential*, to the conservation of a small group of jaguars in northwestern Mexico, rather than the jaguar species as a whole.

### A. The Service Designated "Critical Habitat" That Is Not "Essential."

The Service's challenged designations of the northern Santa Rita Mountains (the portion of Unit 3 around the Rosemont Project site) and Subunit 4(b) as "critical habitat," and the District Court's upholding those designations, contravene the plain meaning—indeed, any reasonable interpretation—of the statutory term "essential." This Court should therefore reverse and remand with instructions to vacate the challenged designations.

#### 1. The Plain Meaning of "Essential," as Used in the ESA, Denotes That Which Is Indispensable or Necessary.

The plain meaning of "essential" is *indispensable* or *necessary*. Yet as Judge Hartz of the Tenth Circuit recently suggested in concurring with a decision holding that the Service's designation of "critical habitat" for the jaguar (the portion in New Mexico) was unlawful, the Service has improperly treated "essential" as

meaning "merely convenient or helpful." *N.M. Farm & Livestock Bureau v. U.S. Dep't of Interior*, 952 F.3d 1216, 1233 (10th Cir. 2020) (Hartz, J., concurring).

*Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), sets forth the familiar two-step inquiry that governs when courts should defer to an agency's interpretation of a statute. Under the first step, a court must ask "whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43. To determine Congress's intent, courts "start with the plain statutory text." *Altera Corp. & Subsidiaries v. Comm'r of Internal Revenue*, 926 F.3d 1061, 1075 (9th Cir. 2019). If there is no uncertainty as to the term's plain meaning, "there is no plausible reason for deference" to the agency's interpretation. *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019). "The [statute] then just means what it means—and the court must give it effect, as the court would any law." *Id.* Courts may also consider "the legislative history, the statutory structure, and other traditional aids of statutory interpretation in order to ascertain congressional intent." *Altera*, 926 F.3d at 1075. Here, each clearly establishes that "essential" means "indispensable" or "necessary."

***Plain Meaning and Dictionary Definitions.*** Turning first to the plain meaning of "essential," there can be no doubt that essential means something

indispensable or necessary, rather than something that is merely convenient or helpful. If a doctor tells a patient it is "essential" that she receive certain medical treatment, the treatment is not merely helpful or nice to have; it is necessary. Or, to say that a quarterback is an "essential" member of a football team is to say that the quarterback is "indispensable."

Dictionaries reflect the same understanding, and consistently define essential as something "indispensable," "necessary," "requisite," or "of the utmost importance." *See, e.g.*, Black's Law Dictionary (10th ed. 2014) ("Indispensable or basic: Necessary"); Oxford English Dictionary (online) (Sept. 2021) ("Absolutely necessary; indispensably requisite"); Webster's New Universal Unabridged Dictionary (2d ed. 1983) ("indispensable; requisite"); Webster's Third New International Dictionary (1968) ("Necessary, indispensable"); Merriam-Webster's Collegiate Dictionary (10th ed. 2000) ("of the utmost importance" or "indispensable"). Where, as here, "[v]irtually every dictionary [the court is] aware of" gives a term a certain meaning, the court will give effect to that meaning under the first step of *Chevron*. *MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218, 225 (1994); *see also Lagandaon v. Ashcroft*, 383 F.3d 983, 988 (9th Cir. 2004) (holding that the statutory term "when" was unambiguous where "[a]ll the dictionaries we have examined agree" on the meaning of the term); *Argo Dutch Indus. Ltd. v. U.S.*, 508 F.3d 1024, 1031 (Fed. Cir. 2007) (refusing to defer to

agency's interpretation of "affiliated" and "affiliate" where "[e]very dictionary we have consulted defines these words" in a way contrary to the agency's interpretation). The dictionary definitions of "essential" thus establish that it unambiguously means that which is indispensable or necessary. Any contrary meaning would "go[] beyond the meaning that the statute can bear." *MCI Telecomms. Corp.*, 512 U.S. at 229.

***Surrounding Statutory Text.*** The surrounding statutory text confirms this understanding of "essential." To begin with, "essential" is used as part of the definition—and thus expounds on the meaning—of "*critical* habitat." Because a term is generally defined by reference to like terms, the meaning of "critical" sheds light on the proper construction of "essential." *See, e.g.*, *Yates v. United States*, 574 U.S. 528, 543 (2015) ("[W]e rely on the principle of *noscitur a sociis*—a word is known by the company it keeps."). And "critical" means "indispensable, vital," Merriam-Webster's Collegiate Dictionary (10th ed. 2000); "important or essential for determining," Webster's New Universal Unabridged Dictionary (2d ed. 1983); or "indispensable for the weathering, the solution, or the overcoming of a crisis," Webster's Third New International Dictionary (1968). *See also* Oxford English Dictionary (online) (Sept. 2021) ("Of decisive importance in relation to the issue"); Webster's II New College Dictionary (1995) ("Designating materials and products essential to a condition or project but in short supply.").

Moreover, the ESA requires that critical habitat be "essential *to*" or "essential *for*" the "conservation of the species." 16 U.S.C. § 1532(5)(A) (emphases added). It then defines "conservation" as "the use of all methods and procedures which are *necessary* to bring any endangered species or threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary." 16 U.S.C. § 1532(3) (emphasis added). And "necessary," like essential, means "indispensable." *See, e.g.,* Black's Law Dictionary (10th ed. 2014) ("Absolutely required: Indispensable; Needed to bring about a certain effect or result"); Oxford English Dictionary (online) (Sept. 2021) ("Indispensable, vital, essential; requisite"); Webster's New Universal Unabridged Dictionary (2d ed. 1983) ("That cannot be dispensed with; essential; indispensable"). In requiring that critical habitat be necessary to the recovery of the species, the ESA makes plain that "essential" means indispensable, or something much more than just helpful.

