No. 20-15654

_____

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

_____

CENTER FOR BIOLOGICAL DIVERSITY,
*Plaintiff/Appellee*,

v.

UNITED STATES FISH AND WILDLIFE SERVICE,
*Defendant/Appellee*,

and

ROSEMONT COPPER COMPANY, *et al.*,
Intervenor-Defendant-Appellant.

_____

Appeal from the United States District Court for the District of Arizona
Nos. 4:17-cv-00475-JAS, 4:17-cv-00576-JAS , 4:18-cv-00189-JAS
(Hon. James A. Soto)

_____

**FEDERAL DEFENDANT'S ANSWERING BRIEF**

_____

TODD KIM
*Assistant Attorney General*
ANDREW C. MERGEN
ANDREW M. BERNIE
*Attorneys*
Environment and Natural Resources Division
U.S. Department of Justice
950 Pennsylvania Avenue N.W.
Washington, D.C. 20530
(202) 514-4010
andrew.m.bernie@usdoj.gov

i

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................iv

INTRODUCTION ............................................................................1

STATEMENT OF JURISDICTION.........................................................4

STATEMENT OF THE ISSUES...........................................................5

PERTINENT STATUTES AND REGULATIONS ......................................6

STATEMENT OF THE CASE ............................................................6

    A.    Statutory and regulatory background ....................................6

    B.    Factual background ........................................................10

        1.    The jaguar and previous jaguar conservation efforts .................................................................10

        2.    The jaguar critical habitat rule .................................13

        3.    The Rosemont Project.............................................20

        4.    Tenth Circuit litigation challenging the Final Rule ................21

        5.    Proceedings below ................................................22

SUMMARY OF ARGUMENT ............................................................25

STANDARD OF REVIEW ...............................................................28

ARGUMENT ...............................................................................29

I.    The Service reasonably designated Unit 3 and Subunit 4b as critical habitat for the jaguar..........................................................29

    A.    The Service reasonably found that Unit 3 qualified as occupied critical habitat. ...................................................29

B.      The Service reasonably determined that Unit 3 and
        Subunit 4b fall within the definition of unoccupied
        critical habitat. ...................................................................35

II.   Rosemont's additional legal challenges to the Service's
      designation are without merit. ......................................................41

A.      The Service did not designate land that is not "essential." ................41

B.      The Service properly considered the Northwestern
        Recovery Unit in determining that Unit 3 and Subunit 4b
        were essential. ...................................................................46

C.      The designations complied with the relevant regulation. ...................48

D.      The district court was not required to remand to the
        Service to reconsider its economic-impact analysis. .........................56

CONCLUSION ...................................................................................58

STATEMENT OF RELATED CASES

CERTIFICATE OF COMPLIANCE

ADDENDUM

# TABLE OF AUTHORITIES

## Cases

*Alaska Oil & Gas Association v. Jewell*,
815 F.3d 544 (9th Cir. 2016) .................................................... 3, 44, 45

*Alliance for the Wild Rockies v. Lyder*,
728 F. Supp. 2d 1126 (D. Mont. 2010) .......................................... 38, 39

*Arizona Cattle Growers Association v. Salazar*,
606 F.3d 1160 (9th Cir. 2010) ...................................................... 29, 34

*Auer v. Robbins*,
519 U.S. 452 (1997) ........................................................................ 50

*Bear Valley Mutual Water Co. v. Salazar*,
2012 WL 5353353 (C.D. Cal. Oct. 17, 2012) ..................................... 55

*Bear Valley Mutual Water Company v. Jewell*,
790 F.3d 977 (9th Cir. 2015) ................................................. 4, 8, 49, 55

*Bowen v. Georgetown University Hospital*,
488 U.S. 204 (1988) ........................................................................ 52

*California Communities Against Toxics v. EPA*,
688 F.3d 989 (9th Cir. 2012) ............................................................ 55

*Center for Biological Diversity v. Kempthorne*,
607 F. Supp. 2d 1078 (D. Ariz. 2009) ........................................... 12, 13

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
401 U.S. 402 (1971) ........................................................................ 52

*Encino Motorcars, LLC v. Navarro*,
136 S. Ct. 2117 (2016) ..................................................................... 40

*Enos v. Marsh*,
769 F.2d 1363 (9th Cir. 1985) ............................................................. 1

*Gifford Pinchot Task Force v. U.S. Fish and Wildlife Service*,
    378 F.3d 1059 (9th Cir. 2004) ................................................................43

*Home Builders Association of Northern California v. Fish and Wildlife Service*,
    616 F.3d 983 (9th Cir. 2010) ......................................... 24, 35, 44

*In re Lovin*,
    652 F.3d 1349 (Fed. Cir. 2011) ................................................................54

*Kisor v. Wilkie*,
    139 S. Ct. 2400 (2019)......................................................... 53, 54, 55

*Lambert v. Saul*,
    980 F.3d 1266 (9th Cir. 2020) ................................................................54

*Levy v. Sterling Holding Co., LLC*,
    544 F.3d 493 (3d Cir. 2008) ................................................................53

*Marsh v. Oregon Natural Resources Council*,
    490 U.S. 360 (1989)...............................................................................1

*Medina-Nunez v. Lynch*,
    788 F.3d 1103 (9th Cir. 2015) ................................................................54

*Milner v. Department of Navy*,
    562 U.S. 562 (2011)................................................................................43

*Momox-Caselis v. Donohue*,
    987 F.3d 835 (9th Cir. 2021) ................................................................50

*National Cable & Telecommunications Association v. Brand X Internet Services*,
    545 U.S. 967 (2005)................................................................................50

*Native Ecosystems Council v. Marten*,
    883 F.3d 783 (9th Cir. 2018) ................................................................28

*Natural Resources Defense Counsel v. Department of the Interior*,
    113 F.3d 1121 (9th Cir. 1997) ....................................................... 1, 45

*New Mexico Farm and Livestock Bureau v. United States*,
    952 F.3d 1216 (10th Cir. 2020) ........................... 11, 21, 30, 31, 33, 35, 37, 50, 53

*Ranchers Cattlemen Action Legal Fund v. USDA*,
  499 F.3d 1108 (9th Cir. 2007) ...............................................................28

*San Luis & Delta-Mendota Water Authority v. Jewell*,
  747 F.3d 581 (9th Cir. 2014) ......................................................... 29, 34

*Sierra Club v. Marsh*,
  816 F.2d 1376 (9th Cir. 1987) ...............................................................34

*Sierra Club v. U.S. Fish and Wildlife Service*,
  245 F.3d 434 (5th Cir. 2001) .................................................................43

*Tennessee Valley Authority v. Hill*,
  437 U.S. 153 (1978)................................................................................6

*United States v. American Railway Express Company*,
  265 U.S. 425 (1924)..............................................................................30

*Weyerhaeuser Co. v. U.S. Fish & Wildlife Service*,
  139 S. Ct. 361 (2018)............................................................................10

**Statutes**

5 U.S.C. §§ 701-706.................................................................................5

5 U.S.C. § 706(2)(A)...............................................................................28

16 U.S.C. § 1532(5)(A)(i)........................................... 7, 11, 29, 35, 43

16 U.S.C. § 1532(5)(A)(ii) ......................................... 3, 7, 8, 36, 37, 43

16 U.S.C. § 1532(6) .................................................................................7

16 U.S.C. § 1532(15) ...............................................................................6

16 U.S.C. § 1533(a)(3).............................................................................1

16 U.S.C. § 1533(a)(3)(A)........................................................................7

16 U.S.C. § 1533(b)(2)............................................................... 9, 21, 34

16 U.S.C. § 1533(d) .................................................................................7

16 U.S.C. § 1536(a)(2) ............................................................... 8, 9

16 U.S.C. § 1538(a)(1)(B) ............................................................. 7

16 U.S.C. §§ 1531-1544 ............................................................... 5

28 U.S.C. § 1291 ........................................................................ 5

28 U.S.C. § 1331 ........................................................................ 4

**Regulations and Administrative Materials**

50 C.F.R. § 17.11 ...................................................................... 7

50 C.F.R. § 17.31 ...................................................................... 7

50 C.F.R. § 402.01(b) ................................................................. 7

50 C.F.R. § 424.12 ..................................................................... 45

50 C.F.R. § 424.12 (a)(1)(ii) (2012) ............................................. 42

50 C.F.R. § 424.12(a) (2012) ...................................................... 45

50 C.F.R. 402.14(b)(1) ................................................................ 8

50 C.F.R. § 402.14(h)(2) ............................................................. 9

86 Fed. Reg. 49,985 (Sept. 7, 2021) ........................................... 25

81 Fed. Reg. 7,414 (Feb. 11, 2016) ............................................. 50

62 Fed. Reg. 39,147 (July 22, 1997) ............................................ 11

40 Fed. Reg. 44,412 (Sept. 26, 1975) .......................................... 10

37 Fed. Reg. 6476 (Mar. 30, 1972) .............................................. 10

# GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| CBD | Center for Biological Diversity |
| ESA | Endangered Species Act |
| NEPA | National Environmental Policy Act |
| NRU | Northwestern Recovery Unit |
| PARU | Pan American Recovery Unit |

# INTRODUCTION

The jaguar is listed as endangered under the Endangered Species Act (ESA), requiring the U.S. Fish and Wildlife Service (Service) to designate critical habitat "to the maximum extent prudent and determinable" for the species. 16 U.S.C. § 1533(a)(3). This Court has made clear that the Service "may only fail to designate a critical habitat under rare circumstances,"[1] and "that Congress intended the imprudence exception to be a narrow one."[2] The Service may designate critical habitat that was occupied by the species when the species was listed (if the area contains features essential to the species' conservation) or critical habitat that was unoccupied (if the area itself is essential). In 2009, a court set aside the Service's decision not to designate critical habitat. Thereafter, and following a proposed rule, multiple rounds of public comment, and input from the Jaguar Recovery Team (a binational group of experts the Service assembled), in 2014 the Service designated 764,207 acres in New Mexico and Arizona as critical habitat for the jaguar.

Rosemont Copper Company (Rosemont) challenges the Service's designation of two areas in Arizona: Unit 3 in the Northern Santa Rita Mountains, and Subunit 4b, a travel corridor connecting the Whetstone Mountains and the Santa Rita

---

[1] *Enos v. Marsh*, 769 F.2d 1363, 1371 (9th Cir. 1985), *abrogated on other grounds by Marsh v. Oregon Natural Resources Council*, 490 U.S. 360 (1989).

[2] *Natural Resources Defense Counsel v. Department of the Interior*, 113 F.3d 1121, 1126 (9th Cir. 1997).

1

Mountains. The Service designated Unit 3 as "occupied" critical habitat based on, among other things, undisputed historical and more recent records of jaguars in that area. Alternatively, the Service found that Unit 3 would qualify as unoccupied critical habitat. The Service further found that Subunit 4b was essential to the conservation of the species because it provides connectivity to Mexico. The district court rejected the Service's finding that Unit 3 was occupied when the jaguar was listed, but upheld its determination that both areas were essential to conservation of the species. The district court erred in rejecting the Service's occupancy determination for Unit 3, but otherwise correctly upheld the Service's determination.

On appeal, Rosemont does not identify any evidence the Service wrongly failed to consider, and largely does not challenge the detailed factual findings supporting the designations. Instead, Rosemont contends that the Final Rule rests on multiple legal errors. Rosemont's arguments are without merit; two of those arguments also rely on strawman contentions that do not accurately characterize the Service's analysis; and the remaining two were not even meaningfully raised below.