***Judicial Interpretations.*** Courts have likewise interpreted the ESA's reference to "critical habitat" that is "essential" as meaning habitat that is "indispensable." In *Weyerhaeuser Co. v. U.S. Fish & Wildlife Service*, 139 S. Ct. 361 (2018), for example, the Supreme Court considered the meaning of "critical habitat" (as used in the ESA) in holding that an area must be habitable by the species in order to constitute "critical habitat." In reaching its holding, the Court noted that the definition of "critical habitat" does not speak to the meaning of "habitat" but

28

instead "identifies only certain areas that are *indispensable* to the conservation of the endangered species." *Id.* at 369 (emphasis added).

Similarly, the Central District of California, in a decision affirmed by this Court, read "essential" as "indispensable"—a construction advanced by *the Service* in that case. *Bear Valley Mut. Water Co. v. Salazar*, 2012 WL 5353353, at *22 (C.D. Cal. Oct. 17, 2012) ("Federal Defendants argue that if something is essential, not having it is necessarily inadequate. Otherwise, it would not be essential. The Court agrees."), *aff'd Bear Valley Mut. Water Co. v. Jewell*, 790 F.3d 977, 994 (9th Cir. 2015). The court—citing dictionary definitions of "essential"—held that "[t]o be essential is to be absolutely necessary, extremely important, or indispensable." 2012 WL 5353353, at *22. And on appeal, this Court affirmed, explaining that, "[a]s the district court properly found, '[i]f certain habitat is essential, it stands to reason that if the [Service] did not designate this habitat, whatever the [Service] otherwise designated would be inadequate.'" 790 F.3d at 994 (quoting 2012 WL 5353353, at *22).

Last year, the Tenth Circuit considered the same designation of critical habitat at issue in this case (albeit for those areas designated just across the state line in New Mexico), and held that the Service acted arbitrarily and capriciously. In a concurrence, Judge Hartz noted that "[t]he administrative record raises concerns about whether the Service defined *essential* to mean merely convenient or helpful,"

29

and advised the Service to "be more careful after remand." *N.M. Farm & Livestock*, 952 F.3d at 1233 (Hartz, J., concurring) (emphasis in original).

Judge Owen of the Fifth Circuit reached a similar conclusion regarding the meaning of "essential" under the ESA. In *Markle Interests, L.L.C. v. U.S. Fish & Wildlife Serv.*, 827 F.3d 452 (5th Cir. 2016), *vacated sub nom. by Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 139 S. Ct. 361 (2018), a divided panel issued an opinion that erroneously held that "critical habitat" need not be habitable; that opinion was later vacated by the Supreme Court. In her dissent, Judge Owen correctly explained that "[t]he word 'essential' means more than desirable" and noted that "Black's Law Dictionary defines 'essential' as '2. Of the utmost importance; basic and necessary. 3. Having real existence, actual.'" 827 F.3d at 483 (Owen, J., dissenting).

***Legislative History.*** Finally, the ESA's legislative history leaves no doubt that Congress intended "essential" to mean "indispensable" or "necessary." When Congress originally enacted the ESA in 1973, the term "critical habitat" was left undefined. Based on concerns that the Service was designating far too much land, not all of which was truly "critical" to species conservation, Congress amended the ESA in 1978 to narrow the Service's overbroad reading of "critical habitat." The Senate report for the 1978 amending legislation criticized the Service's past practice as failing to distinguish between areas that are "*truly critical* to the continued

existence of a[n endangered] species" and areas that would merely "extend the range of [the] species." S. Rep. No. 95-874, at 9-10, 95th Cong. 2d Sess. 10 (emphasis added). Citing the critical habitat then proposed for the grizzly bear as an example of this overreach, the Senate report explained: "Much of the land involved in this proposed designation is not habitat that is *necessary* for the continued survival of the bear. It instead is being designated so that the present population within the true critical habitat can expand." *Id.* (emphasis added).

The House report similarly criticized the Service's interpretation and application of "critical habitat" because it "could conceivably lead to the designation of virtually all of the habitat of a listed species as its critical habitat." H.R. Rep. No. 95-1625, 95th Cong., 2d Sess. 16, at 25, reprinted in 1978 U.S. Code Cong. & Admin. News 9453, 9468. The House report further cautioned that the Service "should be *exceedingly circumspect* in the designation of critical habitat outside of the presently occupied area of the species." *Id.* at 18. Congress then enacted a new definition of "critical habitat"—the one currently in force—to "narrow[] the scope of the term as it is defined in the existing regulations." *Id.* at 25; 16 U.S.C. § 1532(5)(A).

### 2. Even If "Essential" Were Ambiguous, the District Court Should Not Have Deferred to the Service's Unstated, Shifting, and Unreasonable Interpretation.

Under the second step of *Chevron*, "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." 467 U.S. at 843. When a statute is ambiguous, a court will defer to the agency's interpretation only if that interpretation is a "reasonable" one. *Nat'l Cable & Telecomms. Ass'n. v. Brand X Internet Servs.*, 545 U.S. 967, 980 (2005). Even if the meaning of "essential" were ambiguous (it is not), the Service has failed to provide any construction of "essential" to which this Court—or the District Court—could reasonably defer. And the Service's implicit understanding of "essential" undergirding its Final Rule is patently unreasonable.

In both its Final Rule and the proceedings below, the Service was conspicuously silent as to how it defined "essential." Instead, the Service claimed, remarkably, that it could continually shift its understanding of "essential" on a "case-by-case" basis, and that courts would then have to defer to the Service's unstated interpretations, wherever they may land and whatever result they may lead to in any given case. Dkt. 116 at 11–12, *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, No. 4:17-cv-00475 (D. Ariz.); *see also id.* at 12 ("It is of no import that FWS did not define [essential] . . . ."). But such an ad hoc, results-driven approach is not

32

entitled to *Chevron* deference, and would substitute bureaucratic fiat for law. *Chevron* does not require deference when an agency has failed to actually define a purportedly ambiguous statutory term. If the law were otherwise, agencies would be free to reach whatever result they wanted in any given matter and then reverse-engineer new definitions of statutory terms to rationalize that result. While *Chevron* calls for deference to agencies in appropriate circumstances, "deference is not abdication." *Otay Mesa Prop., L.P. v. U.S. Dep't of Interior*, 646 F.3d 914, 916 (D.C. Cir. 2011) (Kavanaugh, J.). Yet that is exactly what would ensue if *Chevron* deference were given to the Service's continuously shifting definition of "essential."