Most prominently, Rosemont contends that, because most jaguars are located outside this country, no habitat anywhere in the United States is essential to the jaguar's conservation. But although Rosemont devotes page after page to arguing that "essential" means something more than "convenient or helpful"—a proposition that, in the abstract, no one disputes—the ESA provides for critical habitat in areas

"essential for the *conservation* of the species." 16 U.S.C. § 1532(5)(A)(ii) (emphasis added). And the ESA separately defines "conservation" as "all methods and procedures which are necessary" to bring an endangered or threatened species to the point where ESA protections are no longer needed. *Id.* § 1532(3). Thus, as this Court has emphasized, "the point of the ESA is to ensure the species' recovery," and it thus "makes little sense to limit its protections to the habitat that the existing, threatened population currently uses." *Alaska Oil & Gas Association v. Jewell*, 815 F.3d 544, 556 (9th Cir. 2016). And this Court has consistently rejected other arguments like those that Rosemont makes here—for example, rebuffing claims that the Service must define critical habitat narrowly, and that designation is only necessary where it would protect the majority of a species' habitat. Similarly here, the Service reasonably found the designated areas were essential to conservation.

Rosemont further faults the Service for treating jaguars in the Northwestern Recovery Unit "as a species unto itself." The Service did no such thing. And the Service's determination that maintenance and possible range expansion of this unit was essential to conservation of the species—echoing the findings of the Jaguar Recovery Team—was logical and supported by the record.

Rosemont also contends that, under regulations in effect in 2014, the Service was required to make a separate finding that designating only areas occupied by the species would be insufficient before designating unoccupied habitat. The Tenth

3

Circuit agreed with this argument in reviewing the New Mexico critical-habitat designation. But as Rosemont acknowledges, *this Court* has rejected that interpretation. *See Bear Valley Mutual Water Company v. Jewell*, 790 F.3d 977 (9th Cir. 2015). Rosemont never argued below that *Bear Valley* was no longer good law. But Rosemont now contends that the *Service*'s subsequent characterization of the regulation, two years *after* the challenged Rule, in the context of the Service's *replacement* of that Rule, displaces *Bear Valley* and retroactively invalidates the 2014 Rule. This argument is both forfeited and without merit.

Finally, Rosemont contends that the district court erred when it remanded the Service's determination that Rosemont's project would not destroy or adversely modify critical habitat, but did not remand for the Service to reconsider its decision that the economic impact of designating the Rosemont project area would be insignificant. This argument is even more clearly forfeited but is in any event premature. No one has found that Rosemont's project *is* likely to destroy or adversely modify jaguar critical habitat. If and when that happens, Rosemont may petition the Service to reconsider its economic-impact analysis then.

The district court's judgment should be affirmed.

## STATEMENT OF JURISDICTION

(a)  The district court had subject matter jurisdiction under 28 U.S.C. § 1331 because Rosemont's claims arose under federal statutes, including the

4

Administrative Procedure Act (APA), 5 U.S.C. §§ 701-706, and the ESA, 16 U.S.C. §§ 1531-1544. 2-ER-85-89.

(b) The district court's judgment was final because it disposed of all remaining claims. 1-ER-2-44. This Court has jurisdiction under 28 U.S.C. § 1291.

(c) The judgment was entered on February 10, 2020. 1-ER-2. Rosemont filed its notice of appeal on April 10, 2020. 5-ER-801-802. The appeal is timely.

## STATEMENT OF THE ISSUES

1. Whether the Service reasonably designated Unit 3 and Subunit 4b as jaguar critical habitat, including:

a. Whether the Service reasonably designated Unit 3 as occupied critical habitat, where undisputed records show the jaguar's presence in the area prior to the jaguar's listing and more recently, and where the Service found that Unit 3 contains all eight of the physical and biological features essential to the jaguar's conservation.

b. Whether the Service reasonably found in the alternative that Unit 3 qualifies as unoccupied jaguar critical habitat, and that Subunit 4b was likewise essential to the jaguar's conservation.

2. Whether Rosemont's contrary arguments lack merit, including:

a. Whether the Service was required to find that there is no jaguar critical habitat anywhere in the United States, notwithstanding the ESA's broad definition of "conservation," the Service's detailed findings (including that individuals at the

5

northernmost edge of the jaguar's range play a critical role in its persistence and genetic diversity), and a federal court decision setting aside the Service's previous decision not to designate critical habitat in the United States.

b.     Whether the Service was arbitrary and capricious in concluding that maintenance and possible range expansion of the Northwestern Recovery Unit was essential to the jaguar's conservation.

c.     Whether the Service violated its then-effective regulation by failing to expressly find that designation of solely occupied areas was insufficient for conservation of the jaguar, when this Court has held that the regulation imposed no such requirement.

d.     Whether the district court erred in failing to remand for the Service to conduct an economic-exclusion analysis.

## PERTINENT STATUTES AND REGULATIONS

All pertinent statutes and regulations are set forth in the Addendum.

## STATEMENT OF THE CASE

### A.     Statutory and regulatory background

The ESA is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 180 (1978).  The Secretary of the Interior has responsibility under the ESA for non-marine species such as the jaguar, 16 U.S.C. § 1532(15), and the

Service implements the ESA with respect to species under Interior's jurisdiction, 50 C.F.R. §§ 17.11, 402.01(b).  A species may be listed as either "endangered" or "threatened."  A species is "endangered" if it is "in danger of extinction throughout all or a significant portion of its range" and "threatened" if it is "likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range."  16 U.S.C. § 1532(6), (20).  Once a species is listed, the ESA makes it unlawful to "take" that species.[3]  16 U.S.C. § 1538(a)(1)(B).

In addition to the ESA's take prohibition, the statute requires the Service— "to the maximum extent prudent and determinable"—to designate any habitat for an endangered or threatened species "which is then considered to be critical habitat." *Id.* § 1533(a)(3)(A).  Two different standards apply to designation of critical habitat: one applicable to areas "occupied" by the species at the time the species is listed, *id.* § 1532(5)(A)(i), and another to areas "unoccupied" by the species at the time of listing, *id.* § 1532(5)(A)(ii).  Occupied critical habitat must contain "physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection."  *Id.* § 1532(5)(A)(i).  Unoccupied areas, by contrast, may be designated critical habitat "upon a

---

[3] The ESA allows this prohibition to be extended to threatened species, 16 U.S.C. § 1533(d), and the Service has done so with respect to most threatened species, 50 C.F.R. § 17.31.

determination by the Secretary that *such areas* are essential for the conservation of the species." *Id.* § 1532(5)(A)(ii) (emphasis added). The ESA in turn broadly defines "conservation" (as well as "conserve" and "conserving") as "to use and the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary." *Id.* § 1532(3).

The Service also has promulgated regulations governing designation of critical habitat. The version of the regulation in force at the time of the 2014 Rule provided that the Service "shall designate" unoccupied critical habitat "only when a designation limited to its present range would be inadequate to ensure the conservation of the species." 4-ER-775. In 2015, this Court held that this language did not impose a separate requirement—reasoning that, if designation of unoccupied habitat is essential, it necessarily follows that designation of only occupied habitat is inadequate. *Bear Valley*, 790 F.3d at 994.

Where critical habitat is designated, federal agencies must ordinarily consult with the Service on any actions they authorize, fund, or carry out if those actions may affect listed species under the Service's jurisdiction, 50 C.F.R. § 402.14(b)(1), and the Service subsequently determines whether the action is likely to destroy or adversely modify critical habitat, 16 U.S.C. § 1536(a)(2). If the Service finds that it

the action is likely to do so, it must suggest reasonable and prudent alternatives that would avoid destruction or adverse modification. 50 C.F.R. § 402.14(h)(2).

But beyond that, the effects of a critical habitat designation are limited in several important respects. First, critical habitat designations do not directly govern the activities of private parties: If a private party's action is not authorized, funded, or carried out in whole, or in part, by a federal agency, it is not affected by a critical habitat designation. 2-ER-221; 16 U.S.C. § 1536(a)(2). Second, a critical habitat designation does not affect an agency's ability to authorize habitat-affecting activities that do not rise to the level of a destruction or adverse modification. *See supra* p. 8. Third, "even in the event of a destruction or adverse modification finding, the obligation of the Federal action agency and the landowner is not to restore or recover the species, but to implement reasonable and prudent alternatives to avoid destruction or adverse modification of critical habitat." 2-ER-221. Fourth and finally, the ESA requires the Service to "tak[e] into consideration the economic impact . . . of specifying any particular area as critical habitat" and authorizes exclusion of "any area from critical habitat [upon a determination] that the benefits of such exclusion outweigh the benefits of specifying such area as part of the critical habitat" (unless exclusion would result in extinction of the concerned species). 16 U.S.C. § 1533(b)(2). The Supreme Court has held that a decision not to exclude

9

critical habitat under this provision is subject to judicial review.  *Weyerhaeuser Co. v. U.S. Fish & Wildlife Service*, 139 S. Ct. 361 (2018).

**B.    Factual background**

**1.    The jaguar and previous jaguar conservation efforts**

The jaguar is a large, nocturnal cat with a camouflaged appearance.  2-ER-224, 244; 4-ER-692, 712.  The population trend of jaguars is decreasing, and the species faces a number of biological factors that pose challenges for its recovery, including "having large spatial requirements."  4-ER-732.  "[C]onservation of key jaguar habitats and populations is critical to [its] sustainability" and, in particular, "persistence of relatively small populations appears to increase with connectivity to other populations and reduction of threats within a corridor."  *Id.*

The regulatory history of the jaguar in the United States is somewhat unusual.  In 1972, the Service listed the jaguar as endangered under the Endangered Species Conservation Act (ESCA), a precursor to the ESA.  37 Fed. Reg. 6476 (Mar. 30, 1972).  When the ESA was enacted the following year, it provided that the ESCA list would be republished, and the entry for the jaguar species in the republished list referred to the original listing date of the jaguar species under the ESCA.  40 Fed. Reg. 44,412, 44,418 (Sept. 26, 1975).  And the Service explained as early as 1979 that it had always been the Service's intent that the jaguar be listed as endangered whether the population existed in the United States or in foreign countries.  4-ER-

779, 796.  As the Tenth Circuit has therefore held—and no party here disputes—the year the jaguar was "listed in accordance with the provisions of" the ESA, 16 U.S.C. § 1532(5)(A)(i), is 1972.  *New Mexico Farm and Livestock Bureau v. United States*, 952 F.3d 1216, 1225 (10th Cir. 2020).  Thus, although the standard for designating critical habitat depends on whether an area was occupied or unoccupied by a species when that species was listed in accordance with the ESA (here 1972),[4] the Service did not  in fact designate critical habitat for the jaguar in 1972.  The Service thus had no occasion to examine what areas were occupied by the species at the time.

The Service, moreover, did not formally list both foreign and domestic jaguars as endangered under the ESA until 1997.  62 Fed. Reg. 39,147 (July 22, 1997).  The Service declined at that time to designate critical habitat for the jaguar.  The Service noted then that "the genetic contribution of all individuals of a declining species may be of great importance."  4-ER-788.  The Service nonetheless declined to designate critical habitat, reasoning that "the primary threat to the species in the United States is direct taking rather than habitat destruction," and that "[p]ublication of detailed critical habitat maps and descriptions in the Federal Register would likely make the species more vulnerable to" such prohibited activities.  4-ER-792.  The Service acknowledged, however, that  "[i]dentification of this species' habitat preferences

---

[4] *See New Mexico Farm and Livestock Bureau*, 952 F.3d at 1225 (explaining that "the Service must use the initial listing date, not a later listing date").

will be addressed through the recovery process," while also noting that "very little" was then "known about the habitat requirements and movement corridors for the jaguar in the United States at the northern periphery of its range." *Id.*

The Center for Biological Diversity (CBD) challenged the Service's decision not to designate critical habitat, and the Service agreed to revisit that determination as part of a settlement agreement. *CBD v. Kempthorne*, 607 F. Supp. 2d 1078, 1082 (D. Ariz. 2009). In 2006, the Service again concluded that designation of critical habitat for the jaguar was not prudent. 4-ER-781.