The District Court nonetheless deferred to the Service's unspecified understanding of "essential" in upholding its challenged critical-habitat designations. Without ever defining what "essential" means, the District Court ruled in conclusory fashion that "[t]he record shows that the [Service] applied the appropriate 'essential' standard to the jaguar," and that Rosemont's "higher standard would not be in accordance with the intent of the ESA." 1-ER-41. The court relied on language from *Home Builders Association of Northern California v. U.S. Fish & Wildlife Service*, 616 F.3d 983, 989 (9th Cir. 2010), stating that the Service must "'be *more generous* in defining area[s] as part of the critical habitat designation.'" 1-ER-41 (quoting *Home Builders*, 616 F.3d at 989) (emphasis in original). But *Home Builders* never considered the meaning of "essential" as used in the ESA, but

33

instead concerned only the number of physical or biological features that must be included in a critical-habitat designation. 616 F.3d at 988. And the "more generous" language was a reference to this Court's decision in *Gifford Pinchot Task Force v. U.S. Fish & Wildlife Service*, 378 F.3d 1059, 1070 (9th Cir. 2004), which held that critical habitat is that which is necessary for both a species' survival and its recovery. 616 F.3d at 983. *Gifford Pinchot*, like *Home Builders*, sheds no light on the meaning of "essential."

Although it never defined what "essential" means, the Service's implicit understanding of the term—as reflected in its Final Rule and its critical-habitat designations—was that it covered not only habitat that was indispensable or necessary to the conservation of the jaguar, but also areas that could be merely convenient or helpful to the jaguar. *See, e.g.*, 2-ER-248 ("[W]e determined that the designation of critical habitat for the jaguar would be *beneficial* to the species." (emphasis added)); *see also* 2-ER-282 ("Critical habitat designation would have long-term, beneficial conservation-related impacts on jaguar survival and recovery . . . ."); 2-ER-217 ("[T]he portion of the United States [designated as critical habitat] is located within a secondary area that provides a recovery function benefitting the overall [NRU]."). But that understanding of "essential" is contrary

34

to its plain meaning and "goes beyond the meaning that the statute can bear." *MCI Telecomms. Corp.*, 512 U.S. at 225.

Neither the northern Santa Rita Mountains within Unit 3 nor the Subunit 4b travel corridor is "essential" to the jaguar's conservation, as that statutory term is properly understood. The overwhelming majority of jaguars are located in South America, Central America, and Mexico—not the United States. There are more than 30,000 jaguars in the wild, occupying between 2.17 billion and 2.88 billion acres of habitat in some 17 different nations. 4-ER-724; *see also* 4-ER-767; *supra* at 7–9. In contrast, from 1996 through 2011, "five, possibly six individual jaguars have been documented in the U.S." 4-ER-726. Given the jaguar's ten-year life span, 2-ER-224, most of these jaguars are likely no longer alive. But even assuming the presence of six jaguars in the United States, that constitutes just 0.02% of the total worldwide population of jaguars. 4-ER-724; 4-ER-726. Moreover, in designating the "critical habitat" at issue, the Service relied on just *two* jaguar sightings in Unit 3: the presence of one male jaguar in 1965 (in the Patagonia Mountains) and another in 2012—47 years later. 2-ER-236. Protecting land that might benefit a miniscule fraction of the species cannot possibly be regarded as "essential" to the conservation of the species.

Furthermore, there is no evidence that Subunit 4b has ever been used by jaguars. 3-ER-462 (Subunit 4b "is not known to have ever been used by jaguars");

3-ER-475 ("no jaguar has ever been documented using Subunit 4b"). Instead, Subunit 4b is "essential" to conserving the species, in the Service's view, because it allegedly provides "connectivity from the Whetstone Mountains [in Arizona] to Mexico." 2-ER-237. But such "linkages to [other] populations [of the species] are not essential to the conservation of the species." *All. for the Wild Rockies v. Lyder*, 728 F. Supp. 2d 1126, 1140 (D. Mont. 2010) (agreeing with the Service that it need not designate certain connectivity corridors for the Canada lynx because "connectivity to marginal or sink populations is unnecessary to conserve the species").[6]

In fact, the Service previously relied on the scarcity of jaguars in the United States in *declining* to designate critical habitat, and conceded, in a 2006 finding, that jaguar habitat in the United States is *not* essential to the conservation of the species. In the Service's own words:

> Because the area used by jaguars in the United States is such a small part of the overall range of the species and because of nomadic use by jaguars, *the range of the jaguar in the United States is not enough area to provide for the conservation (i.e., recovery) of the jaguar or even make a significant contribution to the conservation of the jaguar, and*

---

[6] Moreover, the Service failed to explain why designating Subunit 4b is necessary given the alternate travel corridor provided by Subunit 4c (the more direct route to Mexico). *See* 2-ER-237. The Service acknowledged that "[e]ither Subunit 4b or 4c may be used by the jaguar" to travel between Subunit 4a and Mexico, but concluded, in another leap of logic, that "we have no reason not to include [*both* of] these areas as critical habitat, regardless of which one provides a more direct connection." 2-ER-254 (emphasis added).

> *cannot be defined as essential to the conservation of the species*. Any conservation actions for the jaguar that may bring the species to the point that the measures of the Act are no longer necessary will need to be implemented *in Mexico and Central and South America*. Thus, recovery of the species as a whole depends on conservation efforts in Mexico and Central and South America.

4-ER-783 (emphases added). Although the Service reversed this finding after it was vacated and remanded for further explanation by another district judge, *Ctr. for Biological Diversity v. Kempthorne*, 607 F. Supp. 2d 1078, 1091 (D. Ariz. 2009), the Service has never explained how its earlier finding that areas in the United States "cannot be defined as essential to the conservation of the species," 4-ER-783, can be squared with its later reversal of course. *See F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515–16 (2009) (an agency must provide "a reasoned explanation . . . for disregarding facts and circumstances that underlay or were engendered by [its] prior policy").