The Service acknowledged that the principal reason it gave for not designating critical habitat nine years earlier—publication of detailed critical habitat maps would make the species more vulnerable—was "no longer valid" because multiple "sources routinely give specific and general locations of jaguars." 4-ER-782. The Service also noted that, in 1997, the jaguar occupied southeastern Arizona and extreme southwestern New Mexico. *Id.* But the Service concluded that designation was unwarranted because, inter alia, only five male jaguars had been documented in the United States in the previous nine years, "the best available scientific information suggest[ed] that no area within the United States is critical for the survival of the species," and "any conservation actions for the jaguar that may bring the species to the point that the measures of the Act are no longer necessary will need to be implemented in Mexico and Central and South America." 4-ER-782-783.

12

CBD again challenged this determination in the District of Arizona, which set aside the Service's determination as not based on "the best scientific data available." *CBD*, 607 F. Supp. 2d at 1088-91. In particular, the Service had relied heavily on scientific literature that had concluded that there is no area in the United States that is critical for the *survival* of the jaguar, which is not the ESA standard—"critical habitat is intended to promote not only the survival but also the *recovery* of species." *Id.* at 1089. The court pointed to additional science in the record, which showed among other things that "individuals on the fringe of the range can contribute to the metapopulation and of a species," the importance of "restor[ing] connectivity throughout the range to allow movement between, and survival of, the now isolated individuals," and that "[i]t is critical that these habitats have connections that allow jaguars to move freely between patches, and to allow jaguars the potential to recolonize the southwestern U.S." *Id.* at 1090 (quotation marks omitted). The court also pointed to evidence suggesting "that the jaguar has been a permanent resident of the United States." *Id.* The court therefore concluded that the Service appeared to "overlook[] probative scientific evidence regarding its 'not prudent' determination" and set it aside. *Id.* at 1091.

### 2. The jaguar critical habitat rule

Following the District of Arizona's decision, the Service in 2010 "convened a binational Jaguar Recovery Team" consisting of "jaguar experts, large-cat experts,

and stakeholders from the United States and Mexico." 2-ER-248. The Service subsequently "based jaguar critical habitat on information compiled and produced by the Jaguar Recovery Team, to the greatest extent possible." *Id.*

In April 2012, the Jaguar Recovery Team issued its Recovery Outline for the Jaguar (Recovery Outline). 4-ER-709-767. The Recovery Outline identified two recovery units "that are geographically or otherwise identifiable and essential to the recovery of the species": the Northwestern Recovery Unit (NRU) and the Pan American Recovery Unit (PARU). 4-ER-728, 731. The NRU consists of approximately 85,791 square miles in the United States and Mexico (12,386 of which are in the United States). 4-ER-731. The PARU consists of approximately 5.75 million square miles within 17 countries in the Central and South America. *Id.* While acknowledging that the PARU is considerably larger than the NRU, contains more jaguars, and faces its own distinct conservation needs and challenges, the Jaguar Recovery Team focused on the NRU. 4-ER-747. Because the management and recovery of the jaguar "are primarily the responsibility of the countries in which the species occur," the Recovery Outline focuses "on conservation of the jaguar in the northwestern part of its range as our contribution toward an international effort to conserve and recover the jaguar rangewide." 4-ER-747-748.

The Recovery Outline divided each Recovery Unit into three types of areas. So-called "core areas" include both persistent verified records of jaguar occurrence

14

over time and recent evidence of jaguar reproduction. 4-ER-729. Secondary areas are generally smaller, contain fewer jaguars and at lower densities, and have more sporadic jaguar records (perhaps because some of the areas may not have been surveyed through defined survey protocols), contain no or little evidence of jaguar reproduction within the previous ten years, and generally contain lower quality and quantity of jaguar habitat. 4-ER-730. The Jaguar Recovery Team emphasized that the long-term recovery needs for the jaguar include "the maintenance of secondary areas that provide connectivity between core areas and that could allow for range expansion and genetic exchange," 4-ER-746, and that the secondary areas in the United States "may allow for expansion of the Sonoran core area," 4-ER-750. Finally, peripheral areas contain fewer and more sporadic jaguar records, with habitat that is only marginal for supporting jaguar habitat populations that is not well-connected to larger patches of high-quality habitat. 4-ER-730. The Recovery Outline identifies two core areas within the NRU (both in Mexico), 4-ER-729, and identifies part of southcentral and southeastern Arizona as well as southwestern New Mexico as secondary areas, 4-ER-730, 750.

In August 2012, the Service issued a proposed rule to designate approximately 838,232 acres as critical habitat in New Mexico and Arizona. 4-ER-679. The Service then issued a revised proposed rule in 2013 after receiving a report from the Jaguar Recovery Team that included a revised jaguar habitat model. 3-ER-512-25.

15

Following another round of public comment, the Service published the rule challenged in this litigation on March 5, 2014 (Final Rule). 2-ER-214-298.

The Final Rule designates approximately 764,207 acres in New Mexico and Arizona as jaguar critical habitat. 2-ER-215. The critical habitat includes six units, four of which are entirely in Arizona (Units 1-4), one that straddles the Arizona/New Mexico border (Unit 5), and one that is entirely in New Mexico (Unit 6). 2-ER-234-235. Unit 3 (the largest of the units) consists of 351,501 acres in the Patagonia, Santa Rita, Empire, and Huachuca Mountains, as well as the Canelo and Grosvenor Hills, in Pima, Santa Cruz, and Coshise Counties. 2-ER-235-36. In this appeal, Rosemont challenges designation of the portion of Unit 3 within the Northern Santa Rita Mountains (where the Rosemont Project is located). Rosemont Brief at 14; 2-ER-100-108. Rosemont also challenges designation of Subunit 4b, a travel corridor connecting the Whetstone Mountains and the Santa Rita Mountains; Subunit 4b consists of 12,710 acres between the Empire Mountains and the northern extent of the Whetstone Mountains in Pima County. 2-ER-236-37.

Following an exhaustive review of the current and historical record, the Service designated Unit 3 (as well as all the other Units except Unit 1b and Subunits 4b and 4c) as "occupied" critical habitat—i.e., concluding that these areas were occupied by the jaguar in 1972. 2-ER-234-37. To make these occupancy determinations, the Service initially considered jaguar occupancy records from 1962

16

to 1982 (ten years before and after 1972), "based on expert opinion regarding the average lifespan of the jaguar, the consensus being 10 years."  2-ER-224; *see also* 4-ER-713 (Jaguar Recovery Team estimating 10-15 year lifespan in the wild).

In identifying the relevant records for purposes of determining occupancy, the Service took a conservative approach, distinguishing between undisputed "Class I reports" and "Class II observations."  "Class I reports are those for which some sort of physical evidence is provided for verification (such as a skin, skull, or photograph)" and are thus "considered 'verified' or 'highly probable' as evidence for a jaguar occurrence."  2-ER-222.  Class II observations, by contrast, include detailed information but no physical evidence and are thus considered only probable or possible evidence of jaguar occurrence.  *Id.*  The Service considered only Class I reports as valid evidence.  *Id.*  The Service, moreover, considered only *undisputed* Class I reports.  *Id.*  The Service excluded two disputed Class I jaguar records from 1963 and 1964 based on information during the public comment period that raised doubt about the validity of those records.  2-ER-223-24.  The Service also excluded a more recent record of a jaguar in the Coronado National Forest based on evidence that he may have been lured to the area.  2-ER-224.

The Service also decided to consider undisputed Class I records of jaguars from 1982 to the present.  2-ER-224.  The Service reasoned that, in areas where jaguars have been detected since 1982, "it is likely those areas were occupied at the

time of the original listing, but jaguars had not been detected because of their rarity, the difficulty in detecting them, and a lack of surveys for the species." *Id.*; *see also infra* pp. 32-33 (discussing the Service's analysis on this point further).

The Service next identified the physical and biological features within the geographic areas occupied by the jaguar that are essential to its conservation. 2-ER-225. Following a detailed analysis of the scientific literature and the work of the Jaguar Recovery Team, the Service identified the "primary constituent elements" (PCEs) for the jaguar—i.e. "those specific elements of the physical or biological features that provide for a species' life history processes and are essential to the conservation of the species." 2-ER-230. Those PCEs consist of expansive open spaces in the United States of at least 100 square kilometers as well as seven additional features:

(1) Provide connectivity to Mexico;
(2) Contain adequate levels of native prey species, including deer and javelina, as well as medium-sized prey such as coatis, skunks, raccoons, or jackrabbits;
(3) Include surface water sources available within 20 km (12.4 mi) of each other;
(4) Contain from greater than 1 to 50 percent canopy cover…;
(5) Are characterized by intermediately, moderately, or highly rugged terrain;
(6) Are below 2,000 m (6,562 feet) in elevation; and
(7) Are characterized by minimal to no human population density, no major roads, or no stable nighttime lighting over any [one square kilometer] area.

*Id.*

Here again, the Service took a conservative approach. The Service recognized that habitat in the United States is at the edge of the jaguar's northern range and is

marginal compared to other known habitat. 2-ER-230. Therefore, the Service required that *all* of these PCEs be present in a particular area before that area could be considered occupied critical habitat (even though, as discussed below, this Court has made clear that such a restrictive approach is not required, *see infra* p. 35). *Id.*

Analyzing Unit 3 in particular, the Service determined that it was occupied at the time of the jaguar's listing based on both an undisputed Class I record of a jaguar in the Patagonia Mountains from 1965, as well as currently occupied based on photos of a male jaguar in the Santa Rita Mountains in 2012 and 2013. 2-ER-236. The Service further concluded that the mountain ranges within Unit 3 contain all of the PCEs for the jaguar. *Id.*

Acknowledging uncertainty associated with its occupancy determinations (given the passage of time since 1972), the Service also analyzed whether areas with undisputed Class I records since 1982 were themselves essential to the conservation the jaguar (the standard for unoccupied critical habitat). The Service concluded that these areas were essential because they had demonstrated recent jaguar occupancy (all after 1996), they contain features that comprise jaguar habitat, and because they contribute to the species' persistence by allowing for demographic function and possible range expansion of the NRU, which is essential to the conservation of the species. 2-ER-225; *see also infra* pp. 46-48 (discussing importance of the NRU to conservation of the species).

19

By contrast, the Service determined that Subunit 4b was unoccupied at the time of listing.  2-ER-237.  The Service concluded that this area too was essential to the conservation of the species because it provides connectivity from the Whetstone Mountains to Mexico.  *Id.*  The Service determined that "connectivity between the United States and Mexico is essential for the conservation of jaguars."  2-ER-226. Subunit 4b, in turn, connects "Subunits within the United States that would otherwise not be connected to Mexico" (in particular, it connects Subunit 4a to Unit 3, which provides connectivity to Mexico).  2-ER-270-71.  Subunit 4b also contains "a combination of low human influence and either or both canopy cover and ruggedness such that they represent areas through which a jaguar may travel between Subunit 4a and Mexico."  2-ER-254.

### 3.    The Rosemont Project

Rosemont seeks to develop an open pit copper mine and related mineral processing facilities to recover copper, silver, and molybdenum.  2-ER-155.  The proposed mine is located on private and National Forest System lands in the Coronado National Forest, approximately 30 miles southeast of Tucson, Arizona. *Id.*  In 2013, the Service issued a biological opinion concluding that the project will not likely destroy or adversely modify the (then-proposed) critical habitat for the jaguar.  3-ER-490-93.  The Service reached the same conclusion in a 2016 biological opinion (which applied a revised regulatory definition of destruction or adverse

modification of critical habitat). 2-ER-198-200. On June 6, 2017, the U.S. Forest Service issued a Record of Decision relying on the 2016 Biological Opinion and selecting the preferred alternative (set forth in an Environmental Impact Statement) for the proposed Rosemont project. 2-ER-145-155.