Instead, in reversing its finding in 2010, the Service simply stated that because jaguars have been found in the United States in the past and may occur . . . in the future," and "there are physical and biological features that can be used by jaguars in the United States," "the designation of critical habitat for the jaguar would be beneficial." 4-ER-770. That jaguars may occasionally wander into the United States from Mexico and may "benefit" from the designation of critical habitat does not alter the agency's 2006 finding that "the range of the jaguar in the United States . . . cannot

be defined as essential to the conservation of the species," and the Service has never explained how it could. 4-ER-783.

The Service's 2012 proposed rule similarly concedes that the challenged "critical habitat" is far from essential. The Service acknowledged in its proposed rule that the "more open, dry habitat of the southwestern United States has been characterized as *marginal* habitat for jaguars in terms of water, cover, and prey densities" and that only "a few, *possibly resident jaguars* are able to use the more open, arid habitat found in the southwestern United States." 4-ER-684 (emphases added). Habitat that is "marginal" and, at best, capable of supporting a "few *possibly* resident jaguars" cannot be essential—i.e., indispensable or necessary—to the conservation of the species.

The Recovery Outline the Service repeatedly relies on to support its Final Rule similarly underscores the minimal value of designating jaguar "critical habitat" in the United States. In the Recovery Outline, the Service designated certain "core" and "secondary" areas of jaguar habitat. But there are indisputably no core areas in the United States. 4-ER-730. "South-central and southeastern Arizona" is instead designated as a "secondary area": one in which, according to the Recovery Outline, the "[q]uality and quantity of jaguar habitat is lower compared to core areas" and where "[j]aguar habitat is likely less optimal." 4-ER-730.

38

Importantly, secondary areas "are of particular interest" only when "they occur *between* core areas." 4-ER-729 (emphasis added); *see also* 4-ER-746. But that cannot be the case as to the "secondary" habitat designated here, as the following map included in the Recovery Outline shows:



4-ER-766.

The Recovery Outline also discusses a 2007 study dividing the "currently occupied range" of the jaguar into 90 different "Jaguar Conservation Units" ("JCUs"), which encompassed all areas "known or believed to contain a population of resident jaguars large enough . . . to be potentially self-sustaining" and all "areas containing fewer jaguars but with adequate habitat and stable, diverse prey base, such that jaguar populations in the area could increase if threats were alleviated." 4-ER-724. The two most northwestern JCUs were both in Mexico—none of the 90

39

units fell within the United States. *Id.* As the Recovery Outline concludes—in a statement reminiscent of the Service's 2006 finding that designating jaguar habitat in the United States is not essential—"*[b]ecause such a small portion of the jaguar's range occurs in the U.S., it is anticipated that recovery of the species will rely primarily on actions that occur outside the U.S.* Activities that may adversely or beneficially affect jaguars in the U.S. are far less likely to affect recovery than activities in the core areas of their range." 4-ER-746 (emphasis added).

Moreover, with respect to the northern Santa Rita Mountains, the Service incorrectly assumed, when it issued its Final Rule, that Unit 3—which contains the northern Santa Rita Mountains—was occupied, an assumption the District Court correctly rejected. 1-ER-40. And while the Service purported to analyze, in the alternative, whether Unit 3 was "essential to the conservation of the species" even if unoccupied, that perfunctory analysis cannot carry the day. *See, e.g.*, 2-ER-225, 250–51.

On this last point, *Otay Mesa Property, L.P. v. U.S. Department of the Interior*, 344 F. Supp. 3d 355 (D.D.C. 2018), is instructive. There, in designating unoccupied critical habitat for the Riverside fairy shrimp, the Service "gestured to the required, 'essential for the conservation of the species' finding, . . . but did nothing more to substantiate this conclusory finding." *Id.* at 375. The court granted summary judgment for Otay Mesa, holding that the Service's "designation of

Otay Mesa's property as either occupied or unoccupied critical habitat for the Riverside fairy shrimp was arbitrary and capricious." *Id.* at 379. The court explained that although Congress did not define "essential," "that alone does not mean that the [Service's] bald statement that these are areas essential for the conservation of the species in the 2012 Rule has to be accepted." *Id.* at 375.

So too here. In designating Unit 3 as "critical habitat" even if unoccupied, the Service merely "gestured" to the required finding for unoccupied habitat but did nothing to substantiate its conclusory assertions. 344 F. Supp. 3d at 375; *see also McDonnell Douglas Corp. v. U.S. Dep't of the Air Force*, 375 F.3d 1182, 1187 (D.C. Cir. 2004) (courts "do not defer to the agency's conclusory or unsupported suppositions"); *Garcia v. Holder*, 659 F.3d 1261, 1267 (9th Cir. 2011) (giving "only limited deference" to agency decision that is "conclusory or lacks meaningful analysis"). And it is now, of course, far too late in the day for the Service to provide the requisite explanation. *See Otay Mesa Prop.*, 646 F.3d at 917 ("This Court of course may not supply a reasoned basis for the agency's action that the agency itself has not given."). Nor may the Service now attempt to effectively rewrite its Final Rule on appeal and rationalize how the challenged designations are "indispensable" and "necessary"—i.e., actually *essential*—to the conservation of the jaguar species. *See, e.g.*, *Motor Vehicle Manufacturers Ass'n v. State Farm Mutual*

*Automobile Ins. Co.*, 463 U.S. 29, 50 (1983) ("[C]ourts may not accept appellate counsel's post hoc rationalizations for agency action").

The Service's Final Rule, which designates land that is merely helpful or "nice to have" as "critical habitat" for the jaguar, contravenes the plain meaning of "essential" and cannot be regarded as a reasonable construction or understanding of that statutory term. Under either step of *Chevron*, the Service acted arbitrarily and capriciously in designating the challenged "critical habitat," and the District Court reversibly erred in upholding those designations.

### B. The Service Improperly Designated "Critical Habitat" Beneficial, at Most, to Conserving a Small Group of Jaguars in the NRU.