In the 2014 critical habitat Final Rule, the Service considered a request that it exclude the Rosemont project area from the critical habitat designation under 16 U.S.C. § 1533(b)(2), but declined to enter into the economic exclusion analysis. 2-ER-269. Initially, the Service noted that, because the Rosemont project area was occupied by the jaguar, any implemented or anticipated conservation measures were a result of the species' *listing*, not a critical habitat designation. *Id.* But the Service also explained that a "major determining factor" in its decision was the determination that "the construction and operation of the Rosemont Mine would not . . . adversely modify designated critical habitat" (and thus that the economic costs to Rosemont from the designation would be limited). *Id.*

### 4. Tenth Circuit litigation challenging the Final Rule

As Rosemont notes, the Tenth Circuit previously found that the Final Rule's critical habitat designations for Units 5 and 6 in New Mexico were arbitrary and capricious. *See New Mexico Farm and Livestock Bureau*, 952 F.3d at 1233. The Tenth Circuit agreed with the Service (and this Court's precedent) that "occupy" is not synonymous with "reside." *Id.* at 1226. And although Plaintiffs there advanced

21

several broad arguments—which are similar to the arguments Rosemont advances here—the Tenth Circuit largely disagreed with them. The Court, for example, rejected Plaintiffs' contention that because the areas at issue "are 'secondary,' 'marginal' habitat and constitute only a small portion of the jaguar's range, they cannot be essential for the conservation of the species." *Id.* at 1231-32. And the Court appeared to credit the agency's findings that the NRU is essential for the conservation of the species and that "[c]ritical habitat in the United States contributes to recovery across the species' range." *Id.* at 1232 (quotation marks omitted).

The Tenth Circuit, however, found fault with the New Mexico designations in two respects. First, the Service designated Units 5 and 6 as occupied even though there "were no Class I jaguar sightings in the units between 1962 and 1982" (which is not true of Unit 3). *Id.* at 1226. Second, the Tenth Circuit held that the then-applicable regulation required the Service to make a finding that designating only occupied critical habitat would be inadequate (which, as the Tenth Circuit appeared to recognize, conflicts with this Court's decision in *Bear Valley*). *Id.* at 1228. The Tenth Circuit decided the case on this basis even though no party had raised it, without the benefit of briefing or argument on it. *Id.* at 1230.

### 5. Proceedings below

In September 2017, CBD filed the underlying action giving rise to this appeal, contending that the 2016 Biological Opinion and the Forest Service's 2017 Record

22

of Decision violated the ESA and APA. 2-ER-111-144. Rosemont intervened as a defendant and filed cross-claims against the Service, challenging the critical habitat designations for the two areas at issue. 2-ER-100-109. The district court consolidated CBD's challenge and Rosemont's cross-claim with two other cases challenging various federal analyses associated with approval of the Rosemont Mine. On July 31, 2019, the court granted Plaintiffs' motions for summary judgment in the two other cases, and vacated and remanded the Forest Service's Record of Decision and Environmental Impact Statement. *See* 5-ER-837. Rosemont and the federal agencies appealed; those appeals remain pending. Nos. 19-17585, 19-17586 (9th Cir.).

On February 7, 2020, the district court issued the order at issue in this appeal. 1-ER-3-45. The district court held that the Service's no-adverse-modification finding relied on an overly heightened standard of review, and thus remanded to the agency to reconsider that finding under what it viewed as the proper legal standard. 1-ER-14. The Government did not appeal this ruling, and it is not at issue here. After deciding several other issues not relevant to this appeal, the district court then turned to Rosemont's cross-claims. 1-ER-40-43.

Initially, the district court rejected the Service's finding that Unit 3 was occupied by the jaguar in 1972. The court found it reasonable for the Service to consider jaguar records between 1962 and 1982 (based on a ten-year average jaguar

23

lifespan) but found it unreasonable to consider such records after 1982. 1-ER-39-40. The court acknowledged that the record for Unit 3 included jaguar sightings in *both* categories (an undisputed Class I record from 1965 as well as undisputed Class I records from 2012 and 2013) but nonetheless declared without elaboration that the Service improperly designated Unit 3 as occupied. 1-ER-40.

By contrast, the district court held that the Service had reasonably designated Unit 3 (and Subunit 4b) as unoccupied critical habitat. 1-ER-40. The court rejected Rosemont's contention that the Service impermissibly lowered the "essential" standard for unoccupied critical habitat, noting that the Service is required "to carve out territory that is not only necessary for the species' survival but also essential for the species' recovery." 1-ER-41 (quoting *Home Builders Association of Northern California v. Fish and Wildlife Service*, 616 F.3d 983, 989 (9th Cir. 2010)). The court concluded that the record supported the Service's designation of both areas. The court noted the Service's findings that Unit 3 had displayed recent jaguar occupancy, contained features comprising suitable habitat, and allowed for normal demographic function and possible range expansion of the NRU. 1-ER-41. As to Subunit 4b, the court deferred to the Service's finding that this Subunit was essential because it provided connectivity to Mexico, as well as exhibited low human influence and vegetative cover/rugged terrain. 1-ER-41 (citing 2-ER-232).

24

Relevant to both units, the district court also concluded that the Service had properly relied on the Jaguar Recovery Team's findings, including its findings on the importance of the NRU to the recovery of the jaguar species as a whole. 1-ER-41-42. The court noted and credited the Service's findings that the secondary jaguar habitat in the United States is ecologically distinct, that it is essential that species are protected in all their ecological settings, and that periphery habitat and population at the edge of a species' range is important to genetic diversity and persistence of the species. 1-ER-42-43. The district court further noted that this Court's decision in *Bear Valley* foreclosed any argument that the Service was required to separately find that designating only occupied areas would be sufficient. 1-ER-40 n.30.

The district court accordingly granted the Service and CBD summary judgment on Rosemont's cross-claims. 1-ER-43-44. Rosemont timely appealed. 5-ER-801. In November 2020, Rosemont filed a petition with the Service asking that it revise the critical habitat designations to exclude the Rosemont project site, *see* ECF No. 32 Exhibit A, and this Court stayed Rosemont's appeal while the Service considered that petition, ECF No. 15. The Service subsequently denied the petition, 86 Fed. Reg. 49,985 (Sept. 7, 2021), and this Court lifted the stay, ECF No. 25.

## SUMMARY OF ARGUMENT

1.      The Service reasonably determined that Unit 3 and Subunit 4b qualify as critical habitat under the ESA.

25

a. The district court should have deferred to the Service's determination that Unit 3 was occupied in 1972. Although the district court (and the Tenth Circuit) concluded that the Service may not consider jaguar sightings from after 1982 in that analysis, the Service also relied on an undisputed Class I record from 1965 that the district court did not address. Even putting aside that record, the Service reasonably relied on multiple more recent Class I sightings (from 2012 and 2013), as well as several uncontested facts—including that jaguars are extremely elusive and difficult to detect, occupy expansive and open spaces, as well as inhabit rugged and remote areas—to conclude that the jaguar also likely occupied the area in 1972. Particularly in this unusual context, there is no basis for disturbing the Service's reasonable fact-bound judgment, which also accords with the ESA's underlying purpose.

b. In any event, the Service reasonably determined that Unit 3 and Subunit 4b were essential to the conservation of the species. The Service made detailed findings in support of designating these relatively small tracts of land essential. The Service further explained why the connectivity Subunit 4b provides to Mexico made it essential. These determinations are predictions within the Service's expertise and at the frontiers of science, and are entitled to deference.

2. Rosemont's contrary legal arguments fail.

a.  Rosemont accuses the Service of equating the statutory term "essential" with merely "helpful" or "convenient" and insists that "essential" means something more akin to "necessary." Rosemont misunderstands the passages from the Final Rule it cites. And although Rosemont is correct that "essential" standing alone connotes something that is necessary, the ESA speaks of "essential for the conservation of the species" and defines "conservation" extremely broadly. In light of this text and the ESA's protective purpose, this Court has consistently declined to endorse arguments like those that Rosemont makes here. The same result is warranted in this case.

b.  Rosemont argues that the Service improperly treated the subset of jaguars in the NRU as a distinct species, but Rosemont again misstates the Service's analysis. And the record supports the Service's determination that normal demographic function (through cyclical dispersal) and possible range expansion of the NRU was essential to the jaguar's conservation.

c.  Rosemont contends that the Service misapplied the critical habitat regulation in force when it issued the Final Rule in 2014. This Court expressly rejected this argument in 2015. Rosemont contends that this Court's precedent is no longer good law, because of the Service's characterization of the regulation in 2016, which Rosemont says is entitled to *Auer* deference. This argument is forfeited and, even if it were not, any interpretation of the previous

regulation with the force of law that the Service offered in 2016 would not apply retroactively to agency action taken in 2014. The Service's designations, moreover, complied with the regulation even if this Court's decision in *Bear Valley* were no longer good law. Putting aside all of these obstacles, it is at best doubtful (for multiple reasons) that the agency statements on which Rosemont relies could displace this Court's precedent under the circumstances here.

        d.     Finally, Rosemont contends that the district court should have vacated the critical habitat designation so the Service could reconsider whether to exclude the Rosemont Project site from that designation. This argument is also forfeited and it is in any event premature.

## STANDARD OF REVIEW

    This Court reviews the district court's grant of summary judgment de novo. *Native Ecosystems Council v. Marten*, 883 F.3d 783, 789 (9th Cir. 2018). Under the APA, courts must uphold agency action that is not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). This standard is "highly deferential, presuming the agency action to be valid and affirming the agency action if a reasonable basis exists for its decision." *Ranchers Cattlemen Action Legal Fund v. USDA*, 499 F.3d 1108, 1115 (9th Cir. 2007) (internal quotation marks omitted). Challenges to an agency's compliance with the ESA are

also reviewed under the APA's deferential standard of review. *San Luis & Delta-Mendota Water Authority v. Jewell*, 747 F.3d 581, 601 (9th Cir. 2014).

## ARGUMENT

### I. The Service reasonably designated Unit 3 and Subunit 4b as critical habitat for the jaguar.

The Service found that Unit 3 fell within the ESA's definition of occupied critical and that both Unit 3 and Subunit 4b were essential to the conservation of the species. These findings reflect the Service's expert scientific judgment, and should be upheld.

#### A. The Service reasonably found that Unit 3 qualified as occupied critical habitat.

To fall within the ESA's definition of occupied critical habitat, the habitat must be "within the geographical area occupied by the species, at the time it was listed." 16 U.S.C. § 1532(5)(A)(i). This Court has noted that determining jaguar occupancy is a "highly contextual and fact-dependent" exercise as to which the Service is owed deference. *Arizona Cattle Growers Association v. Salazar*, 606 F.3d 1160, 1164-65 (9th Cir. 2010). A "species need not be present continuously for habitat to be considered 'occupied,'" and the Service also need not limit occupied habitat "to areas in which the species 'resides,'" but rather may include "habitat that merely 'contains individuals of the species.'" *Id.* at 1165. The Service's

29

determination that Unit 3 was occupied by the jaguar in 1972 was reasonable and the district court erred in concluding otherwise.[5]

As discussed above, the Service in fact took a conservative approach to this question in multiple respects. The Service limited its consideration to Class I records supported by physical evidence (considered "highly probable") and ignored Class II records (considered merely "probable" or "possible") entirely. *See* p. 17, *supra*. It further excluded particular Class I records when comments suggested that those records were unreliable or suspect. *Id.* The Service then concluded that Unit 3 was occupied critical habitat based on *both* an undisputed 1965 Class I record of a jaguar in the area, and on photos of a jaguar in the area in 2012 and 2013 (as well as based on its conclusion that Unit 3 contained all the PCEs for the jaguar). 2-ER-236; *supra* p. 19. In rejecting that conclusion, the district court only faulted the Service for considering the 2012 and 2013 records, finding that the Service "relied on evidence that is counter to Congress' intention that the agency consider occupancy at the time of listing, not at the time of designation or some undefined period." 1-ER-40. This conclusion is flawed in multiple respects.