In addition to contravening the plain meaning of the statutory term "essential," the Service also violated the ESA by treating the small group of jaguars in the Northwestern Recovery Unit—an area almost entirely in Mexico—as tantamount to the jaguar species as a whole. In other words, the Service designated "critical habitat" helpful to those NRU jaguars, rather than "critical habitat" "essential to" or "essential for" the "conservation of the *species*." 16 U.S.C. § 1532(5)(A) (emphasis added). The District Court carried forward this error in a conclusory footnote stating that "the NRU is for the benefit of the entire species, not just the jaguars within it, and supporting [the NRU] is essential to the recovery of the entire species." 1-ER-41–42 (citing 4-ER-748). That, too, conflates a benefit to the NRU with a benefit to the species as a whole and independently warrants reversal.

42

The ESA defines "species" as "includ[ing] any subspecies of fish or wildlife or plants, and any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature." 16 U.S.C. § 1532(16). But the jaguars within the NRU are neither a subspecies nor a distinct population segment, and the Service has never found that they qualify as either. A "subspecies" is a biological classification applied to a genetically distinct, named subgroup of a species. *See* Webster's Third New International Dictionary (1968) (defining subspecies as "a morphologically distinguishable group" within a species). The Service has not listed any jaguar subspecies, undoubtedly because "molecular genetic analyses have revealed that subspecies recognition may not be warranted in jaguars." 4-ER-712. The Service has also not listed any "distinct population segment" of jaguars. *See* Policy Regarding the Recognition of Distinct Vertebrate Population Segments Under the Endangered Species Act, 61 Fed. Reg. 4,722, 4,725 (Feb. 7, 1996).

Nevertheless, the Service effectively treated the NRU and its small group of jaguars as equivalent to the entire jaguar species, in designating habitat beneficial to the small group of jaguars in the NRU, rather than habitat *essential* to the conservation of the *jaguar species as a whole*. That is both contrary to the plain meaning of "species" and an unreasonable interpretation or application of that statutory term.

The NRU contains just 86,000 square miles, or less than 3% of the jaguar's total range. 4-ER-724–25, 731. It contains just two "core" jaguar areas, 4-ER-766, both of which are in Mexico, and those core areas contain about 600 jaguars, or merely 2% of the total worldwide jaguar population. 4-ER-724–25. The areas designated as critical habitat in the United States make up only 1.4% of the NRU and a miniscule fraction of the jaguar's total habitat (0.04%), and contain at most a handful of jaguars (and no breeding population). 2-ER-215.

Despite the small size of the NRU and its limited group of jaguars, the Service relied on it to justify designating "critical habitat" over the Rosemont Project site. The Service found, for example, that the "critical habitat" it designated was "not being designated to create a self-sustaining, breeding population north of the U.S.-Mexico border," 2-ER-267, but rather to "provide areas to support some individuals during dispersal movements, by providing small patches of habitat (perhaps in some cases with a few resident jaguars), and as areas for cyclic expansion and contraction of the nearest core area and breeding population in Mexico [i.e., the core areas within the NRU]." 2-ER-254.

The Service also stated that the "specific areas within [the] secondary area" of habitat in the United States could "contribute to the species' persistence . . . by providing . . . areas for cyclic[al] expansion and contraction of the nearest core area and breeding population *in the Northwestern Recovery Unit* (about 210 km (130 mi)

south of the U.S.-Mexico border)." 2-ER-267 (emphasis added); *see also* 2-ER-225 (critical habitat "contribute[s] to the species' persistence in the United States by allowing the normal demographic function and possible range expansion *of the Northwestern Recovery Unit*, which is essential to the conservation of the species" (emphasis added)). In other words, the Service designated the "critical habitat" at issue not to support the jaguar species as a whole, but rather to benefit a small number of *individual* jaguars dispersing from the NRU. As to Subunit 4b, the Service similarly provided that "maintaining travel corridors to Mexico is essential for the conservation of jaguars *in the Northwestern Recovery Unit*." 2-ER-232 (emphasis added).

In making the challenged designations, the Service thus treated the small group of jaguars in the NRU as a "species" unto itself, contrary to the plain meaning (or any reasonable interpretation) of that statutory term, and contrary to the Service's implicit recognition elsewhere in its Final Rule that the jaguar "species" is distinct from the small group of jaguars in the NRU. *See, e.g.*, 2-ER-217 ("The Recovery Outline delineates two recovery units for the species, the Northwestern Recovery Unit . . . and the Pan American Recovery Unit . . . ."); 2-ER-252 (describing the NRU as "an area comprising jaguars in the northernmost portion of their range").

Finally, even if the statutory term "species" were ambiguous (it is not), the Service's de-facto treatment of the NRU jaguars as the jaguar "species" would still

be arbitrary and capricious, and something the District Court should have vacated and remanded to the Service for further consideration. *See E. Bay Sanctuary Covenant v. Garland*, 994 F.3d 962, 987 (9th Cir. 2020) ("[A]s we have previously observed in an APA case, § 706(2)(A) provides that a 'reviewing court shall . . . hold unlawful and set aside agency action . . . not in accordance with law.'"). Under either step of *Chevron*, once again, the Service's interpretation and application of "species" cannot stand, nor can the District Court's order upholding the Service's challenged critical-habitat designations.

## II. The District Court Erred in Failing to Vacate the Critical-Habitat Designations Despite the Service's Arbitrary and Capricious Failure to Follow the Two-Step Analysis Mandated by Its Own Regulations.

Although the Service's designations should have been vacated for the reasons explained above, reversal is independently warranted because the District Court erred in failing to vacate the challenged designations even though the Service failed to follow its own regulations. The regulation in effect when the Service made its challenged designations (and the current version of that regulation) required the Service to first consider whether designating areas *occupied* by the jaguar at the time of its listing in 1972 would have been sufficient to conserve the species, before the Service could then consider designating areas *unoccupied* by the jaguar. *See* 50 C.F.R. § 424.12(e) (2012); 50 C.F.R. § 424.12(b)(2) (2019). But the Service indisputably failed to follow this step-wise process here.