---

[5] The Service did not forfeit this issue by not filing a notice of appeal. *See United States v. American Railway Express Company*, 265 U.S. 425 (1924); *New Mexico Farm and Livestock Bureau*, 952 F.3d at 1225-26 n.10 (recognizing that United States could challenge district court's occupancy determination in its role as appellee).

To start, even accepting the district court's premise, the court should not have rejected the Service's occupancy determination because it was *also* supported by the undisputed 1965 Class I sighting. Indeed, the district court noted that it "was reasonable for the [Service] to consider sightings between 1962 and 1982" and acknowledged (but did not address) the earlier jaguar record. 1-ER-39-40. And although the district court cited the District of New Mexico's decision addressing the jaguar critical habitat rule (which the Tenth Circuit subsequently reversed while agreeing with the district court on the question of jaguar occupancy), in that case "[t]here were no Class I jaguar sightings in the [New Mexican] units between 1962 and 1982," "and no other evidence of jaguar presence during that time period." *New Mexico Farm and Livestock Bureau*, 952 F.3d at 1226. By contrast, Unit 3 contained an undisputed 1965 Class I jaguar record. For this reason alone, the district court erred in its occupancy determination.

In any event, the district court's conclusion (and that of the Tenth Circuit) that the Service could not consider more recent jaguar occupancy is unsound, particularly on the facts here. Initially, the Service was required to perform a difficult and unusual task. Because the jaguar was not formally listed until 1997 and the Service determined then and in 2006 that it would not designate critical habitat (a determination a federal court set aside), in 2014 it needed to determine whether jaguars occupied particular areas more than four decades earlier—at a time when

31

essentially no one was looking for them. *See infra* p. 33. The Service concluded that, as to areas displaying more recent occupancy, "it is likely those areas were occupied at the time of the original listing, but jaguars had not been detected because of their rarity, the difficulty in detecting them, and a lack of surveys for the species." 2-ER-224.

The Service then explained the basis for this determination in detail. Initially, jaguars were rare within the United States in 1972, and jaguars require expansive open spaces for each individual—because large areas may be occupied by only a few individual jaguars, it would have been difficult to detect them in 1972. *Id.*; *see also* 2-ER-226 (identifying expansive open spaces of at least 100 square kilometers as essential for the conservation of the jaguar). In addition to their rarity, jaguars are difficult to detect because of their "cryptic appearance, elusive behavior, and habitat complexity," features that require multiple sampling methods to increase confidence that non-detection of jaguars indicates true absences of jaguars. *Id.*

Jaguars, moreover, "are secretive and nocturnal in nature and, in the United States and northern Mexico, inhabit rugged, remote areas that are logistically difficult to survey." 2-ER-225. Indeed, even in recent studies designed to detect jaguars using multiple methods in northern Mexico, neither method was completely effective in identifying individuals because of "logistical problems related to rugged topography, hard soils, absence of roads, and harsh weather conditions." 2-ER-225.

And in the United States, most of the post-1996 jaguar occurrences would not have been known if not for the efforts of the Borderlands Jaguar Detection Project, which maintained 45-50 remote-camera stations across three Arizona counties, conducted feces surveys, and followed up on credible sighting reports. 3-ER-225. By contrast, "[f]rom the time the jaguar was listed in 1972 until 1997, no effort was made to detect jaguars in the United States." *Id.*

Contrary to the Tenth Circuit, moreover, the Service's consideration of more recent occupancy data in this context is consistent with the ESA's 1978 amendments. The Tenth Circuit noted that the legislative history of those amendments suggests that Congress was concerned by "the prospect of human displacement if an endangered species were to expand out of the area it occupied at the time of listing." *New Mexico Farm and Livestock Bureau*, 952 F.3d at 1225. But even if this is right, it simply does not follow that the Service is categorically barred from consulting more recent data *as evidence* that particular areas were also occupied at the time of listing. To be sure, such an inference (like any inference an agency draws from data) must be reasonable. But neither the Tenth Circuit nor the district court suggested any reason the Service's inference here—that areas occupied by the jaguar more recently were also likely occupied in 1972—was unreasonable. The record does not suggest that the jaguar's range *expanded* from 1972 to 2014. Indeed, it suggests the

opposite. 4-ER-733 ("various factors, particularly habitat loss, have caused a considerable reduction in the historical range of the jaguar").

Obviously, it would have been preferable if more jaguar data from 1962 to 1982 were available but that was not the situation the Service faced in 2014. The Service is required to make its determinations on the basis of the "best scientific data available," 16 U.S.C. § 1533(b)(2) (emphasis added), even if that data leaves room for doubt. *See also id.* § 1533(b)(6) (delayed critical habitat designation must be "based on such data as may be available at that time."). As this Court has observed, it "is not our job to task the [Service] with filling the gaps in the scientific evidence" and "[w]e must respect the agency's judgment even in the face of uncertainty." *San Luis & Delta-Mendota Water Authority*, 747 F.3d at 633. And as to occupancy determinations in particular, this Court has emphasized that "[w]here data are inconclusive or where habitat is used on a sporadic basis, allowing the [Service] to designate as 'occupied' habitat where the species is likely to be found promotes the ESA's conservation goals and comports with the ESA's policy of 'institutionalized caution.'" *Arizona Cattle*, 606 F.3d at 1166-67; *cf. also Sierra Club v. Marsh*, 816 F.2d 1376, 1386 (9th Cir. 1987) ("Congress clearly intended that [agencies] give the highest of priorities and the benefit of the doubt to preserving endangered species." (internal quotation marks omitted)). The Service's occupancy determination for Unit 3 was neither contrary to law nor arbitrary and capricious.

Finally, the record provides ample support for the Service's conclusion that Unit 3 contains "those physical or biological features . . . essential to the conservation of the species" (the standard for designating occupied areas as critical habitat). 16 U.S.C. § 1532(5)(A)(i). Indeed, although not required by the ESA, the Service limited its designation to areas with *all* the PCEs for jaguar habitat. *See supra* pp. 18-19; *compare Home Builders Association*, 616 F.3d at 988-89 (area need not contain all PCEs). And the Service explained that the Unit 3 contains all such elements. 2-ER-236.

### B. The Service reasonably determined that Unit 3 and Subunit 4b fall within the definition of unoccupied critical habitat.

Notwithstanding the above, the Service acknowledged that the passage of time created uncertainty about occupancy and that "there is an alternative explanation," namely, that jaguars had been effectively eliminated from the United States as of 1972—such that either no areas were occupied at that time or only areas containing undisputed Class I records from between 1962 and 1982 were occupied. 2-ER-225.[6] Given this uncertainty, the Service also considered whether the same units it deemed occupied were "essential to the conservation of the species" and thus fall within the

---

[6] The Tenth Circuit held this open-mindedness *against* the Service, reasoning that "the Service did not make a factual finding that Units 5 and 6 were occupied by jaguars in 1972." *New Mexico Farm and Livestock Bureau*, 952 F.3d at 1226. But this is incorrect and it makes little sense to *fault* the Service for candidly acknowledging the uncertainty associated with its complex determinations.

definition of unoccupied critical habitat. 16 U.S.C. § 1532(5)(A)(ii). The Service

concluded that each such unit (including Unit 3) is essential for three reasons:

> (1) They have demonstrated recent (since 1996) occupancy by jaguars;
> (2) they contain features that comprise suitable jaguar habitat; and (3)
> they contribute to the species' persistence in the United States by
> allowing the normal demographic function and possible range
> expansion of the proposed Northwestern Recovery Unit, which is
> essential to the conservation of the species.

2-ER-225.

As the district court concluded, the record amply supports these

determinations. 1-ER-40-43. Rosemont does not dispute the Service's finding of

recent jaguar occupancy in Unit 3. Nor, for the most part, does Rosemont appear to

contest the Service's finding that Unit 3 contains features that comprise suitable

jaguar habitat—as explained previously, Unit 3 contains *all* the PCEs for the jaguar.

(Rosemont does challenge the Service's emphasis on the NRU's importance—we

address that in greater detail below, *see infra* pp. 46-48.) And as the Service further

explained, the arid character and peripheral locations of those units are among the

features that make them essential to the conservation of the species. The United

States and northwestern Mexico "represent the northernmost extent of the jaguar's

current range" and "populations at the edge of a species' range play a role in

maintaining the total genetic diversity of a species." 2-ER-217.

The Service also properly determined that Subunit 4b is essential to the

conservation of the jaguar because it both provides connective habitat and

connectivity to jaguar habitat in Mexico. 2-ER-236-237. The Service found that "connectivity between the United States and Mexico is essential for the conservation of the jaguars." 2-ER-226. Subunit 4b both connects subunits within the United States that would not otherwise be connected to Mexico, 2-ER-271, as well as contains habitat characteristics that are consistent with jaguar movement (canopy cover, low human influence, and ruggedness), 2-ER-254.

We address Rosemont's four overarching legal challenges to the Service's designation decisions in the next section. *See infra* Part II. But Rosemont also levels several narrower factual critiques, none of which have merit. We address those now.

First, Rosemont contends that the designated critical habitat is "marginal" and of "minimal value" to jaguar conservation. Rosemont Brief at 38. This is not a fair characterization of the record or the Service's reasoning. Although the *quality* of jaguar habitat in the United States can be considered "marginal when compared to other areas throughout the species' range," 2-ER-216, that does not mean that this habitat is not "essential for the conservation of the species," 16 U.S.C. § 1532(5)(A)(ii); *see also New Mexico Farm and Livestock Bureau*, 952 F.3d at 1232 ("In our view, it is not inconsistent for the Service to find both that Units 5 and 6 are 'secondary' or 'marginal' habitat and that they are essential for the conservation of the jaguar."). As discussed in more detail below, "conservation" entails more than mere survival; it also encompasses recovery. And although

Rosemont highlights that the designated critical habitat in the United States consists of secondary rather than core areas, the Recovery Outline explained that secondary areas contribute to jaguar recovery by supporting dispersal movements (a critical component given that habitat fragmentation is a threat to the species' conservation) and provide areas for cyclic expansion and contraction of the core areas. 4-ER-729-730; *see also* 4-ER-746 (emphasizing the importance of maintaining "secondary areas that provide connectivity between core areas and that could allow for range expansion and genetic exchange").

Second, Rosemont plucks a single sentence from the Recovery Outline for the proposition that secondary areas are essential "only" when they are located between core areas. Rosemont Brief at 39. But the sentence Rosemont cites does not say "only"—as Rosemont notes, it states that such areas are "*of particular interest* when they occur between areas." 4-ER-729 (emphasis added). The Recovery Outline further explained that, although the secondary areas in the United States do not connect two core areas (as many other secondary areas do), they are important because they may allow for expansion of the Sonoran core area. 4-ER-750.

Third, Rosemont argues that connectivity to Mexico cannot make Subunit 4b essential because "linkages to [other] populations [of the species] are not essential to the conservation of the species." Rosemont Brief at 36 (quoting *Alliance for the Wild Rockies v. Lyder*, 728 F. Supp. 2d 1126, 1140 (D. Mont. 2010)) (alterations

supplied by Rosemont). But the district court case on which Rosemont relies—which is of course not binding on this Court—is obviously distinguishable. In *Alliance for the Wild Rockies*, the court *deferred to the Service's determination* that designating unoccupied habitat to allow connectivity to Colorado was unnecessary because, inter alia, Colorado lacked the physical and biological features essential for the conservation of the species, because the unoccupied habitat did not contribute to the persistence of the species, and because the species was able to disperse across and connect between areas of unsuitable habitat. 728 F. Supp. 2d at 1140. Here, by contrast, Unit 3 contains all of the PCEs for the jaguar and Subunit 4b provides both essential connectivity and habitat characteristics that are favorable to jaguar movement.