### A.     The Service's Regulations Require a Step-Wise Approach.

The Service's rule specifying the procedures for designating critical habitat, codified at 50 C.F.R. § 424.12, was first promulgated in 1980, and has been amended through notice-and-comment rulemaking four times since, including in 2012, 2016, and 2019.  The 2012 version of the rule, which was in effect when the Service published its Final Rule designating the "critical habitat" at issue, provided that "[t]he Secretary shall designate as critical habitat areas outside the geographical area presently occupied by a species ***only*** *when a designation limited to its present range would be **inadequate*** to ensure the conservation of the species."   4-ER-775 (emphases added).

The most natural reading of the rule's text is that it requires a two-step process.  By providing that unoccupied areas may be designated "*only when* a designation limited to [the species'] present range would be inadequate to ensure" its conservation, *id.* (emphasis added), the rule makes the inadequacy of habitat *occupied* by the species a condition precedent for designating *unoccupied* critical habitat.  In other words, the regulation requires two sequential steps:  First, the Service must determine whether designating just occupied areas would be insufficient to conserve the species.  Only if that condition precedent is satisfied may the Service then proceed to consider designating as critical habitat areas *unoccupied* by the species.

The Service has clarified, through subsequent amendments to Section 424.12, that the 2012 version of the rule required a step-wise approach. In its preamble to the 2016 amendment, the Service explained that it was abandoning the 2012 version's "rigid step-wise approach, i.e., first designating all occupied areas that meet the definition of 'critical habitat' (assuming that no unoccupied habitat is designated) and then, only if that is not enough, designating essential unoccupied habitat." 81 Fed. Reg. 7,414, 7,427 (Feb. 11, 2016). The Service amended the rule again in 2019, and explained that it was "*restoring* the requirement that the Secretary will first evaluate areas occupied by the species" before considering designating unoccupied habitat. 84 Fed. Reg. 45,020, 45,043 (Aug. 27, 2019) (emphasis added). It characterized the 2016 rule as "chang[ing] the step-wise approach we had been using since 1984 to allow for simultaneous consideration of occupied and unoccupied habitat." *Id*.

These statements leave no doubt that the 2012 version of Section 424.12 mandated a "rigid step-wise approach" that allowed the Service to designate unoccupied habitat only after first determining that the habitat occupied at the time of listing was inadequate to conserve the species. "[W]here an agency interprets its own regulation, . . . its interpretation of an ambiguous regulation is controlling under *Auer* [*v. Robbins*, 519 U.S. 452 (1997)] unless 'plainly erroneous or inconsistent with the regulation.'" *Bassiri v. Xerox Corp.*, 463 F.3d 927, 930 (9th Cir. 2006)

(quoting *Auer*, 519 U.S. at 461). The Service's interpretation of the regulation as requiring a step-wise process follows naturally from the text of the rule, and is entitled to *Auer* deference. The Tenth Circuit, reviewing the same critical-habitat designation (albeit in New Mexico), recognized as much in *New Mexico Farm and Livestock*, in which it correctly held that "the 2016 and 2019 rulemakings . . . support our conclusion that [the 2012 version of] § 424.12(e) required a sequential, 'step-wise' approach, under which the Service must find designation of occupied areas inadequate as a prerequisite to designating unoccupied areas." 952 F.3d at 1229.

While this Court, in *Bear Valley Mutual Water Co. v. Jewell*, 790 F.3d 977 (9th Cir. 2015), previously considered whether the ESA and the 2012 rule required a step-wise analysis, it did so without the benefit of the 2016 and 2019 rulemakings. As a result, the Court erroneously viewed the two steps as functionally identical. *See id*. at 994 ("Although appellants consider these to be two separate requirements, they are identical. The ESA requires the FWS to demonstrate that unoccupied area is 'essential' for conservation before designating it as critical habitat. The implementing regulation phrases the same requirement in a different way, and states that the FWS must show that the occupied habitat is not adequate for conservation.").

*Bear Valley* thus concluded that where the Service "sufficiently explained why the designation of unoccupied habitat . . . was essential," it had necessarily explained "why designation of solely occupied habitat was inadequate for the

49

conservation of the species." *Id.* That approach cannot be reconciled with the Service's subsequent interpretations of its own regulation; thus, *Bear Valley* no longer remains good law on this issue under the principles established by the Supreme Court in *Brand X*. *See* 545 U.S. at 982 ("A court's prior judicial construction of a statute trumps an agency construction otherwise entitled to *Chevron* deference *only if* the prior court decision holds that its construction follows from the *unambiguous* terms of the statute and thus leaves no room for agency discretion." (emphases added)); *see also Betansos v. Barr*, 928 F.3d 1133, 1141–42 (9th Cir. 2019) (applying *Brand X* and deferring to agency interpretation of an ambiguous statute, even though the agency's interpretation conflicted with the Ninth Circuit's in a prior decision); *Ctr. for Biological Diversity v. Zinke*, 900 F.3d 1053, 1063–64, 1067 (9th Cir. 2018) (same).

While *Brand X* concerned judicial deference to agencies' interpretations of *statutes*, courts applying *Brand X* have uniformly confirmed that it applies with equal (if not greater) force to an agency's interpretation of its own *regulations*. In *Levy v. Sterling Holding Co., LLC*, 544 F.3d 493 (3d Cir. 2008), the Third Circuit deferred to the Securities and Exchange Commission's interpretation of its own rules, even though a prior Third Circuit decision in the same case had interpreted those rules differently. *Id.* at 502–04. Citing *Brand X*, the Third Circuit concluded that there was "no reason why [its] principles should not apply equally to the

interpretation of a regulation. After all, '[w]hen the construction of an administrative regulation rather than a statute is in issue, deference is even more clearly in order.'" *Id*. at 502 (quoting *Udall v. Tallman*, 380 U.S. 1, 16–17 (1965)). Because its prior decision had not held that the relevant regulation *unambiguously* precluded the SEC's subsequent interpretation, that decision "d[id] not control the result . . . simply by virtue of the fact that it came first and ha[d] not been overturned." *Id*. at 503.