Fourth, Rosemont argues that the Service should not have designated Subunit 4b as essential because Subunit 4c also provides a travel corridor to Mexico. Rosemont Brief at 36 n.6. But as the Service's draft BiOp explained, absent Subunit 4b, "50% of the connectivity to Mexico from the Whetstones" would likely be lost; "maintaining all critical habitat that allows for this movement is extremely important to jaguar conservation" particularly since the Service cannot know "which direction a jaguar may move to travel between the Whetstone Mountains and Mexico (i.e., via 4b or 4c)." FWSSER-4-5; *see also* 3-ER-476 (final BiOp similarly noting that "we are uncertain which direction a jaguar may move to travel between the Whetstone

Mountains and Mexico (i.e., via 4b or 4c)").  The Service thus explained in the Final Rule that it would designate both subunits since both "provide connectivity to Mexico through Unit 3."  2-ER-254.  Rosemont's argument is not a basis for disturbing the Service's determination that it is important to ensure connectivity regardless of which direction jaguars are traveling from the Whetstone Mountains. *See* 2-ER-236-37.

Fifth, Rosemont contends that the Service changed its position from 2006 (when it declined to designate critical habitat) without appropriate justification. Rosemont Brief at 36-37.  But "[a]gencies are free to change their existing policies as long as they provide a reasoned explanation for the change." *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016).  And here, of course, a federal court *set aside* that determination on multiple grounds, including as not based on the best scientific data available.  On remand, the Service reconsidered its prior critical habitat finding—which included convening the binational Jaguar Recovery Team. The Service acknowledged its prior 2006 determination and explained that following "a review of the best available information" including "information and analysis that became available subsequent to the July 12, 2006, not prudent finding," it "no longer [found] that designation of critical habitat for the jaguar is not prudent under our regulations."  2-ER-248.  The APA requires no more.

40

Sixth, Rosemont highlights that the critical habitat the Service designated is comparatively small. *See* Rosemont Brief at 12 ("the areas designated as critical habitat within the United States constitute just 0.04% of the jaguar's range"); *id.* at 44 (making the same point, while also noting that the areas the Service designated make up only 1.4% of the NRU). But far from supporting Rosemont's argument, the Service's restraint only underscores that it acted reasonably. Indeed, as the Final Rule notes, certain habitat models identified 21 to 30 percent of Arizona and about half of New Mexico as potential jaguar habitat. 2-ER-249. The Service, however, designated only a tiny fraction of that, the very small subset of lands that are truly essential. The district court correctly upheld the Service's determination.

## II. Rosemont's additional legal challenges to the Service's designation are without merit.

Much of Rosemont's brief consists of four general legal arguments against the Service's designation, all of which fail.

### A. The Service did not designate land that is not "essential."

Rosemont's main argument on appeal turns on the dictionary definition of "essential." Rosemont Brief at 24-42. The argument can be understood as having three parts: (1) the Service, Rosemont claims, implicitly understood essential to mean "merely convenient or helpful," *id.* at 34; (2) but "essential" in fact means something akin to necessary, *id.* at 24-31; and (3) the areas at issue cannot be essential because most jaguars are located outside the United States and, indeed,

41

outside the NRU, *id.* at 35-42. The first argument mischaracterizes the Service's analysis. The second is true in the abstract but beside the point. And the third is contrary to the ESA and this Court's precedents.

Starting with the first: the Service did not water down "essential" as Rosemont suggests. Rosemont cites to places in the Final Rule where the Service pointed to the "beneficial" impacts of critical habitat designation on the jaguar. Rosemont Brief at 34 (citing 2-ER-248, 282). But in the first of these cited pages the Service was explaining why it was reconsidering its prior "not prudent" finding, *see* 2-ER-248, and the regulation then in force stated that designation would be imprudent if it "would not be beneficial to the species," 50 C.F.R. § 424.12 (a)(1)(ii) (2012). In the second, the Service was responding to a comment contending that "adverse impacts of the proposed designation outweigh benefits," 2-ER-282, so obviously it makes sense that the Service referred to the "long-term, beneficial, conservation-related impacts" of the designation in explaining why the comment was incorrect. In any event, the Service explained in detail why the designated habitat was essential to the conservation of the species (*see* 2-ER-225-226, 236-237)—that it *also* noted the various ways the designation will benefit the species (a closely related concept) does not mean that the Service applied a watered-down standard.

42

As to Rosemont's second argument, we agree that "essential" means something more than convenient or helpful.[7]  But the word "essential" does not appear in isolation.   It appears twice in the definition of "critical habitat," in phrases that refer to "areas" or "physical or biological features" that are "essential to [or for] the *conservation* of the species." 16 U.S.C. § 1532(5)(A)(i), (ii) (emphasis added). Unlike "essential," "conservation" is defined in the ESA.  It means "the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary." *Id.* § 1532(3).  As this Court has noted, therefore, Congress did not intend the ESA "merely to forestall the extinction of species (i.e. promote a species survival), but to allow a species to recover to the point where it may be delisted." *Gifford Pinchot Task Force v. U.S. Fish and Wildlife Service*, 378 F.3d 1059, 1070 (9th Cir. 2004); *accord Sierra Club v. U.S. Fish and Wildlife Service*, 245 F.3d 434, 441 (5th Cir. 2001) ("'Conservation' is a much broader

---

[7] That said, Rosemont's analysis of the various sources discussed on pages 24-31 of its brief is misplaced in multiple respects.  Rosemont points to language in the legislative history of the 1978 ESA amendments discussing areas "*truly critical* to the continued existence of a[n endangered] species" and "habitat that is *necessary* for the continued survival of the" grizzly bear.  Rosemont Brief at 30-31 (emphases and alterations supplied by Rosemont).  But the legislation that Congress passed does not adopt that approach.  Rather, Congress enacted definitions of critical habitat that refer to what is essential for the "conservation" of a species, not merely its survival.  *See Milner v. Department of Navy*, 562 U.S. 562, 572 (2011) ("We will not . . . allow[] ambiguous legislative history to muddy clear statutory language.");

concept than mere survival."). Given this broad standard—and the species-protective purpose of the ESA more generally—this Court in reviewing the Service's critical habitat designations has never insisted on anything like the narrow-tailoring requirements Rosemont would impose. *See Alaska Oil & Gas Association*, 815 F.3d at 555 (noting that a "narrow construction of critical habitat runs directly counter to the Act's conservation purposes"); *Home Builders Association of Northern California*, 616 F.3d at 989 (the ESA's mandate that the Service focus on both survival and recovery means that Service must be "*more* generous in defining area as part of the critical habitat designation").[8]

In particular, Rosemont's argument that there is no critical habitat for the jaguar in the United States because most jaguars are currently found outside the country is contrary to this Court's caselaw. This Court has rejected the notion that "designation is only necessary where it would protect the majority of species

---

[8] This context—and the ESA's expansive purposes more generally— also makes Rosemont's analogies inapt. Take Rosemont's football analogy for example: Rosemont notes that "to say that quarterback is an 'essential' member of a football team is to say that the quarterback is 'indispensable.'" Rosemont Brief at 26. But an analogy that better fits the ESA's text and purposes would involve an owner—known for their heavy prioritization on winning—who tells their GM to "sign any person essential to winning the Super Bowl." No faithful GM would interpret such a mandate as a license to act parsimoniously. And any GM who did—by, for example, not signing a competent kicker, not investing in solid backups, or not hiring an experienced and well-respected coaching staff (on the theory that none of these things would be "indispensable" if everything else went right for the team)—would not stay employed for very long.

44

habitat." *Natural Resources Defense Council*, 113 F.3d at 1126. Moreover, "[s]ince the point of the ESA is to ensure the species' recovery, it makes little sense to limit its protections to the habitat that the existing, threatened population currently uses." *Alaska Oil & Gas Association*, 815 F.3d at 556.[9] Similarly here, the Service reasonably found that jaguars "dispersing into the United States are important because they occupy habitat that serves as a buffer to zones of regular reproduction and are potential colonizers of vacant range" and "as such, areas supporting them are important to maintaining normal demographics, as well as allowing for possible range expansion." 2-ER-217.

In short, Rosemont's attempt to transform a dispute about the evidence in the record into a question of statutory interpretation fails. The Service reasonably found that Unit 3 and Subunit 4b were essential to the jaguar's conservation.

---

[9] Indeed, the critical habitat regulation in force in 2014 set forth multiple circumstances in which a designation of critical habitat may be not prudent or not determinable and does not include a scenario in which most individuals are located outside the United States. 50 C.F.R. § 424.12(a) (2012). The current version of the regulation provides that where "[a]reas within the jurisdiction of the United States provide no more than negligible conservation value, if any, for a species occurring primarily outside the jurisdiction of the United States," the Service "*may, but is not required to*, determine that a designation would not be prudent." 50 C.F.R. § 424.12 (emphasis added). And here, of course, the Service did not find that areas within the United States provide only negligible conservation value.

### B. The Service properly considered the Northwestern Recovery Unit in determining that Unit 3 and Subunit 4b were essential.

The Service explained that the designated critical habitat is essential because it would continue to allow for normal demographic function (through cyclical dispersal) and possible range expansion of the NRU, "which is essential to the conservation of the species." 2-ER-231. Rosemont contends that, by highlighting the NRU, the Service treated the jaguars there "as tantamount to the jaguar species as a whole." Rosemont Brief at 42. Not so: Rather, as the Jaguar Recovery Outline explains, "[e]ach designated recovery unit is critical to recovering the jaguar *throughout its entire current range*." 4-ER-748 (emphasis added).

The record fully supports this conclusion. First of all, as the Jaguar Recovery Team explained, the United States has little authority to influence actions needed to recover the jaguar outside the NRU, and it is thus appropriate to focus on the NRU "as our contribution toward an international effort to conserve and recover the jaguar rangewide." 4-ER-748. The NRU is also one of only two recovery units for the jaguar across its range and, as the Jaguar Recovery Team also noted, each recovery unit is "individually necessary to conserve genetic robustness, demographic robustness, important life history stages, or some other feature necessary for long-term sustainability of the species." *Id.*

46

In addition to these general observations, the Recovery Outline explains in detail why conservation efforts in the NRU in particular significantly contribute to range-wide recovery of the jaguar. The NRU includes two core areas and two "highest priority Jaguar Conservation Units" as identified in the scientific literature. 4-ER-748. The NRU also "has distinct ecological conditions (i.e., xeric habitat) that occur nowhere else in the species range' range." *Id.* The Service similarly explained in the Final Rule that the habitat in the United States is "one of only four distinct xeric (extremely dry) habitats that occur within the species' range." 2-ER-217; *see also* 2-ER-216 (noting that "Jaguar habitat available in the U.S.-Mexico borderlands area is quite different from habitat in Central and South America"). Those unique ecological features are important. As scientific literature on which the Service relied (*see* 2-ER-217) notes, conservation actions require "saving populations of the species in all the significantly different ecological systems in which they occur." FWSSER-7. The Service thus rightly noted that the "ability for jaguars in the [NRU] to utilize physical and biological habitat features in the borderlands region is ecologically important to the recovery of the species." 2-ER-217.

In addition, the Jaguar Recovery Team explained that peripheral populations such as the jaguars in the NRU are both important genetic resources critical to conservation, and beneficial to the protection of evolutionary processes that are likely to generate future evolutionary diversity. 4-ER-748; *see also* 2-ER-217. The

47

potential genetic diversity of peripheral populations "may be particularly important considering the potential threats of global climate change." 2-ER-217; *see also* 4-ER-748 (Jaguar Recovery Team making same point). Moreover, as the Final Rule explained (citing scientific literature), these peripheral populations sometimes persist the longest as fragmentation and habitat loss affect the range. 2-ER-217.