The Federal Circuit, relying on *Levy*, likewise held that "[t]he principles in [*Brand X*] apply equally to an agency's interpretation of its own regulations." *In re Lovin*, 652 F.3d 1349, 1354 (Fed. Cir. 2011). And at least two judges of this Court have stated that they agree with *Levy* and *Lovin*. *See Shahinyan v. Holder*, 518 F. App'x 545, 547–48 (9th Cir. 2013) (Ikuta, J., concurring, joined by O'Scannlain, J.) (citing *Levy* and *Lovin* and explaining that the Board of Immigration Appeals was "free to provide an authoritative construction" of its regulation, and that "[i]f it does so, we will have to reassess the continued validity of our contrary precedent as required by *Brand X*").

Here, faced with rulemakings from the agency that expressly interpret the ESA and Section 424.12 (2012) as requiring a step-wise process for the designation of unoccupied areas as critical habitat, the Court should "reassess the continued validity of [its] contrary precedent" in *Bear Valley*, "as required by *Brand X*." *Shahinyan*, 518 F. App'x at 547–48 (Ikuta, J., concurring).

51

**B.**    **The Service Failed to Follow the Required Step-Wise Process in Designating the Challenged "Critical Habitat."**

Although the Service acknowledged in its Final Rule that it was required to use a sequential, step-wise process, it failed to do so. The Service stated in its Final Rule that "[i]f, ***after*** *identifying occupied areas*, a determination is made that those areas are inadequate to ensure conservation of the species . . .[,] *we* ***then*** *consider*" whether to designate unoccupied areas as essential to conserving the species. 2-ER-233 (emphases added). But as the Tenth Circuit concluded as to the same designation of "critical habitat" at issue here (albeit for other portions across the state line—namely, Units 5 and 6 in New Mexico), the Service failed to follow the step-wise process mandated by the regulation. *See N.M. Farm & Livestock*, 952 F.3d at 1231. Specifically, the Service "did not find that the designation of areas occupied by jaguars in 1972 would be inadequate to ensure the conservation of the species," and did not "make findings about whether any individual unit designated as unoccupied was essential for the conservation of the species." *Id*. The same holds true for the challenged designations here (the northern Santa Rita Mountains and Subunit 4b), which both consist of unoccupied habitat.

The District Court correctly held that the northern Santa Rita Mountains were not occupied by the jaguar at the time of its listing in 1972. 1-ER-39–40. It reasoned that "[s]ightings or evidence outside the reasonable timeframe" of 1962 to 1982 (based on the jaguar's average ten-year lifespan) "should not have been considered"

in determining whether an area was occupied in 1972. *Id*. And there is no record of jaguar presence in the northern Santa Rita Mountains during the two decades from 1962 to 1982. *Id*. But the Service failed to make any finding that other areas it considered to be "occupied" were inadequate to conserve the jaguar species before it designated Unit 3 (which covers the northern Santa Rita Mountains) as unoccupied "critical habitat." The Service similarly designated Subunit 4b as unoccupied "critical habitat" without separately and expressly examining the sufficiency of any areas it considered "occupied."

In fact, as the Tenth Circuit correctly noted, nowhere in the Final Rule did the Service evaluate the adequacy of areas it considered occupied, prior to and separate from its analysis of whether unoccupied areas are "essential" to conserve the jaguar species. Instead, it "addressed all the units together, finding that to the extent they were not occupied, they were essential for the conservation of the species." *N.M. Farm & Livestock*, 952 F.3d at 1231. The Service's failure to follow its own regulations and apply a step-wise approach to the designation of unoccupied areas was arbitrary and capricious. *See id*. ("Because it did not follow its own regulations or provide a rational explanation for failing to do so, its designation of Units 5 and 6 as critical habitat was arbitrary and capricious."). Any conclusion to the contrary would unnecessarily conflict with the Tenth Circuit's recent, sound decision in *New Mexico Farm and Livestock*. *See Kelton Arms Condo. Owners Ass'n v.*

*Homestead Ins. Co.*, 346 F.3d 1190, 1192 (9th Cir. 2003) ("[W]e decline to create a circuit split unless there is a compelling reason to do so.").  This Court could avoid this issue entirely by holding that the District Court erred in upholding the Service's critical-habitat designations (*see* Section I, *supra*), but if it opts not to, then it should follow the Tenth Circuit's lead.

Significantly, on remand from the Tenth Circuit's decision in *New Mexico Farm and Livestock*, the District of New Mexico found that the Service's failure to follow the step-wise approach was a "fundamental flaw," "[t]he magnitude of [which] . . . is significant." *N.M. Farm & Livestock Bureau v. U.S. Dep't of Interior*, 2021 WL 275535, at *8 (D.N.M. Jan. 27, 2021).  The court concluded that it was "unlikely . . . that upon remand the Service would re-designate Unit 5 and Unit 6 as unoccupied critical habitat" if it used the two-step process mandated by its regulations.  *Id*.  The court therefore vacated the critical-habitat designations for the portions of Units 5 and 6 in New Mexico.  The Service, conceding that vacatur was warranted, then removed approximately 110,438 acres in New Mexico from its designation of "critical habitat" for the jaguar.  *See id.*, at *4, 8; Revision of the Critical Habitat Designation for the Jaguar in Compliance With a Court Order, 86 Fed. Reg. 38,570 (July 22, 2021).

The same should happen here with respect to the challenged designations of the northern Santa Rita Mountains and Subunit 4b.

### III. The District Court Erred By Failing to Remand to the Service to Reconsider Its Economic-Impact Analysis.

Under Section 4(b)(2) of the ESA, "[t]he Secretary shall designate critical habitat, and make revisions thereto, . . . on the basis of the best scientific data available and after taking into consideration the economic impact, the impact on national security, and any other relevant impact, of specifying any particular area as critical habitat." 16 U.S.C. § 1533(b)(2). "The Secretary may exclude any area from critical habitat if he determines that the benefits of such exclusion outweigh the benefits of specifying such area as part of the critical habitat, unless he determines . . . that the failure to designate such area as critical habitat will result in the extinction of the species concerned." *Id*. The District Court gutted the foundation for the Service's assessment of economic impacts by eliminating a crucial predicate of that analysis—one that, in the Service's own words, was a "major determining factor" for its conclusion. 2-ER-269. Yet the District Court failed to take the logical next step: vacating the Service's challenged designations and remanding for the Service to redo its economic-impact analysis.