Rather than engage with this, Rosemont repeatedly characterizes the Service as treating the jaguars in the NRU as a *separate species*—and having erected this strawman, Rosemont has little trouble dismantling it as an unreasonable interpretation of the ESA under *Chevron*. *See, e.g.*, Rosemont Brief at 43, 46. But although the NRU does include the entire range of a putative jaguar subspecies, *see* 4-ER-748, the Service neither found nor suggested that the jaguars in the NRU were a separate species or subspecies. And the Service's explanation of why maintenance and possible range expansion of the NRU was essential to the jaguar's recovery is reasonable.

### C. The designations complied with the relevant regulation.

Rosemont next argues that the Service's critical-habitat designation failed to comply with the version of 50 C.F.R. § 424.12 applicable in 2014. Rosemont Brief at 46-54. That regulation then provided that "[t]he Secretary shall designate as critical habitat areas outside the geographical area presently occupied by a species only when a designation limited to its present range would be inadequate to ensure

48

the conservation of the species."  4-ER-775.  Rosemont contends that this language

required the Service to make a separate finding that habitat occupied at the time of

listing was inadequate to conserve the species before designating unoccupied

habitat.  Rosemont Brief at 47-51.

Rosemont acknowledges that this Court has expressly rejected precisely this

argument.  Rosemont Brief at 49 (discussing *Bear Valley*).  In *Bear Valley*, this Court

held that where the Service "sufficiently explained why the designation of

unoccupied habitat . . . was essential," it necessarily explained "why designation of

solely occupied habitat was inadequate for the conservation of the species."  790

F.3d at 994; *see also id.* ("Although appellants consider these to be two separate

requirements, they are identical.").  Rosemont does not contend that any Supreme

Court decision or en banc decision from this Court since 2015 has overruled *Bear*

*Valley*.    And Rosemont does not dispute that the Service's critical-habitat

designation complied with the regulation as this Court interpreted it in *Bear Valley*.

*Bear Valley* was correct.  Nothing in the 2012 regulation requires any express

findings about the inadequacy of designating only occupied areas.  To be sure, the

Service must explain to the satisfaction of a reviewing court that any unoccupied

areas it designates are in fact essential to the conservation of the species.  But when

the Service does that, it follows tautologically that failing to designate that area (and

designating only occupied areas) would be insufficient.  Even if that conclusion were

49

debatable, *Bear Valley*'s directly-on-point reading of the same regulatory language forecloses Rosemont's argument here.

In attempting to get around *Bear Valley*, Rosemont notes that the Service *subsequently* characterized the prior regulation as requiring a "rigid step-wise approach" when it replaced that regulation in 2016. Rosemont Brief at 48 (quoting 81 Fed. Reg. 7,414, 7,427 (Feb. 11, 2016)). Rosemont contends that this characterization is an interpretation of the regulation entitled to deference under *Auer v. Robbins*, 519 U.S. 452 (1997). Rosemont Brief at 48. And that interpretation, Rosemond argues, displaces *Bear Valley*—in much the same way that an agency construction of a statute entitled to *Chevron* deference may trump a court's prior construction of that statute under *National Cable & Telecommunications Association v. Brand X Internet Services*, 545 U.S. 967, 982 (2005). This argument fails for multiple reasons.[10]

Initially, Rosemont never advanced this argument in the district court. *See Momox-Caselis v. Donohue*, 987 F.3d 835, 841 (9th Cir. 2021) ("Generally, we do

---

[10] To the extent Rosemont suggests that the Tenth Circuit's decision supports its retroactive *Auer* deference argument, Rosemont is incorrect. Although the Tenth Circuit felt that the agency's subsequent characterization of the prior regulation supported the court's own interpretation, the Tenth Circuit made clear that it viewed the prior regulation as unambiguous such that *Auer* did not apply. 952 F.3d at 1231 n.16. The Tenth Circuit erred in its interpretation of the regulation, but its opinion thus does not support Rosemont's argument that the Service's after-the-fact characterization of the regulation supplants binding circuit precedent to the contrary.

not consider arguments raised for the first time on appeal.").  Although Rosemont noted below that the relevant regulation authorized designation of unoccupied areas only when a designation limited to its present range would be inadequate to ensure the conservation of the species, FWSSER-11, 13-14, Rosemont made this point as a gloss on its broader contention that the Service failed to demonstrate that any unoccupied habitat here was essential, FWSSER-13-14.  By contrast, Rosemont did not contend that *Bear Valley* had been incorrectly decided or was no longer good law, let alone advance the novel argument based on *Brand X* and *Auer* that it makes here; indeed, Rosemont did not even *mention Brand X* or *Auer* in either of its district-court summary judgment briefs.  And Rosemont discussed *Bear Valley* only in its reply brief, and there characterized it as a case in which unoccupied critical habitat had been *properly* designated.  FWSSER-19-20.  Rosemont also never contended that the regulation required a "two-step process," Rosemont Brief at 47, or assert that the 2016 rulemaking retroactively changed the law governing the Service's application of the prior regulation two years earlier.  As discussed below, the novel arguments Rosemont presses here raise, at the very least, convoluted questions; this Court should not address them when Rosemont failed to make such arguments below.

There is also an even more basic problem with Rosemont's argument.  Putting aside that the Service offered the characterization of the 2012 regulation Rosemont

deems authoritative in the course of *replacing* that regulation,[11] that characterization was offered in 2016—two years *after* the Service issued the Final Rule. Review under the APA is generally limited to the administrative record that existed at the time the agency made its decision. *See Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971). And even "congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result." *Bowen v. Georgetown University Hospital*, 488 U.S. 204, 208 (1988). Thus, the Service's passing remarks cannot reasonably have retroactive effect. Nothing in the Service's 2016 rulemaking suggests that it intended its characterization of the 2012 regulation to apply retroactively to agency actions previously taken pursuant to that regulation.

But even if Rosemont's forfeiture were excused and even if the Service's remarks could apply retroactively to effectively overrule *Bear Valley*, that *still* would not help Rosemont's challenge with respect to either Unit 3 or Subunit 4b. There is no serious dispute that Unit 3 was *presently* occupied by the jaguar in 2014. And the 2012 regulation speaks of "habitat areas outside the geographical area *presently*

---

[11] Although we put that issue aside, it is potentially quite important. It is odd to think an agency could cast new meaning on an old regulation in the course of replacing it—and in doing so, to create new legal vulnerabilities for past agency actions that remain subject to legal challenge. But since Rosemont's argument fails on numerous other grounds, this Court need not squarely address that issue here.

occupied by a species" and "a designation limited to its *present* range," not occupied at the time of listing. 4-ER-775 (emphases added). Perhaps because the Tenth Circuit decided the regulatory interpretation issue without any input from the parties, *see supra* p. 22, it simply misread the regulation. And as to Subunit 4b, the Tenth Circuit stated (or at least strongly suggested) that the Service *complied* with its reading of the regulation with respect to that Subunit. *See* 952 F.3d at 1231 & n.17.

These threshold points make it wholly unnecessary to decide the novel *Brand X/Auer* argument Rosemont raises here. But if the Court did reach that argument, it would face substantial obstacles—the government notes at least three here.

First, this Court would have to actually decide that *Brand X* principles apply to agency interpretations of regulations that conflict with prior judicial interpretations. As Rosemont acknowledges, this Court has never squarely addressed that issue. Rosemont Brief at 50-51. And although the Government agrees that an agency interpretation entitled to deference may supplant a contrary judicial interpretation under at least some circumstances, the two cases Rosemont cites from other circuits appear to rely at least in part on reasoning that the Supreme Court rejected in *Kisor v. Wilkie*, 139 S. Ct. 2400 (2019).[12]

---

[12] Rosemont favorably cites the Third Circuit's assertion (quoting older Supreme Court precedent) that "'[w]hen the construction of an administrative regulation rather than a statute is in issue, deference is even more clearly in order.'" Rosemont Brief at 51 (quoting *Levy v. Sterling Holding Co., LLC*, 544 F.3d 493, 502 (3d Cir.

Second, assuming that *Brand X* principles can apply to some agency regulatory interpretations, *Brand X* permits an agency's interpretation to trump a court's only when that prior judicial interpretation was premised on *ambiguity*. *See, e.g.*, *Lambert v. Saul*, 980 F.3d 1266, 1275 (9th Cir. 2020); *Medina-Nunez v. Lynch*, 788 F.3d 1103, 1105 (9th Cir. 2015). And in *Kisor*, the Supreme Court reiterated that an ambiguity finding should be a conclusion of last rather than first resort. *See* 139 S. Ct. at 2415 (noting that before concluding that a regulation is ambiguous, a court must, inter alia, "exhaust all the traditional tools of construction" and accord deference "only when that legal toolkit is empty and the interpretive question still has no single right answer" (quotation marks omitted)). Nothing in *Bear Valley* suggests that this Court viewed the regulation as ambiguous—or, for that matter, that it thought the question was particularly difficult. Rather, the Court's conclusion that the two steps were functionally identical flowed from the district court's conclusion (with which this Court agreed) that "[i]f certain habitat is essential, it stands to reason that if the [Service] did not designate this habitat, whatever the

---

2008)). But *Kisor* rejected this. 139 S. Ct. at 2416 ("Some courts have thought . . . agency constructions of rules receive greater deference than agency constructions of statutes. But that is not so." (internal citation omitted)). Similarly, in *In re Lovin*, the Federal Circuit applied the principle that an agency regulatory interpretation controls unless it is "plainly erroneous or inconsistent with the regulation." 652 F.3d 1349, 1356 (Fed. Cir. 2011) (quotation marks omitted); *but see Kisor*, 139 S. Ct. at 2415 (suggesting that this formulation "may suggest a caricature of the doctrine" and emphasizing that "a court should not afford *Auer* deference unless the regulation is genuinely ambiguous").

[Service] otherwise designated would be inadequate." 790 F.3d at 994 (quoting *Bear Valley Mutual Water Co. v. Salazar*, 2012 WL 5353353, at *22 (C.D. Cal. Oct. 17, 2012)) (alterations supplied by this Court)).

Third, assuming that *Brand X* applies to agency interpretations of ambiguous regulations and assuming that *Bear Valley* found the prior regulation genuinely ambiguous, that would merely raise the question whether the agency's 2016 characterization of the prior regulation is in fact entitled to *Auer* deference. Under *Kisor*, it probably would not be. As *Kisor* explained, the Supreme Court has "only rarely given *Auer* deference to an agency construction conflicting with a prior one." 139 S. Ct. at 2418 (cleaned up). Here, the Service's passing remarks in 2016 arguably do not qualify as an "agency construction" at all; but if they did, the agency did not follow what it later described as a "rigid step-wise approach" when the prior regulation was actually in effect—or at least did not do so consistently. *See Bear Valley*, 2012 WL 5353353, at *22 ("*Federal Defendants argue* that if something is essential, not having it is necessarily inadequate. Otherwise, it would not be essential." (emphasis added)).

Finally, even if Rosemont were able to clear all of these hurdles, any misapplication of the 2012 Regulation would plainly not be an error warranting vacatur of the critical-habitat designations. *See California Communities Against Toxics v. EPA*, 688 F.3d 989, 992 (9th Cir. 2012). Here, the Service explained in

detail why the designated areas were essential to the jaguar's conservation—which, as this Court held in *Bear Valley*, is logically identical to finding that a designation that did not include these areas would be inadequate. But even if *Bear Valley* is wrong, there is no reason to think any formalistic failure in the Service's findings made a difference, let alone a difference that warrants removing environmental protections from areas the Service found were essential to the jaguar's conservation.