The Service did "not f[i]nd any disproportionate impacts, economic or other, on the Rosemont Mine due to the critical habitat designation" and "[t]herefore, [it] did not find it to be reasonable or appropriate . . . to enter into the discretionary exclusion analysis about whether to exclude the mine from the final designation." 2-ER-263. In other words, the Service did not actually consider whether to exclude

55

the northern Santa Rita Mountains (including the Rosemont Project site) and Subunit 4b from its designation of "critical habitat" for the jaguar; it merely made a threshold determination that it did not need to engage in an exclusion analysis given its assessment that the economic impact would be minimal.

That conclusion, in turn, rested on a predicate assumption that did not survive the District Court's decision. The Service assumed that "the construction and operation of the Rosemont Mine would not . . . adversely modify designated critical habitat." 2-ER-269. In making this assumption, the Service relied on its 2013 Biological Opinion, which had concluded as much. *See* 2-ER-243, 269; 1-ER-13–14.

The economic report that the Service commissioned and relied on in conducting its economic-impact analysis illustrates the significance of this assumption. It explained that, "[a]t the high end," the economic costs of designating critical habitat could include "the expected loss in employment, revenue, and potential market impacts" if the Rosemont Mine does not "open for operation due to the designation of critical habitat and the costs of conservation measures to avoid adverse modification." 3-ER-353. But while the report categorized those costs as "[p]ossibly major," it also dismissed them as "unlikely" because "the recently issued biological opinion did not find that the operation was likely to result in adverse modification of jaguar critical habitat." 3-ER-356, 359.

The Service's own economic-impact analysis similarly assumed that the 2013 Biological Opinion foreclosed any likelihood that these major costs would be imposed on the Rosemont Project. Relying on the premise that "the proposed mining operation would not destroy or adversely modify critical habitat," the Service assumed that the critical-habitat designations would not require costly modifications to, or otherwise interfere with, the Project. 2-ER-269. Therefore, it found "no . . . probable economic impact due solely to the designation of critical habitat." *Id*. The Service expressly stated that this premise was "a *major determining factor* in whether the Secretary would consider the exclusion of the mine area from critical habitat." *Id*. (emphasis added).

The District Court eliminated that "major determining factor" by holding that the Service had erroneously "applied a heightened standard of review" in determining that the Rosemont Mine was unlikely to adversely modify critical habitat and vacating the 2013 Biological Opinion. 1-ER-15–16. As a matter of law and logic, that ruling left the District Court with only one option: to vacate the designations and remand for the Service to conduct a new economic-impact analysis. Yet the court inexplicably failed to follow through on the corollary of its ruling. Instead, it left the conclusion of the Service's economic-impact analysis intact even after kicking the legs out from under it. This Court should correct that error by

ordering the District Court to vacate the challenged designations and remand to the agency for further consideration.

That follows from this Court's precedents, under which an agency's decision is arbitrary and capricious when it rests on a "flawed premise [that] is fundamental to [the agency's] determination." *Safe Air for Everyone v. EPA*, 488 F.3d 1088, 1101 (9th Cir. 2007). "[W]e must 'remand to the agency for additional investigation or explanation' when the agency's analysis is incomplete after its flawed basis is removed," or when its conclusion no longer follows once its flawed premise is rejected. *Id.* (quoting *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985)). In such circumstances, vacatur and remand is necessary to give the agency "the first opportunity" to conduct an analysis based on the correct premise. *Id.* at 1101.

Here, because the District Court rejected the key predicate for the Service's conclusion that the economic impacts of the challenged designations were too minimal to warrant engaging in an exclusion analysis, the court rendered the agency's analysis "incomplete" and illogical, just as this Court's removal of the "flawed premise" in *Safe Air* did. The District Court therefore should have vacated and remanded to the Service to redo the analysis mandated by Section 4(b)(2), including analyzing whether to exclude the northern Santa Rita Mountains and Subunit 4b from its critical-habitat designations. 16 U.S.C. § 1533(b)(2).

## CONCLUSION

The Service's designations of "critical habitat" for the jaguar in the northern Santa Rita Mountains and Subunit 4b were arbitrary and capricious, and the District Court erred in upholding them. This Court should therefore reverse the District Court's grant of summary judgment to CBD and the Government and remand with instructions to: (i) grant Rosemont's cross-motion for summary judgment, (ii) vacate the Service's critical-habitat designations for the northern Santa Rita Mountains and Subunit 4b, and (iii) remand to the Service for further consideration consistent with such rulings.

Dated: December 23, 2021           Respectfully submitted,

                                    *s/ Julian W. Poon*
                                    Julian W. Poon
                                    GIBSON, DUNN & CRUTCHER LLP

                                    Norman D. James
                                    FENNEMORE CRAIG, P.C.

                                    *Counsel for Intervenor-Defendant-*
                                    *Appellant Rosemont Copper Company*

## STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Rule 28-2.6, Intervenor-Defendant-Appellant Rosemont Copper Company states that there is one related case of which it is aware currently pending before this Court: *Center for Biological Diversity v. United States Fish and Wildlife Service v. Rosemont*, Nos. 19-17585, 19-17586.

Dated: December 23, 2021

*s/ Julian W. Poon*
_____
Julian W. Poon

60

## CERTIFICATE OF COMPLIANCE

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

**9th Cir. Case Number(s)** 20-15654

I am the attorney or self-represented party.

**This brief contains 13,591 words,** excluding the items exempted by Fed. R.

App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P.

32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ X ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties;
    [ ] a party or parties are filing a single brief in response to multiple briefs; or
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** _s/ Julian W. Poon_      **Date** _____ December 23, 2021 _____

61

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on December 23, 2021.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: December 23, 2021

*s/ Julian W. Poon*
_____
Julian W. Poon