### D. The district court was not required to remand to the Service to reconsider its economic-impact analysis.

Finally, Rosemont argues that, after rejecting the agency's adverse-modification analysis, the district court should have remanded for the Service to reassess its decision not to exclude the northern Santa Rita Mountains and Subunit 4b from its critical-habitat designations. Rosemont Brief at 55. Even if Rosemont were right about this, the proper remedy would be a remand for reconsideration of economic impact—not, as Rosemont appears to suggest, vacatur of the entire critical habitat designation. Rosemont Brief at 58. But Rosemont is not right: this argument is both forfeited on appeal and in any event premature.

As to forfeiture, Rosemont never argued below that vacatur and reconsideration of economic impact should follow if the district court disturbed the Service's adverse-modification analysis (as CBD requested). Rosemont's district-court briefing on its crossclaim also does not even *mention* the Service's economic-impact analysis, let alone challenge the Service's determination not to exclude the

Rosemont project area from the final designation. Similarly, Rosemont's cross-complaint—although it noted and seemingly criticized how the agency addressed the economic-impact question, *see* 2-ER-98-99—did not present any challenge or request any relief related to this question. 2-ER-100-109. The district court did not err—let alone "inexplicably" err, Rosemont Brief at 57—by failing to grant relief Rosemont did not request, concerning an issue it did not raise.

Even if Rosemont had preserved this argument, it would fail. The district court did not conclude that the Rosemont Project *would* likely destroy or adversely modify critical habitat. Rather, the court noted that the Service had stated that "to reach a conclusion of destruction or adverse modification of critical habitat from a Federal action, we must determine that preclusion of recovery is 'very probable' due to that action," a standard the district court viewed as too demanding. 1-ER-14 (quotation marks omitted). The court remanded to the agency to "reconsider whether the Rosemont Mine is 'likely' to result in destruction or adverse modification of the jaguar's critical habitat under the proper more likely than not standard." 1-ER-16. The court's ruling thus does not decide the adverse-modification question—nor does it dictate (either formally or practically) the Service's resolution of that question. If the Service later concludes that the Rosemont Project would adversely modify critical habitat, Rosemont may ask the Service to reconsider its prior economic-impact analysis then. There is no basis for

requiring the agency to redo its analysis now, particularly since—depending on the

Service's analysis of this question—doing so might prove unnecessary.

## CONCLUSION

For the foregoing reasons, the district court's judgment should be affirmed.

Respectfully submitted,

/s/ *Andrew M. Bernie*
TODD KIM
*Assistant Attorney General*
ANDREW C. MERGEN
ANDREW M. BERNIE
*Attorneys*
Environment and Natural Resources Division
U.S. Department of Justice
950 Pennsylvania Avenue N.W.
Washington, D.C. 20530
(202) 514-4010
andrew.m.bernie@usdoj.gov

Dated: March 18, 2022
DJ# 90-8-6-08145

## STATEMENT OF RELATED CASES

Pursuant to Circuit Rule 28-2.6, Federal Defendant-Appellee certifies that there is one related pending case of which it is currently aware pending before this Court: *Center for Biological Diversity v. United States Fish and Wildlife Service and Rosemont Copper Company*, Nos. 19-17585, 19-17586.

## Form 8.  Certificate of Compliance for Briefs

**9th Cir. Case Number(s)**        20-15654.

I am the attorney or self-represented party.

**This brief contains 13,937 words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ X ]  complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

[ ] it is a joint brief submitted by separately represented parties;

[] a party or parties are filing a single brief in response to multiple briefs; or

[ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature**   s/ *Andrew M. Bernie*

**Date**        March 18, 2022

# ADDENDUM

Administrative Procedure Act

    5 U.S.C. § 706.......................................................................................1a

Endangered Species Act

    16 U.S.C. § 1532................................................................................2a

    16 U.S.C. § 1533................................................................................3a

    16 U.S.C. § 1536................................................................................4a

    16 U.S.C. § 1538................................................................................5a

Endangered Species Act Regulations

    50 C.F.R. § 402.14.............................................................................6a

    50 C.F.R. § 424.12 (2012) ...............................................................6a

## Administrative Procedure Act

### 5 U.S.C. § 706. Scope of review

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

## Endangered Species Act

### 16 U.S.C. § 1532. Definitions

For the purposes of this chapter—

. . . .

**(3)** The terms "conserve", "conserving", and "conservation" mean to use and the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary. Such methods and procedures include, but are not limited to, all activities associated with scientific resources management such as research, census, law enforcement, habitat acquisition and maintenance, propagation, live trapping, and transplantation, and, in the extraordinary case where population pressures within a given ecosystem cannot be otherwise relieved, may include regulated taking.

. . . .

**(5)(A)** The term "critical habitat" for a threatened or endangered species means--
**(i)** the specific areas within the geographical area occupied by the species, at the time it is listed in accordance with the provisions of section 1533 of this title, on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection; and
**(ii)** specific areas outside the geographical area occupied by the species at the time it is listed in accordance with the provisions of section 1533 of this title, upon a determination by the Secretary that such areas are essential for the conservation of the species.

. . . .

**(6)** The term "endangered species" means any species which is in danger of extinction throughout all or a significant portion of its range other than a species of the Class Insecta determined by the Secretary to constitute a pest whose protection under the provisions of this chapter would present an overwhelming and overriding risk to man.

2a

. . . .

**(15)** The term "Secretary" means, except as otherwise herein provided, the Secretary of the Interior or the Secretary of Commerce as program responsibilities are vested pursuant to the provisions of Reorganization Plan Numbered 4 of 1970; except that with respect to the enforcement of the provisions of this chapter and the Convention which pertain to the importation or exportation of terrestrial plants, the term also means the Secretary of Agriculture.

. . . .

**(19)** The term "take" means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct.

**(20)** The term "threatened species" means any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range.

. . . .

**16 U.S.C. § 1533. Determination of endangered species and threatened species**

**(a) Generally**

. . . .

(3)(A) The Secretary, by regulation promulgated in accordance with subsection (b) and to the maximum extent prudent and determinable--

> (i) shall, concurrently with making a determination under paragraph (1) that a species is an endangered species or a threatened species, designate any habitat of such species which is then considered to be critical habitat; and

> (ii) may, from time-to-time thereafter as appropriate, revise such designation.

. . . .

**(b) Basis for determinations**

. . . .

3a

(2) The Secretary shall designate critical habitat, and make revisions thereto, under subsection (a)(3) on the basis of the best scientific data available and after taking into consideration the economic impact, the impact on national security, and any other relevant impact, of specifying any particular area as critical habitat. The Secretary may exclude any area from critical habitat if he determines that the benefits of such exclusion outweigh the benefits of specifying such area as part of the critical habitat, unless he determines, based on the best scientific and commercial data available, that the failure to designate such area as critical habitat will result in the extinction of the species concerned.

. . . .

**(d) Protective regulations**

Whenever any species is listed as a threatened species pursuant to subsection (c) of this section, the Secretary shall issue such regulations as he deems necessary and advisable to provide for the conservation of such species. The Secretary may by regulation prohibit with respect to any threatened species any act prohibited under section 1538(a)(1) of this title, in the case of fish or wildlife, or section 1538(a)(2) of this title, in the case of plants, with respect to endangered species; except that with respect to the taking of resident species of fish or wildlife, such regulations shall apply in any State which has entered into a cooperative agreement pursuant to section 1535(c) of this title only to the extent that such regulations have also been adopted by such State.

. . . .

**16 U.S.C. § 1536. Interagency cooperation**

**(a) Federal agency actions and consultations**

. . . .

4a

**(2)** Each Federal agency shall, in consultation with and with the assistance of the Secretary, insure that any action authorized, funded, or carried out by such agency (hereinafter in this section referred to as an "agency action") is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary, after consultation as appropriate with affected States, to be critical, unless such agency has been granted an exemption for such action by the Committee pursuant to subsection (h) of this section. In fulfilling the requirements of this paragraph each agency shall use the best scientific and commercial data available.

. . . .

## 16 U.S.C. § 1538. Prohibited acts

(a) Generally

(1) Except as provided in sections 1535(g)(2) and 1539 of this title, with respect to any endangered species of fish or wildlife listed pursuant to section 1533 of this title it is unlawful for any person subject to the jurisdiction of the United States to—

. . . .

(B) take any such species within the United States or the territorial sea of the United States;

. . . .

## Endangered Species Act Regulations

**50 C.F.R. § 402.14 Formal consultation.**

(a) Requirement for formal consultation. Each Federal agency shall review its actions at the earliest possible time to determine whether any action may affect listed species or critical habitat. If such a determination is made, formal consultation is required, except as noted in paragraph (b) of this section. The Director may request a Federal agency to enter into consultation if he identifies any action of that agency that may affect listed species or critical habitat and for which there has been no consultation. When such a request is made, the Director shall forward to the Federal agency a written explanation of the basis for the request.

(b) Exceptions.

> (1) A Federal agency need not initiate formal consultation if, as a result of the preparation of a biological assessment under § 402.12 or as a result of informal consultation with the Service under § 402.13, the Federal agency determines, with the written concurrence of the Director, that the proposed action is not likely to adversely affect any listed species or critical habitat.

> (2) A Federal agency need not initiate formal consultation if a preliminary biological opinion, issued after early consultation under § 402.11, is confirmed as the final biological opinion.

. . . .

(h) Biological opinions.
. . . .

(2) A "jeopardy" biological opinion shall include reasonable and prudent alternatives, if any. If the Service is unable to develop such alternatives, the Service will indicate that to the best of its knowledge there are no reasonable and prudent alternatives.
. . . .

**50 C.F.R. § 424.12 Criteria for designating critical habitat.**

**Effective: May 31, 2012 to March 13, 2016**

(a) Critical habitat shall be specified to the maximum extent prudent and determinable at the time a species is proposed for listing. If designation of critical habitat is not prudent or if critical habitat is not determinable, the reasons for not designating critical habitat will be stated in the publication of proposed and final rules listing a species. A final designation of critical habitat shall be made on the basis of the best scientific data available, after taking into consideration the probable economic and other impacts of making such a designation in accordance with § 424.19.

(1) A designation of critical habitat is not prudent when one or both of the following situations exist:

(i) The species is threatened by taking or other human activity, and identification of critical habitat can be expected to increase the degree of such threat to the species, or

(ii) Such designation of critical habitat would not be beneficial to the species.

(2) Critical habitat is not determinable when one or both of the following situations exist:

(i) Information sufficient to perform required analyses of the impacts of the designation is lacking, or

(ii) The biological needs of the species are not sufficiently well known to permit identification of an area as critical habitat.

(b) In determining what areas are critical habitat, the Secretary shall consider those physical and biological features that are essential to the conservation of a given species and that may require special management considerations or protection. Such requirements include, but are not limited to the following:

(1) Space for individual and population growth, and for normal behavior;

(2) Food, water, air, light, minerals, or other nutritional or physiological requirements;

(3) Cover or shelter;

(4) Sites for breeding, reproduction, rearing of offspring, germination, or seed dispersal; and generally;

7a

(5) Habitats that are protected from disturbance or are representative of the historic geographical and ecological distributions of a species.

When considering the designation of critical habitat, the Secretary shall focus on the principal biological or physical constituent elements within the defined area that are essential to the conservation of the species. Known primary constituent elements shall be listed with the critical habitat description. Primary constituent elements may include, but are not limited to, the following: roost sites, nesting grounds, spawning sites, feeding sites, seasonal wetland or dryland, water quality or quantity, host species or plant pollinator, geological formation, vegetation type, tide, and specific soil types.

. . . .

(e) The Secretary shall designate as critical habitat areas outside the geographical area presently occupied by a species only when a designation limited to its present range would be inadequate to ensure the conservation of the species.

. . . .

8a