No. 20-15654

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

CENTER FOR BIOLOGICAL DIVERSITY,
*Plaintiff/Appellee*,

v.

UNITED STATES FISH AND WILDLIFE SERVICE,
*Defendant/Appellee*,

and

ROSEMONT COPPER COMPANY, *et al.*,
*Intervenor-Defendant-Appellant.*

Appeal from the United States District Court for the District of Arizona
Nos. 4:17-cv-00475-JAS, 4:17-cv-00576-JAS, 4:18-cv-00189-JAS
(Hon. James A. Soto)

**APPELLEE'S ANSWERING BRIEF**

Allison N. Melton
Center for Biological Diversity
P.O. Box 3024
Crested Butte, CO 81224
(970) 309-2008
amelton@biologicaldiversity.org

Roger Flynn
Western Mining Action Project
P.O. Box 349, 440 Main St., #2
Lyons, CO 80540
(303) 823-5738
roger@wmaplaw.org

Marc D. Fink
Center for Biological Diversity
209 East 7th Street
Duluth, Minnesota 55805
(218) 464-0539
mfink@biologicaldiversity.org

Brendan Cummings
Center for Biological Diversity
1212 Broadway #800
Oakland, CA 94612
(510) 844-7100
bcummings@biologicaldiversity.org

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Fed. R. App. P. 26.1, Appellee-Intervenor Center for Biological Diversity states that it is a non-profit organization that does not have any parent companies, subsidiaries, or affiliates that have issued shares of stock to the public in the United States or abroad.

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ....................................................................v

INTRODUCTION .............................................................................1

STATEMENT OF JURISDICTION.......................................................3

STATEMENT OF ISSUES ................................................................3

STATEMENT OF THE CASE...........................................................3

   I.  Factual Background ...............................................................3

   II.  Procedural History .............................................................7

STATUTORY AND REGULATORY BACKGROUND.........................8

STANDARD OF REVIEW ................................................................11

SUMMARY OF THE ARGUMENT .................................................11

ARGUMENT ..................................................................................14

   I.  The Designation of Critical Habitat is Central to the
      Endangered Species Act's Conservation Objective. ....................14

   II.  The Service reasonably designated Unit 3 as occupied
      critical habitat...................................................................16

   III. The Service Properly Included Unit 3 and Subunit 4b
      in the Critical Habitat Designation Because They Are
      Essential for Jaguar Conservation..........................................16

      A.   The dictionary definition of essential is not determinative
            as to what habitat should have been designated for the jaguar. ..............17

      B.   What habitat is essential depends on the species
            at issue, and must include the habitat that is
            needed for both the species' survival and recovery. ...............19

      C.   The record and the best available scientific
            evidence support the Service's determination that

ii

the Santa Rita Mountains in Unit 3 and the Whetstone-Santa Rita Subunit 4b are essential for jaguar conservation............................22

1.  The Service appropriately considered the best available science regarding the jaguar's recovery needs.......................................................................................22

2.  The Service rationally concluded that Unit 3, including the Santa Rita Mountains, is essential for jaguar conservation even if it was unoccupied at the time the jaguar was listed............................................31

3.  The Service rationally concluded that Subunit 4b is essential for jaguar conservation. ..........................................35

D.  Rosemont's remaining arguments that Unit 3 and Subunit 4b are not essential to the jaguar's survival and recovery lack merit..............................................................39

1.  The ESA's legislative history does not justify replacing the ESA's plain language with terms of Rosemont's choosing........................................................39

2.  The Service's determination that habitat in the United States is essential for the jaguar's conservation is supported by the Final Rule and best available science. ....................41

IV. The Service Properly Included Unoccupied Habitat in the Critical Habitat Designation. ...........................................................44

A.  The Service's designation of Unit 3 and Subunit 4b as unoccupied critical habitat is consistent with the statute, regulation, and Ninth Circuit precedent. ....................................45

B.  Contrary to Rosemont's arguments, the Court's review of the Service's 2014 Final Rule is limited to the record that was before the agency..................................................48

V.  The District Court Did Not Need to Remand the Economic Impact Analysis. ............................................................55

VI. The Final Rule Should Not be Vacated Pending Remand
    Even if the Court Finds Flaws in the Jaguar Critical
    Habitat Designation. ........................................................................58

CONCLUSION ...................................................................................61

STATEMENT OF RELATED CASES

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

## Cases

*Alaska Dep't of Envtl. Conservation v. EPA*,
  540 U.S. 461 (2004) ............................................................................18

*Alaska Oil & Gas Ass'n v. Jewell*,
  815 F.3d 544 (9th Cir. 2016) ................................................... 9, 26, 30

*Alliance for the Wild Rockies v. Lyder*,
  728 F. Supp. 2d 1126 (D. Mont. 2010) ........................................ 38, 39

*Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*,
  988 F.2d 146 (D.C. Cir. 1993) ...............................................................58

*Ariz. Cattle Growers' Ass'n v. Salazar*,
  606 F.3d 1160 (9th Cir. 2010) ................................................... 2, 19, 20

*Bear Valley Mut. Water Co. v. Jewell*,
  790 F.3d 977 (9th Cir. 2015) ...................................................... *passim*

*Bear Valley Mut. Water Co. v. Salazar*,
  2012 U.S. Dist. LEXIS 160048 (C.D. Cal., Oct. 17, 2012).......................... 18, 46

*Betansos v. Barr*,
  928 F.3d 1133 (9th Cir. 2019) ...............................................................51

*Bldg. Indus. Ass'n v. Norton*,
  247 F.3d 1241 (D.C. Cir. 2001) ...........................................................30

*Bolker v. Comm'r*,
  760 F.2d 1039 (9th Cir. 1985) ...............................................................56

*Cal. Cmtys. Against Toxics v. U.S. EPA*,
  688 F.3d 989 (9th Cir. 2012) .................................................................58

*Ctr. for Biological Diversity v. Zinke*,
  900 F.3d 1053 (9th Cir. 2018) ...............................................................52

v

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
　401 U.S. 402 (1971) ......................................................................... *passim*

*Ctr. for Biological Diversity v. Kempthorne*,
　607 F. Supp. 2d 1078 (D. Ariz. 2009) ......................................... *passim*

*Ctr. for Biological Diversity v. Norton*,
　240 F. Supp. 2d 1090 (D. Ariz. 2003) .................................................15

*Ctr. for Native Ecosystems v. Cables*,
　509 F.3d 1310 (10th Cir. 2007) ..........................................................15

*Gifford Pinchot Task Force v. United States Fish & Wildlife Serv.*,
　378 F.3d 1059 (9th Cir. 2004) ............................................... 20, 21, 22

*Idaho Farm Bureau Fed'n v. Babbitt*,
　58 F.3d 1392 (9th Cir. 1995) ..............................................................58

*In re E.R. Fegert, Inc.*,
　887 F.2d 955 (9th Cir. 1989) ..............................................................55

*In re Lovin*,
　652 F.3d 1349 (Fed. Cir. 2011).........................................................52

*Inland Cities Express, Inc. v. Diamond Nat'l Corp.*,
　524 F.2d 753 (9th Cir. 1975) ..............................................................56

*Int'l Union of Bricklayers & Allied Craftsman Local Union*
　*No. 20 v. Martin Jaska, Inc*.,
　752 F.2d 1401 (9th Cir. 1984) ............................................................56

*Kelton Arms Condo Owners Ass'n v. Homestead Ins. Co*.,
　346 F.3d 1190 (9th Cir. 2003) .................................................... 54, 55

*Kisor v. Wilkie*,
　139 S.Ct. 2400 (2019)..........................................................................49

*Levy v. Sterling Holding Co.*,
　544 F.3d 493 (3rd Cir. 2008) ..............................................................51

*Markle Interests, L.L.C. v. U.S. Fish & Wildlife Serv.*,
  827 F.3d 452 (5th Cir. 2016) ................................................................18

*Milner v. Dep't of the Navy*,
  562 U.S. 562 (2011)...........................................................................41

*Morrow v. Greyhound Lines, Inc.*,
  541 F.3d 713 (8th Cir. 1976) ..............................................................56

*Motor Vehicle Mfrs. Ass'n of the United States, Inc. v.
  State Farm Mut. Auto. Co.*,
  463 U.S. 29 (1983)...................................................................... 49, 52

*Nat. Res. Defense Council v. U.S. Dep't of the Interior*,
  113 F.3d 1121 (9th Cir. 1997) ............................................................26

*Nat'l Parks Conservation Ass'n v. FERC*,
  6 F.4th 1044 (9th Cir. 2020) ..............................................................48

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*,
  545 U.S. 967 (2005)...........................................................................50

*N.M. Farm & Livestock Bureau v. United States DOI*,
  952 F.3d 1216, 1233 (10th Cir. 2020) ........................... 18, 28, 53, 54

*Otay Mesa Property, L.P. v. United States DOI*,
  344 F. Supp. 3d 355 (D.D.C. Sept. 25, 2018)......................................34

*Pac. Coast Fed'n of Fishermen's Ass'ns v. U.S. Bureau of Reclamation*,
  426 F.3d 1082 (9th Cir. 2005) ............................................................11

*San Luis & Delta-Mendota Water Auth. v. Locke*,
  776 F.3d 971 (9th Cir. 2014) ..............................................................11

*Sierra Club v. U.S. Fish & Wildlife Serv.*,
  245 F.3d 434 (5th Cir. 2001) ..............................................................15

*Sierra Club v. Marsh*,
  816 F.2d 1376 (9th Cir. 1987) ............................................................60

*Tenn. Valley Auth. v. Hill*,
  437 U.S. 153 (1978).............................................................. 8, 9, 14, 60

*Weyerhaeuser Co. v. United States Fish & Wildlife Serv.*,
  139 S. Ct. 361 (2018).................................................................. 17, 18

*Whittaker Corp. v. Execuair Corp.*,
  953 F.2d 510 (9th Cir. 1992) ..............................................................56

## Statutes

5 U.S.C. § 706(2)(A)............................................................................11

16 U.S.C. § 1531(b) ...................................................................... 9, 14, 15

16 U.S.C. § 1531(c) .............................................................................9

16 U.S.C. § 1532(2) .............................................................................9

16 U.S.C. § 1532(3) ................................................................. 9, 15, 21, 40

16 U.S.C. § 1532(5) ............................................................................40

16 U.S.C. § 1532(5)(A)................................................................... *passim*

16 U.S.C. § 1532(5)(A)(i) .....................................................................6

16 U.S.C. § 1532(5)(A)(ii)........................................................... 11, 36, 45

16 U.S.C. § 1532(5)(C)................................................................... 10, 40

16 U.S.C. § 1533(a)(1).........................................................................9

16 U.S.C. § 1533(a)(2).........................................................................9

16 U.S.C. § 1533(a)(3).........................................................................15

16 U.S.C. § 1533(a)(3)(A)(i) ......................................................... 9, 11, 60

16 U.S.C. § )(2)...............................................................................10

16 U.S.C. § 1533(f).................................................................... 9, 21, 23

16 U.S.C. § 1536(a)(2) .................................................................. 14

## Regulations

50 C.F.R. § 424.12(a) .................................................................. 10

50 C.F.R. § 424.12(b)(2) .............................................................. 10

50 C.F.R. § 424.12(e) ............................................................ *passim*

50 C.F.R. § 424.12(f) ................................................................... 46

## Other Authorities

45 Fed. Reg. 13,010 (Feb. 27, 1980) ......................................... 46

49 Fed. Reg. 38,900 (Oct. 1, 1984) ............................................ 46

86 Fed. Reg. 49,985 (Sept. 7, 2021) ................................. 8, 28, 42

Circuit Rule 28-2.5 ..................................................................... 56

H.R. Rep. No. 94-887 (1976) ...................................................... 15

H.R. Rep. No. 95-1625 (1978) ............................................. 15, 16

S. Rep. No. 95-874 ...................................................................... 40

## INTRODUCTION

Rosemont Copper Company ("Rosemont") challenges the U.S. Fish and Wildlife Service's ("Service") 2014 Final Rule designating jaguar critical habitat because it wants to build a 3,000-foot deep open-pit copper mine in the Santa Rita Mountains of southern Arizona. Rosemont specifically challenges the Final Rule's inclusion of the northern Santa Rita Mountains as part of Unit 3, and all of Subunit 4b. Unfortunately for Rosemont, while the Service was developing the Final Rule, the one area in Arizona that a jaguar indisputably occupied was at and near the proposed mine site in the northern Santa Rita Mountains. 2-ER-236; Center-SER-007.

The Endangered Species Act ("ESA") requires that critical habitat designations be based on the best available science. Here, the Service did just that, relying extensively within the Final Rule on the 2012 Jaguar Recovery Outline that was developed by a team of experts. The designated critical habitat in Arizona, including Unit 3 and Subunit 4b, are part of the Northwestern Recovery Unit, which the Recovery Outline determined to be essential to the jaguar's recovery. 4-ER-748. The Recovery Outline also emphasized the importance of peripheral populations, such as the jaguars in Arizona that are at the northernmost portion of the species' range. 4-ER-727-28. Rosemont does not argue that the Recovery

1

Outline should not have been considered in the Final Rule, and also does not identify any relevant science that it claims the Service failed to consider.

The ESA requires critical habitat designations to include the specific areas that are essential to the species' conservation. The Final Rule explained that the ability of jaguars in the Northwestern Recovery Unit to utilize physical and biological features in the borderlands regions is ecologically important to the recovery of the species, thus maintaining connectivity to Mexico is essential to jaguar conservation. 2-ER-ER-217. The Service then explained that Unit 3 is essential because it was occupied by a jaguar at the time the Rule was prepared, contained all of the features that comprise jaguar habitat, and would contribute to the jaguar's persistence in the United States. 2-ER-225-26. The Service further explained that Subunit 4b is essential because it provides connectivity, including to jaguar habitat across the border in Mexico. 2-ER-237.

Analyzing the best available science and determining what habitat is essential to the conservation of the jaguar is squarely within the Service's expertise and entitled to deference. *Ariz. Cattle Growers' Ass'n v. Salazar*, 606 F.3d 1160, 1164-65 (9th Cir. 2010). The Final Rule explains in detail the Service's process for identifying and designating critical habitat in Arizona, including Unit 3 and Subunit 4b. As the district court recognized, the record supports the Service's determination that Unit 3 and Subunit 4b are essential to the recovery of the jaguar.

2

1-ER-41.  This Court should deny Rosemont's appeal and affirm the district court's upholding of the Final Rule designating jaguar critical habitat in Unit 3 and Subunit 4b.

## STATEMENT OF JURISDICTION

Appellee Center for Biological Diversity ("the Center") agrees with and adopts the Service's statement of jurisdiction.  Service's Br. at 4-5.

## STATEMENT OF ISSUES

The Center agrees with and adopts the Service's statement of issues.

## STATEMENT OF THE CASE

### I.   Factual Background

Jaguars (*Panthera onca*) have been continuously present in North America for over one million years and are native to the United States.  4-ER-768; 2-ER-216.  The species is not, as Rosemont asserts, an exotic, foreign visitor to the southwestern United States, expanding into an inhospitable and marginal landscape.  Nor did jaguars voluntarily leave their native habitat in the United States, lured by "preferred" habitat elsewhere; they were trapped, shot, poisoned, and largely extirpated from the United States by the mid-20th century.  4-ER-791.

Jaguar's historic range in the United States includes at least the states of Arizona, New Mexico, Texas, Louisiana, and California.  4-ER-784; 3-ER-449.  As the largest cat in the Western hemisphere, jaguars are territorial and require

3

expansive open space for each individual, meaning large areas may be occupied by just a few individual jaguars. 2-ER-224. Jaguar home ranges are highly variable and depend on topography, available prey, and population dynamics. 2-ER-226 (estimating one jaguar in southeastern Arizona has a minimum home range of 1,359 square kilometers (525 square miles) that encompassed two distinct mountain ranges). Given the jaguar's vast home ranges and their historic and continuous presence in the borderlands region, Rosemont's characterization of jaguars as "occasionally wander[ing] into the United States" is inaccurate. Rosemont's Br. at 37.

In Arizona, jaguars have been recorded from as far north as the Grand Canyon, south through the Mogollon Rim, and throughout the Sky Islands of southern Arizona. Center-SER-009; 3-ER-449; *Ctr. for Biological Diversity v. Kempthorne*, 607 F. Supp. 2d 1078, 1081 (D. Ariz. 2009) ("*Kempthorne*"). Documentation indicates that the first jaguars intentionally taken by the U.S. government in Arizona were trapped in the Santa Rita Mountains, specifically at Helvetia in 1917 and Greaterville in 1919. Center-SER-014. A third jaguar was trapped on Mt. Baldy in the Santa Ritas in 1918. *Id*. In November 1965, a jaguar was shot in the Patagonia Mountains in southern Arizona. 2-ER-223. From 1972 until 1997, no effort was made to detect jaguars in the United States. 2-ER-225. Accordingly, the lack of records detecting jaguars does not mean that the species

4

was absent during these years. *Id*.; Center-SER-015-16; Center-SER-010 ("Without systematic surveys, use of hunting dogs, cameras, or track plates, jaguars are extremely difficult to detect."); *Ctr. for Biological Diversity*, 607 F. Supp. 2d at 1081-82 (noting the absence of confirmed female jaguar observations is not unusual, as even in high occupancy areas such observations are rare).

Between 1996 and 2011, there were at least five unique jaguars documented in Arizona-New Mexico with undisputed Class I records,[1] including a confirmed record of a jaguar in the Whetstone Mountains in 2011. 2-ER-222-23; 2-ER-222. This same jaguar was repeatedly recorded in the Santa Rita Mountains from 2012 to 2014, within and near the proposed Rosemont Mine area. *Id*.; 3-ER-461. The Service concluded that this area was occupied in 2014 based on the many photos taken of this male jaguar in the Santa Rita Mountains. 2-ER-236. And the United States Forest Service hypothesized that this "resident male jaguar" had "established a territory that includes most of the Santa Rita Mountains (which includes the proposed [Rosemont Mine]) and possibly the Whetstone Mountains as well." Center-SER-007.

In 2014, the Service issued a Final Rule designating jaguar critical habitat in the United States. 2-ER-215. The Service recognized in the Rule, in accordance

---

[1] Class 1 reports "are those for which with some sort of physical evidence is provided for verification, and they considered "verified" or "highly probable" as evidence for jaguar occurrence. 2-ER-222.

with jaguar experts, that it is not sufficient to pursue jaguar conservation efforts only in tropical forests outside the United States. 2-ER-229; Service-SER-007; *see also* Center-SER-012 (American Society of Mammologists has stated that "habitats for jaguars in Arizona and New Mexico, are vital to the long-term resilience and survival of the species, especially in response to ongoing climate change."). The Service explained in the Rule that the value of critical habitat in the United States is to contribute to the jaguars' persistence and, therefore, overall conservation by identifying areas that support individuals during dispersal movements, contain patches of habitat (perhaps with a few resident jaguars), and allow for cyclic expansion of the nearest core area and breeding population in northwestern Mexico. 2-ER-229.

The Service included Unit 3 in the Final Rule as "occupied habitat." 2-ER-236. Under the ESA, occupied habitat means it was occupied at the time the Service listed the species as threatened or endangered. 16 U.S.C. § 1532(5)(A)(i). For the jaguar, this required the Service to look back to 1972, which it acknowledged was challenging due to the jaguar's low numbers, the difficulty in detecting jaguars, and the fact that no effort was being made to detect jaguars at that time. 2-ER-224-25. The Service therefore took a conservative approach in the Rule, and also determined that it was appropriate to designate Unit 3 as unoccupied habitat, even if it was not occupied in 1972. 2-ER-225. The Service found this

Unit essential because it was currently occupied, contained all of the jaguar's habitat features, and contributed to the jaguar's persistence. 2-ER-225, 2-ER-236. The Service also designated Subunit 4b as unoccupied habitat, finding that it was essential to the jaguar's conservation because it provided the jaguar with connectivity to occupied areas, including jaguar populations in Mexico. 2-ER-234, 2-ER-236-37.

## II. Procedural History

The present challenge stems from the district court's 2009 order in *Kempthorne* that required the Service to designate jaguar critical habitat. 607 F. Supp. 2d at 1094. That case provides a detailed history of both the ESA listing of jaguar as endangered and the Service's actions leading up to the agency's initial unlawful failure to designate critical habitat based on a 2006 "not prudent" finding. *Id*. at 1082-83; *see also* Service's Br. at 10-13.

Rosemont's challenge to the Service's critical habitat rule for jaguar was brought as a cross-claim against the Service in a case the Center filed challenging the Service's issuance of a 2016 biological opinion[2] for the Rosemont Mine. 2-ER-112-44; 2-ER-63-110. The Center intervened as a defendant on Rosemont's cross-claim. *See* 5-ER-802. The district court denied Rosemont's summary

---

[2] This was the second biological opinion the Service issued for the project, and it incorporated portions of an earlier 2013 biological opinion.

7

judgment motion challenging the Service's critical habitat rule for Unit 3 and Subunit 4b. The court held that although Unit 3 was not occupied at the time jaguar was ESA listed, the Service properly designated Unit 3 and Subunit 4b as unoccupied jaguar critical habitat because "Unit 3 and Subunit 4b are essential to the jaguar species' conservation." 2-ER-43; 2-ER-39-44. Rosemont appealed and on November 11, 2020, filed a petition with the Service requesting that the agency revise its critical habitat designations for jaguar to exclude that Santa Rita Mountains in Unit 3 and Subunit 4b. 5-ER-801; ECF No. 32, Exhibit A. The petition made the same arguments that Rosemont now makes on appeal. *See id*.; 86 Fed. Reg. 49,985, 49,987 (Sept. 7, 2021). On September 7, 2021, the Service rejected these arguments, "finding . . . that the petition does not present substantial scientific information indicating that the requested revision to the critical habitat designation may be warranted." *Id*. at 49,985. This Court then lifted a stay that had been in place while the Service was considering the petition and Rosemont filed its opening brief on December 23, 2021. ECF No. 25; ECF No. 30.

## STATUTORY AND REGULATORY BACKGROUND

When enacted in 1973, the ESA "represented the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978) ("*TVA*"). The ESA's purposes are "to provide a means whereby the ecosystems upon which endangered

species and threatened species depend may be conserved," and "to provide a program for the conservation of such . . . species . . . ." 16 U.S.C. § 1531(b). All federal agencies must seek to conserve threatened and endangered species. *Id*., § 1531(c). "Lest there be any ambiguity as to the meaning of this statutory directive, the Act specifically defined 'conserve' as meaning 'to use and the use of *all methods and procedures which are necessary* to bring *any endangered species* or threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary.'" *TVA*, 437 U.S. at 180 (emphasis in original), *quoting* 16 U.S.C. § 1532(2).

As this Court has recognized, "[t]he purpose of the ESA is to ensure the recovery of endangered and threatened species, not merely the survival of their existing numbers." *Alaska Oil & Gas Ass'n v. Jewell*, 815 F.3d 544, 550-51 (9th Cir. 2016) *citing* 16 U.S.C. §§ 1531(b), 1532(3). "[T]he goal of species recovery is paramount." *Id.* at 551 *citing TVA*, 437 U.S. at 184. The goals of the ESA are first met by the Service listing a species as endangered or threatened under the Act. 16 U.S.C. § 1533(a)(1), (2). The Service is then required to designate habitat that is critical to each species' conservation*,* and to generally develop and implement a recovery plan for each listed species. *Id*. § 1533(a)(3)(A)(i), 1533(f).

The ESA defines critical habitat as areas the species occupied at the time of listing that contain physical or biological features essential to the species'

conservation and that may require special management considerations or protections, as well as unoccupied areas that are determined to be essential for the species' conservation. *Id*. § 1532(5)(A).

The Service must designate a species' critical habitat "on the basis of the best scientific data available." *Id*. § 1533(b)(2); 50 C.F.R. § 424.12(a). Except in narrow circumstances, critical habitat shall not include the entire geographical area that a threatened or endangered species can occupy. 16 U.S.C. § 1532(5)(C). According to the regulations in effect at the time of the jaguar critical habitat designation, the Service is to designate critical habitat outside the geographic area occupied by a species only when a designation limited to its present range would be inadequate to ensure the conservation of the species. 50 C.F.R. § 424.12(e) (2013).[3] These provisions cabin the designation of critical habitat while still enshrining critical habitat designations for ecosystem protection as a keystone principle of species recovery. Pertinent provisions of legal authorities at issue in this case are provided in the Service's Addendum. Service's Br. at 1a-8a.

---

[3] This provision was subsequently removed and then later put back in place in substantially similar form in 2019 in 50 C.F.R. § 424.12(b)(2). All subsequent references are to the 2013 version as this was the applicable version at the time the 2014 Rule was issued.

## STANDARD OF REVIEW

The district court's grant of summary judgment is reviewed de novo. *Bear Valley Mut. Water Co. v. Jewell*, 790 F.3d 977, 986 (9th Cir. 2015) ("*Bear Valley*"). Rosemont has the burden of demonstrating that the Service's designation of Unit 3 and Subunit 4b as critical habitat was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The court's review is narrow, and it may not substitute its judgment for that of the agency. *Pac. Coast Fed'n of Fishermen's Ass'ns v. U.S. Bureau of Reclamation*, 426 F.3d 1082, 1090 (9th Cir. 2005). The court "will sustain an agency action if the agency has articulated a rational connection between the facts found and the conclusions made." *Id.* This deference "is at its highest where a court is reviewing an agency action that required a high level of technical expertise." *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 994 (9th Cir. 2014).

## SUMMARY OF THE ARGUMENT

Critical habitat designations are fundamental to the ESA's goal of conserving endangered species. Congress requires that these designations are based on the best available science and include habitat that is essential to the species' conservation. 16 U.S.C. §§ 1532(5)(A)(ii), 1533(a)(3)(A)(i). Rosemont does not dispute that the Service's designation of Unit 3 and Subunit 4b as jaguar critical habitat is based on the best available science. Its disagreement is with the

11

Service's conclusion that Unit 3 and Subunit 4b are essential to the jaguar's conservation. Rosemont relies on three arguments, none of which prove that Unit 3 or Subunit 4b were arbitrarily and capriciously designated as jaguar critical habitat or that the district court erred in upholding these designations.

First, in arguing that Unit 3 and Subunit 4b are not essential, Rosemont argues that "essential" means indispensable or necessary. Rosemont's Br. at 24-31. The dictionary definition of "essential," however, is not in dispute; the relevant questions is what "essential" means in the context of the jaguar's critical habitat designation—that is, what habitat is indispensable or necessary for the jaguar's conservation? While Rosemont argues this question cannot be answered on a "case-by-case" basis, *id*. at 32, what is essential for each species is wholly dependent on that species' unique habitat needs. Rosemont is also wrong that the Service only determined that Unit 3 and Subunit 4b are merely convenient or helpful, as the Service specifically determined in the Final Rule that both units are essential to the jaguar's conservation. *Id*. at 34; 2-ER-225, 2-ER-234, 2-ER-236-37. This determination is directly within the purview of the Service's expertise, entitled to deference, supported by the best available science, and should be upheld.

Second, Rosemont attacks the Final Rule for not including an explicit "two-step analysis," which it claims required the Service to first determine that occupied

12

habitat would be insufficient before it considered designating unoccupied habitat. Rosemont's Br. at 46. Rosemont's argument has already been squarely rejected by this Court in *Bear Valley,* 790 F.3d at 994. In determining that certain unoccupied habitat was essential to jaguar conservation, the Service thereby also determined that occupied habitat, by itself, was insufficient. *Id*. Rosemont relies on 2016 and 2019 rulemakings to support this argument. Rosemont's Br. at 48. The statements made in these rulemakings, although they may be relevant for future decisions, were not before the Service at the time of the Final Rule and are post-decision, extra-record evidence that should not be considered. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971).

Third, Rosemont criticizes the district court for not remanding the Final Rule to the Service to reconsider its economic-impact analysis. The Center agrees with the Service that this argument fails because it is waived and premature. Service's Br. at 56-58.

Last, even if this Court finds flaws in the jaguar critical habitat designation, the Final Rule should not be vacated pending remand because the Service would likely make the same decision and the consequences of vacatur could be severe.

**ARGUMENT**

### I.  The Designation of Critical Habitat is Central to the Endangered Species Act's Conservation Objective.

When Congress enacted the ESA in 1973, it recognized that conserving species requires more than just prohibiting the killing of imperiled animals; conservation also requires protecting these animals' habitats.  The two major causes of extinction were determined to be hunting and the destruction of habitat, and of these twin threats, "Congress was informed that the greatest was the destruction of natural habitat." *TVA*, 437 U.S. at 179.  Among other measures to safeguard against extinction, the ESA is intended to "provide a means whereby the ecosystems upon which endangered and threatened species depend may be conserved … ." 16 U.S.C. § 1531(b).

Conserving habitats is primarily executed through the ESA's requirement that federal agencies must ensure that their actions do not destroy or adversely modify an endangered species' critical habitat.  *Id*. § 1536(a)(2).  The only direct effect of critical habitat designation is the ESA's requirement that federal agencies must consult with the Service to ensure that their actions are not likely to destroy or adversely modify critical habitat.  *Id*.; 16 U.S.C. § 1536(a)(2).  The ESA's consultation requirement provides that critical habitat designation is a brake on federal action, not a land use regulation.  2-ER-221.  The ESA's legislative history evidences Congress' understanding of the importance of identifying such habitat:

14

> If the protection of endangered and threatened species depends in
> large measure on the preservation of the species' habitat, then *the
> ultimate effectiveness of the Endangered Species Act will depend on
> the designation of critical habitats*.

*Ctr. for Biological Diversity v. Norton*, 240 F. Supp. 2d 1090, 1098 (D. Ariz. 2003)

*citing* H.R. Rep. No. 94-887, at 497 (1976) (emphasis in original).

Listing species, consultation, and critical habitat designations are all tools

for achieving the ESA's ultimate objective: the conservation of endangered and

threatened species. 16 U.S.C. § 1531(b); *Sierra Club v. U.S. Fish & Wildlife Serv.*,

245 F.3d 434, 438 (5th Cir. 2001) ("[T]he objective of the ESA is to enable listed

species not merely to survive, but to recover from their endangered or threatened

status."). Congress equated "conservation" with the recovery of listed species by

defining "conservation" to mean the use of all methods and procedures to bring

any endangered or threatened species to the point at which the protections of the

ESA are no longer necessary. 16 U.S.C. § 1532(3); *Ctr. for Native Ecosystems v.

Cables*, 509 F.3d 1310, 1321-22 (10th Cir. 2007) ("conservation" as used in the

phrase "essential to the conservation of the species," encompasses recovery).

In 1978, the ESA was amended to require that critical habitat be designated

concurrently with species listing "to the maximum extent prudent and

determinable." 16 U.S.C. § 1533(a)(3). With this amendment, Congress reiterated

that "[t]he loss of habitat for many species is universally cited as the major cause

for the extinction of species worldwide." H.R. Rep. No. 95-1625, at 729 (1978).

As amended, the ESA defines "critical habitat" in two different ways depending on whether the area in question is occupied at the time of listing, and directs that unoccupied habitat be included when such areas are essential for the conservation of the species. 16 U.S.C. § 1532(5)(A). That critical habitat is generally to be designated concurrently and that critical habitat can be occupied or unoccupied, underscores the imperative nature of the Service's duty to designate critical habitat and these designations fundamental component to the function of the ESA and achievement of its purposes.

## II.     The Service reasonably designated Unit 3 as occupied critical habitat.

The Center adopts and incorporates here the Service's Section I.A. that Unit 3 was properly designated as occupied critical habitat and that the district court erred in concluding otherwise. Service's Br. at 29-35.

## III.    The Service Properly Included Unit 3 and Subunit 4b in the Critical Habitat Designation Because They Are Essential for Jaguar Conservation.

The district court correctly held that the Service "applied the appropriate 'essential' standard to the jaguar," and that the "record supports [the Service's] determination that Unit 3 and Subunit 4b are essential to the recovery of the jaguar species." 1-ER-41. The Service's critical habitat designation for Unit 3 and Subunit 4b is rationally connected to the facts, fully supported by the Final Rule, based on the best available science, and should be upheld.

16

**A.  The dictionary definition of essential is not determinative as to what habitat should have been designated for the jaguar.**

Rosemont's argument boils down to an assertion that the meaning of "essential" is clear, and that Unit 3 and Subunit 4b are clearly not essential. Rosemont is correct on the first part, but wrong on the second.  The Center does not dispute that Congress intended "essential" to have its ordinary dictionary definition, which includes necessary and indispensable.  Rosemont's Br. at 25-27. But the more difficult question remains what habitat is essential, necessary, or indispensable for jaguar conservation.

Rosemont implies that the Supreme Court held in *Weyerhaeuser* that all critical habitat—occupied and unoccupied— must be "indispensable," and thus that only indispensable habitat can be designated critical habitat.  Rosemont's Br. at 28-29.  But the Supreme Court did not create a new "indispensability" requirement for critical habitat that is different from the statutory requirement that critical habitat must consist of areas essential to the conservation of the species. Rather, the Court noted that the ESA does not include a definition of "habitat" but "identifies only certain areas ["critical habitat"] that are indispensable to the conservation of the endangered species." *Weyerhaeuser Co. v. United States Fish & Wildlife Serv.*, 139 S. Ct. 361, 369 (2018).  This statement does not add anything to the ESA's definition of critical habitat; the Court simply viewed "essential" as synonymous with "indispensable."  Moreover, the Supreme Court rejected

17

adopting Judge Owen's dissent on the matter from *Markle Interests, L.L.C. v. U.S. Fish & Wildlife Serv.*, 827 F.3d 452 (5th Cir. 2016), reinforcing the lack of any precedential value of this out-of-circuit dissent cited by Rosemont.

The district court's decision in *Bear Valley Mutual Water Company v. Salazar*, is similarly unremarkable, with the court upholding the Service's critical habitat designation and agreeing to read essential as synonymous with indispensable. 2012 U.S. Dist. LEXIS 160048 (C.D. Cal. Oct. 17, 2012), *aff'd Bear Valley*, 790 F.3d 977 (9th Cir. 2015). As with the Supreme Court in *Weyerhaeuser*, the district court did not add anything to the statutory definition of critical habitat.

Last, Rosemont's representation of the concurrence from *New Mexico Farm & Livestock Bureau v. United States DOI* stretches well-beyond its meaning. 952 F.3d 1216, 1233 (10th Cir. 2020). Judge Hartz's "observation" was not stated as a rationale for joining the majority and lacks any analysis. It is a simple opinion that the Service could have been clearer, which is not sufficient for upsetting an agency decision where the agency's path may be reasonably discerned. *E.g. Alaska Dep't of Envtl. Conservation v. EPA*, 540 U.S. 461, 497 (2004) ("when an agency explains it decision with 'less than ideal clarity,' a reviewing court will not upset the decision on that account 'if the agency's path may be reasonably discerned.'").

18

**B.     What habitat is essential depends on the species at issue, and must include the habitat that is needed for both the species' survival and recovery.**

Rosemont is dismayed by the notion that determining what habitat is essential depends on the particular species that is under consideration.  Rosemont's Br. at 32 (claiming that the Service cannot "continually shift its understanding of 'essential' on a 'case-by-case basis.").  But the Service must assess what habitat is essential on a species-by-species basis because it depends on the scientifically recognized habitat needs of the particular species.  *See e.g., Ariz. Cattle Growers' Ass'n v. Salazar*, 606 F.3d 1160, 1164 (9th Cir. 2010).  What habitat is essential for bull trout in an Oregon stream is different from what habitat is essential for an endemic butterfly in Nevada, or for the jaguar in southern Arizona.  Looking up the meaning of essential is the easy part.  Applying that meaning to a particular species' habitat needs is a scientifically-based decision squarely within the Service's expertise.  *Ariz. Cattle Growers' Ass'n*, 606 F.3d at 1164-65.  This is not a groundbreaking concept, nor does it create an ad hoc or unreasonable approach as Rosemont attempts to paint it, *see* Rosemont's Br. 32-46; to the contrary, this is the only approach that is consistent with the ESA's requirement to designate critical habitat based on the best available scientific information.

In *Arizona Cattle Growers' Association*, the Cattle Growers challenged the critical habitat designation for the Mexican spotted owl and argued over the

19

definition of "occupied."  606 F.3d at 1163-66.  This Court found that defining the term occupied, much like the term essential, is not enough to resolve the issue, as it is highly dependent on the particular species.  Determining whether an area is occupied "is a highly contextual and fact-dependent inquiry," that is "within the purview of the agency's unique expertise" and entitled to deference.  *Id*. at 1164-65.  Moreover, as in *Arizona Cattle Growers*, the Service's determination of what is essential for the jaguar should "not be interpreted in a restrictive fashion," as the Service must have the "authority to act in the face of uncertainty."  *Id*. at 1165-66.

Significantly, in determining what habitat to designate, the ESA required the Service to include the habitat that is essential for the jaguar's conservation, or said another way, essential to both the survival and recovery of the species.  16 U.S.C. § 1532(5)(A).  As this Court has explained, "the purpose of establishing 'critical habitat' is for the government to carve out territory that is not only necessary for the species' survival but also essential to the species' recovery."  *Gifford Pinchot Task Force v. United States Fish & Wildlife Serv.*, 378 F.3d 1059, 1070 (9th Cir. 2004) ("*Gifford Pinchot*").  Congress did not intend the ESA "merely to forestall the extinctions of species (i.e. promote a species survival), but to allow a species to recover to the point where it may be delisted."  *Kempthorne*, 607 F. Supp. 2d at 1088 (D. Ariz. 2009) *citing Gifford Pinchot*, 378 F.3d at 1070.

"Recovery" is a fundamental concept of the ESA that Rosemont glosses over. Rosemont's Br. 28. Conservation encompasses recovery, and both conservation and recovery refer to a process, not a static end state. *Gifford Pinchot*, 378 F.3d at 1070-71. "Conservation" means "to use and the use of *all methods and procedures* which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to [the ESA] are no longer necessary." 16 U.S.C. § 1532(3) (emphasis added). "Recovery" is the "process that stops or reverses the decline of a species and neutralizes threats to its existence." *Ctr. for Biological Diversity*, 607 F. Supp. 2d at 1088; *see* 16 U.S.C. § 1533(f) (describing recovery planning process).

Thus, in context, "essential" does not mean "essential for jaguars" in some existential sense, as Rosemont argues. Rosemont's Br. at 24-46. Rather, it means essential for the process of jaguar recovery. If this process requires designation of a particular area as critical habitat, then that designation is "essential to the conservation of the jaguar." *See Ctr. for Biological Diversity*, 607 F. Supp. 2d at 1089. Because critical habitat designation is required to promote recovery, the Service's conclusion that the Santa Rita Mountains in Unit 3 and Subunit 4b are essential for jaguar conservation means that protecting these areas through the ESA's consultation process will promote jaguar recovery. It does not mean, and cannot mean in the ESA's statutory context, that the jaguar will go extinct

21

throughout its present range without these areas. *See* 2-ER-241 (describing "adverse modification" analysis in an ESA consultation and its focus on effects on critical habitat's contribution to recovery).

> ### C. The record and the best available scientific evidence support the Service's determination that the Santa Rita Mountains in Unit 3 and the Whetstone-Santa Rita Subunit 4b are essential for jaguar conservation.

The Service's inclusion of Unit 3 and Subunit 4b in the jaguar critical habitat designation stems from peer-reviewed research and a team of feline ecologists, conservation biologists, and other experts that the Service convened who advise the Jaguar Recovery Team and the Service on appropriate short- and long-term actions necessary to recovery the jaguar. 2-ER-216-17, 225. The district court recognized this as well as the operative role of recovery in the critical habitat designation in upholding the Service's Final Rule. 1-ER-41-43. In designating Unit 3 and Subunit 4b, the Service appropriately considered the recovery standard, rationally concluded that Unit 3 was occupied at the time of listing, and rationally concluded that Unit 3 and Subunit 4b are essential to jaguar conservation.

> #### 1. The Service appropriately considered the best available science regarding the jaguar's recovery needs.

It "is logical and inevitable that a species requires more critical habitat for recovery than is necessary for species survival." *Gifford Pinchot*, 378 F.3d at 1069. The Service's inclusion of Unit 3 and Subunit 4b in the Final Rule should be

upheld because, as held by the district court, it was reasonable for the Service to determine that they are essential to the jaguar's recovery. 16 U.S.C. § 1532(5)(A).

In 2010, the Service convened the binational Jaguar Recovery Team to coordinate jaguar recovery efforts in the United States and Mexico, and to commence the Service's recovery planning efforts as the ESA and the court's order in *Kempthorne* required. 607 F.Supp.2d at 1094-95; 16 U.S.C. § 1533(f); 2-ER-216. In 2012, the Jaguar Recovery Team produced the Recovery Outline for the Jaguar, which is intended as an interim recovery planning guidance document until a full recovery plan was developed. 2-ER-217.

The Recovery Outline divided the jaguar population into two units: (1) the Northwestern Recovery Unit, which includes southern Arizona, southwestern New Mexico, and northwestern Mexico; and (2) the Pan American Recovery Unit, which extends from Mexico to Argentina. 4-ER-748, 750. The Recovery Outline also divided the jaguars' habitat into "core," "secondary," and "peripheral" areas. 4-ER-728. "Core areas" are those with the strongest long-term evidence of jaguar population persistence; "secondary areas" are those that contain jaguar habitat with historical and/or recent records of jaguars but with no or few records of reproduction; and "peripheral areas" are those with only sporadic historical jaguar records and minimal or no evidence of long-term presence or reproduction. 4-ER-728-730.

23

The Northwestern Recovery Unit includes two core areas within Mexico, and the designated critical habitat in Arizona and New Mexico is within the "Borderlands Secondary Area."  4-ER-729.



Figure 1. Northwestern Jaguar Recovery Unit.  3-ER-499.

As the Final Rule explains, the Borderlands Secondary Area "provides a recovery function benefitting the overall recovery unit."  2-ER-217.

Rosemont disagrees with the Recovery Outline's identification of the Northwestern Recovery Unit's importance to the jaguar recovery strategy.

24

Rosemont's Br. at 34-40. The Recovery Outline explains, however, that it is a "logical recovery unit" for multiple reasons, including its distinct ecological conditions that occur nowhere else in the species' range. 4-ER-748. As further explained in the Recovery Outline, a "recovery unit" is a subunit of a species that is geographically or otherwise identifiable "*and essential to the recovery of the species*." 4-ER-748 (emphasis added). "Recovery units are individually necessary to conserve genetic robustness, demographic robustness, important life history stages, or some other feature necessary for long-term sustainability of the species," and therefore "[e]ach designated recovery unit is critical to recovering the jaguar throughout its entire current range." *Id*. "Recovery units are not necessarily self-sustaining viable units on their own, but instead need to be collectively recovered to ensure recovery of the entire listed entity." *Id*.

The Recovery Outline recognized that although there are conservation needs and challenges facing the jaguar elsewhere, this is no excuse for failing to act within the United States to conserve the jaguar:

> The management and recovery of listed species outside of U.S. borders, including the jaguar, are primarily the responsibility of other countries in which the species occur, with the help, as appropriate, of available technical and monetary assistance from the U.S. Thus, it is appropriate to focus our efforts and resources on conservation of the jaguar in the northwestern part of its range as our contribution toward an international effort to conserve and recover the jaguar rangewide.

25

4-ER-747-748. The Final Rule's recognition that the best available science supports habitat within the United States as essential, and thus receiving critical habitat designation, is consistent with Ninth Circuit precedent. "Since the point of the ESA is to ensure the species' recovery, it makes little sense to limit its protections to the habitat that the existing, threatened population currently uses." *Alaska Oil & Gas Ass'n*, 815 F.3d at 555-56. Similarly, this Court has rejected the notion that critical habitat designation "is only necessary where it would protect the majority of the species habitat." *Nat. Res. Defense Council v. U.S. Dep't of the Interior*, 113 F.3d 1121, 1126 (9th Cir. 1997).

Congruent with the recovery strategy, the Service identified within the Borderlands Secondary Area the physical or biological features that it determined were required for jaguar recovery, including expansive open spaces in the southwestern United States with adequate connectivity to Mexico that contain sufficient prey and available surface water, have suitable vegetative cover and rugged topography, are below 6,562 feet, and have minimal human impact. 2-ER-226. Based on the best available science, the Service identified expansive open spaces in the United States of at least 38.6 square miles as physical and biological features essential for the jaguar's conservation as well as connectivity between the United States and Mexico. 2-ER-238.

The Service ultimately included six units in southern Arizona and

26

southwestern New Mexico, totaling 764,207 acres. 2-ER-215. Thus, the Service did not designate the entire Borderlands Secondary Area in the United States as critical habitat. *See e.g.* 2-ER-219; 2-ER-226. Rather, it concluded only a small fraction of this area was essential, including Unit 3 and Subunit 4b in Arizona. *Id.;* 2-ER-234-35. The specific areas included provide physical and biological features essential to the jaguar and support dispersal movements, allowing for cyclic expansion and contraction of the nearest core area and breeding population. 2-ER-217. This allows these areas to "contribute to the species' persistence and, therefore, overall conservation." *Id*.



Figure 2. Designated Jaguar Critical Habitat. 2-ER-295.

Rosemont claims that secondary areas are only important when they occur between core areas, and not at the edge of a species range. Rosemont's Br. at 39.

27

The Final Rule directly refutes this, explaining that the Service designated jaguar critical habitat in part due to the importance of protecting habitat for populations that are at the far edge of a species' range.  2-ER-217.  These populations play a role in maintaining the total genetic diversity of the species, and in some cases persist the longest as fragmentation and habitat loss impact the species' total range. *Id*.  The Service's determination here is supported by the best available science, including the Recovery Outline.  4-ER-727-28.

Rosemont similarly argues that because the Service designated habitat in a secondary area, characterized as more marginal habitat, it cannot be essential to the jaguar's conservation.  Rosemont's Br. at 38-39.  As the Service pointed out, this misconstrues the record and ignores that the operative issue is whether these areas contribute to the conservation of the jaguar, which they do.  Service's Br. at 37-38 *citing N.M. Farm & Livestock Bureau*, 952 F.3d at 1231-32; 2-ER-230, 264, 271 (stating that habitat in the United States is marginal compared to known habitat throughout the range); 86 Fed. Reg. at 49,988 (The Service dismissing Rosemont's argument about "marginal" habitat because this "does not indicate that jaguar habitat is no longer present or essential for Unit 3.").

That the Service—and the experts that the agency convened—approach recovery of a wide-ranging species, such as the jaguar, with a combination of units that collectively equate to the whole needed for the species' recovery is also not

28

indicative of improper agency action. Nor does it indicate that the Service was failing to consider habitat essential to the conservation of the species as a whole. Rosemont's Br. at 42-46. The Service is unequivocal that "[c]ritical habitat in the United States contributes to *recovery the jaguar's persistence and recovery across the species' entire range* by providing small patches of habitat (perhaps in some cases with a few resident jaguars), and as areas for cyclic expansion and contraction of the nearest core area and breeding population in the proposed Northwestern Recovery Unit." 2-ER-248 (emphasis added).

Rosemont is wrong that the Service found that the designated critical habitat, including Unit 3 and Subunit 4b, is merely helpful or convenient to the jaguar. *See* Rosemont's Br. at 22, 34, 42. The Service explicitly determined that the designated critical habitat, including Unit 3 and Subunit 4b, are essential to the jaguar's recovery. 2-ER-225 (explaining why Unit 3 is essential); 2-ER-234 (explaining why Subunit 4b is essential). This habitat is part of the Northwestern Recovery Unit, which both the Service and the Recovery Outline found to be essential for the species' conservation. 2-ER-217. That such habitat is also stated to be "beneficial" is not a red flag of inappropriate agency decision-making. Essential habitat inherently encompasses habitat that is beneficial for the species; if it was not beneficial, it could not be essential.

The Final Rule also carefully distinguished between areas like Unit 3, which

contains the physical or biological features essential for conservation of the jaguar and is occupied, and Subunit 4b, which provide essential connectivity, from areas that were considered but lacked these characteristics or provided non-essential connectivity.  For example, the Service observed that connectivity between expansive open spaces within the United States is also "necessary if viable habitat for the jaguar is to be maintained."  2-ER-226.  This connectivity is provided by valley bottoms that connect isolated mountain ranges within the United States that contain suitable jaguar habitat.  The Service considered designating these valley areas, but while it acknowledged that valleys provided connectivity, it could not determine that any particular valley areas were *essential* for jaguar conservation and thus did not designate such areas.  *Id.*

As the Ninth Circuit held in upholding the Service's critical habitat designation for another apex predator, the polar bear: "[t]he Act is concerned with protecting the future of the species, not merely the preservation of existing bears. And it requires use of the best available technology, not perfection."  *Alaska Oil & Gas Ass'n*, 815 F.3d at 555.  The D.C. Circuit has also "stressed that while the agency 'may not base its listings on speculation or surmise' where there is no superior data, 'occasional imperfections do not violate [the ESA].'"  *Id.*, citing *Bldg. Indus. Ass'n v. Norton*, 247 F.3d 1241, 1247 (D.C. Cir. 2001).

30

### 2. The Service rationally concluded that Unit 3, including the Santa Rita Mountains, is essential for jaguar conservation even if it was unoccupied at the time the jaguar was listed.

The Service reasonably determined in the Final Rule that Unit 3 was occupied at the time the jaguar was listed in 1972, and openly acknowledged in the Rule that there was uncertainty over whether areas were occupied in 1972 due to the difficulty in detecting jaguars, especially in such rugged and remote areas, and the fact that no effort was being made to detect jaguars around that time. 2-ER-225; Service's Br. at 29-35. The Service therefore took a conservative approach and also analyzed whether or not these areas were essential to jaguar conservation and should still be designated as unoccupied habitat. 2-ER-225; Service's Br. at 35-41. The Service then explicitly determined that Unit 3 was essential. *Id.*

Rosemont glosses over the Service's "unoccupied" rational for Unit 3 as "perfunctory," but the Rule does not support that characterization. There is ample explanation and rational basis for the Service's decision in the Rule. The Service determined that Unit 3 and other designated occupied areas were essential even if not occupied for three reasons: (1) they have had recent jaguar occupancy; (2) they contain "features that comprise jaguar habitat"; and (3) they contribute to the jaguars' persistence in the United States by allowing "the normal demographic function and possible range expansion of the Northern Recovery Unit," which is essential to the jaguar's conservation. *Id.*

31

These three factors are easily satisfied for Unit 3, and are especially met for the northern Santa Rita Mountains where the Rosemont Mine is proposed. Unit 3 consists of 351,501 acres and includes the Patagonia, Santa Rita, Empire, and Huachuca Mountains. 2-ER-236. In consideration of the first factor, recent occupancy, the Service found that Unit 3 "is currently occupied based on . . . multiple sightings of a male jaguar from October 2012 through September 11, 2013, in the Santa Rita Mountains." 2-ER-270; 2-ER-236 (stating that "a male jaguar has been documented numerous times in the Santa Rita Mountains"); 2-ER-269 ("Rosemont Mine area is occupied by the jaguar"); 2-ER-222 (Table 1) (documenting 13 "Class 1" jaguar records in Santa Rita Mountains in 2012 and 2013).

In consideration of the second factor, whether Unit 3 includes the features that comprise jaguar habitat, the Service focused on the following physical and biological features: "[e]xpansive open spaces in the southwestern United States with adequate connectivity to Mexico that contain a sufficient native prey base and available surface water, have suitable vegetative cover and rugged topography to provide sites for resting, are below 2,000 m (6,562 feet (ft)), and have minimal human impact." 2-ER-226. The mountain ranges within Unit 3, including the Santa Rita Mountains, "contain all elements of the physical or biological feature essential to the conservation of the jaguar." 2-ER-236.

32

The third and last factor was whether the areas contribute to the jaguars' persistence by allowing "the normal demographic function and possible range expansion of the Northern Recovery Unit." 2-ER-225. The Final Rule explains that the lands designated as critical habitat are part of the "Borderlands Secondary Area" within the "Northwestern Recovery Unit" for the jaguar. 2-ER-217. These lands are located within a "secondary area" of the Jaguar Recovery Outline that "provides a recovery function benefitting the overall recovery unit." *Id*.

More specifically, as the Jaguar Recovery Outline recognizes, these lands support individual jaguars during dispersal movements, and provide areas for cyclic expansion and contraction of the nearest core area and breeding population south of the U.S.-Mexico border. *Id*. Individuals and populations at the edge of the jaguar's range are also important in maintaining the total genetic diversity of the jaguar, and in some cases "these peripheral populations persist the longest as fragmentation and habitat loss impact the total range." *Id*. As the Service concluded:

> The ability for jaguars in the proposed Northwestern Recovery Unit to utilize physical and biological habitat features in the borderlands region is ecologically important to the recovery of the species; therefore, maintaining connectivity to Mexico is essential to the conservation of the jaguar.

*Id*. Indeed, Unit 3 includes habitat from the Santa Rita Mountains in the north, down to the U.S.-Mexico border to the south, helping to maintain that essential

connectivity to the jaguar populations in Mexico. 2-ER-236; *see* 2-ER-295 (map of Units 1-4).

Rosemont's reliance on *Otay Mesa Property, L.P. v. United States DOI*, which involved a critical habitat designation for fairy shrimp, misses a key distinction, that for the jaguar, the Service did not depend solely on the presence of primary constituent elements. 344 F. Supp. 3d 355, 367, 374 (D.D.C. Sept. 25, 2018); Rosemont's Br. at 40-41. In *Otay Mesa*, the court found that the Service had merely gestured to the required "essential for the conservation of the species" finding, as its only rationale was that the fairy shrimp's "primary constituent elements" were present was not sufficient. *Id*. at 376. By contrast, although the Service may have similarly determined that the features that comprise jaguar habitat were present prior to determining Unit 3 is essential to jaguar conservation, the Service did not stop there. The Service additionally found that Unit 3 had also demonstrated recent jaguar occupancy, as it was occupied at the time the Final Rule was being developed, and that Unit 3 contributed to the species' persistence in the United States by allowing normal demographic function. 2-ER-225. This analysis was also completed in the context of the overall recovery needs of the jaguar, as set forth in the Recovery Outline and summarized in the Final Rule. 2-ER-217.

34

### 3. The Service rationally concluded that Subunit 4b is essential for jaguar conservation.

Subunit 4b, also called the "Whetstone-Santa Rita Subunit," consists of 12,710 acres between the Empire Mountains and the northern extent of the Whetstone Mountains. 2-ER-236.



Figure 3. 2-ER-296.

The Service included Subunit 4b because it was determined to be essential for the jaguar's conservation as it connects "Subunits within the United States that would otherwise not be connected to Mexico," including Subunit 4a. 2-ER-271. More specifically, Subunit 4b "provides connectivity from Subunit 4a to Mexico (by connecting it to Unit 3, which provides connectivity to Mexico)," and this

connectivity "is an essential feature of jaguar habitat in the United States." 2-ER-270.

Rosemont challenges the inclusion of Subunit 4b in the jaguar critical habitat designation, arguing that there is no evidence that this Subunit has ever been used by jaguars. Rosemont's Br. at 35-36. The Service determined that a jaguar likely used this area as recently as 2012,[4] but regardless, the ESA directs the Service to designate unoccupied areas if the Service determines that the area is "essential for the conservation of the species." 16 U.S.C. § 1532(5)(A)(ii); *infra* 37. Here, the Service determined that Subunit 4b is essential to the conservation of the jaguar because it provides important connectivity habitat between two mountain ranges where jaguar have recently been sighted (the Whetstones and Santa Ritas) and provides connectivity to jaguar habitat in Mexico. 2-ER-236-37.

In designating jaguar critical habitat, the Service determined that "connectivity between the United States and Mexico is essential for the conservation of the jaguars." 2-ER-226. As explained, because jaguars that have recently been observed in the United States are understood to be individuals dispersing from the nearest core population in Mexico, "maintaining travel corridors to Mexico is essential for the conservation of jaguars in the Northwestern Recovery Unit, and, therefore, for the species as a whole." 2-ER-232; *see also* 2-

---

[4] Center-SER-004-005.

ER-258. The Service also found that it needed to identify areas that would provide connectivity between expansive open spaces within the United States to maintain viable jaguar habitat. 2-ER-226. As the Service recognized, this is particularly important in southern Arizona, "where isolated mountain ranges providing the physical and biological feature of jaguar habitat are separated by valley bottoms" that may not provide the necessary jaguar habitat features. *Id*.

Subunit 4b contains a combination of low human influence, canopy cover, and ruggedness such that it represents an area through which a jaguar may travel. 2-ER-254. Indeed, as explained, a jaguar was spotted in the Whetstone Mountains in 2011, within Subunit 4a, and then observed in the Santa Rita Mountains in 2012 and 2013, within Unit 3. 2-ER-222 (Table 1); 2-ER-270. The Service believes it is likely this jaguar used Subunit 4b to reach the Santa Rita Mountains:

> Absent the Santa Rita-Whetstone "bridge," inter-mountain, east-west jaguar movement within the United States and to and from Mexico would be reduced. We make this assertion because, again, *it is likely that a jaguar used this very corridor to get from the Whetstones to the Santa Ritas*.

Center-SER-005 (emphasis added).

The Service also explained that while connectivity from the Whetstone Mountains to Mexico would still exist through Subunit 4c (if Subunit 4b was not designated), "50% of the connectivity to Mexico from the Whetstones" would likely be lost. FWS-SER-004-005. And because the Service was "uncertain which direction a jaguar may move to travel between the Whetstone Mountains and

37

Mexico (i.e., via 4b or 4c)," the agency found that "maintaining all critical habitat that allows for this movement is extremely important to jaguar conservation." FWS-SER-005. Thus, both Subunits 4b and 4c are essential to the conservation of the jaguar:

> [e]ither Subunit 4b or 4c may be used by a jaguar based on these habitat characteristics; therefore, we have no reason not to include these areas as critical habitat, regardless of which one provides a more direct connection to Mexico, as both subunits provide connectivity to Mexico through Unit 3.

2-ER-254.

Rosemont cites to the district court case *Alliance for the Wild Rockies v. Lyder* for what it proclaims as a universal fact that linkage habitat between populations cannot be considered essential to the conservation of any species. Rosemont's Br. at 36, *citing* 728 F. Supp. 2d 1126, 1140 (D. Mont. 2010). This case stands for no such rule. In *Alliance for the Wild Rockies*, the Service had found that designating presently occupied areas of Canada lynx habitat was sufficient for the conservation of the species, and this occupied habitat included "the necessary connectivity for populations within the designated habitat." 728 F.Supp. 2d at 1139. In contrast, unoccupied critical habitat as a travel corridor was not demonstrated as essential for the lynx, and thus the Service was correct to not designate any. *Id*.

Rosemont's argument highlights both the need to defer to the Service on matters within its expertise, and that what is essential for the recovery of a

38

particular species depends on its recognized habitat needs. One size does not fit all. Just as the Service was entitled to deference in *Alliance for the Wild Rockies* that additional corridors were not essential for Canada lynx, the Service is entitled to deference here that Subunit 4b is essential to jaguar conservation. It is irrelevant that the Service decided for Canada lynx—an entirely different species with different recovery needs—that unoccupied habitat that provided linkages was not essential is irrelevant. Here, the Service, based on the best available science, determined that the connectivity provided by Subunit 4b is essential for the jaguar's conservation.

> **D.** **Rosemont's remaining arguments that Unit 3 and Subunit 4b are not essential to the jaguar's survival and recovery lack merit.**

Rosemont also seeks to rely on carefully selected portions of the ESA's legislative history and prior Service rulemakings that courts rejected, but neither of these arguments undermines the Service's rationale and the reasonableness of including Unit 3 and Subunit 4b in the Final Rule.

> **1.** **The ESA's legislative history does not justify replacing the ESA's plain language with terms of Rosemont's choosing.**

Rosemont relies on cherry-picked excerpts of the ESA's legislative history leading up to the 1978 amendments to suggest that Congress intended that critical habitat be designated only if it essential for the survival of the species. Rosemont's Br. at 30-31. Rosemont cites these asides in the legislative history suggesting that

only "those areas which are truly critical to the continued existence of a species" should qualify as critical habitat. *Id*. at 30-31, citing S. Rep. No. 95-874 at 947-48.[5] But while that statement may reflect what the Senate Committee and what some individual legislators wanted the ESA to say (and what Rosemont now wants it to say), the plain language of the enacted critical habitat definition says something else entirely. The ESA does not say that critical habitat is constrained by what is "essential for the continued existence of the species." *Compare* 16 U.S.C. § 1532(5)(A). Congress considered, and ultimately rejected this language. *Id*. With rejection of this amendment, the committee reports and floor statements Rosemont cites represent legislative dead ends, not the intent of Congress.

In contrast, the statute does expressly accommodate Senator Garn's proposed amendment that "the extent of critical habitat should usually be smaller than the 'entire range of the endangered or threatened species,'" a provision the Service expressly complied with in the Final Rule. 16 U.S.C. § 1532(5)(C); 2-ER-249; 2-ER-226. There is no ambiguity in the definition of critical habitat that Congress ultimately adopted—critical habitat means areas that are essential for the conservation of a species, and "conservation" is defined as measures that promote recovery. 16 U.S.C. §§ 1532(5), 1532(3). As the Supreme Court has observed, "[t]hose of us who make use of legislative history believe that clear evidence of

_____

[5] Rosemont does not include this reference in its appendix.

congressional intent may illuminate ambiguous text. We will not take the opposite tack of allowing ambiguous legislative history to muddy clear statutory language." *Milner v. Dep't of the Navy*, 562 U.S. 562, 572 (2011).

> **2.    The Service's determination that habitat in the United States is essential for the jaguar's conservation is supported by the Final Rule and best available science.**

Rosemont seeks to resurrect a decade-old argument the Service made—and the District Court of Arizona rejected in 2009—that no habitat in the United States is critical for the survival of the jaguar. Rosemont's Br. 36-37; *Kempthorne*, 607 F.Supp.2d at 1089-90. The rationale for rejecting this argument in 2009 remains true, and equally, if not more compelling, today: the best available science supports the designation of jaguar critical habitat and the purpose of critical habitat designations to "promote not only the survival but also the *recovery* of species." *Id*. at 1089 (emphasis in original). *Kempthorne*, 607 F. Supp. 2d at 1092.

The *Kempthorne* court observed that the Service's rationale failed to consider the effect of designating critical habitat in the United States on the jaguar's recovery, as the ESA requires. *Id*. The Service's reliance on the argument that no area in the United States was critical for the survival of the jaguar was "indicative that [the Service] unduly limited its consideration of the recovery goal of the ESA in making its determination, while focusing on the survival goal." *Id*. at 1090. In contrast, the Service's 2014 Final Rule considered the needs for jaguar

recovery, complying with the ESA's clear command and the *Kempthorne* order
that set aside the Service's prior determination that it was not prudent to designate
jaguar critical habitat in the United States. *Kempthorne*, 607 F. Supp. 2d at 1094-
95.

The Service did not pursue an appeal of *Kempthorne*, opting instead to re-
evaluate the best available science, leading to the 2014 Final Rule that Rosemont
now challenges. *See* 2-ER-248.[6] Since 2009, the best available science has
continued to mount in support of the Service's jaguar critical habitat designation,
especially in Unit 3 and Subunit 4b, with documentation of a male jaguar so
routine that federal agencies considered it a resident. *Supra* III.C.2. After
*Kempthorne*, the Service has consistently rebuffed Rosemont's framing, instead
embracing the best available science that habitat in the United States is essential to
conservation of the jaguar. *See e.g.* 4-ER-747-748; 2-ER-215; 86 Fed. Reg. 49,985
(Sept. 7, 2021) (Service's rejection of Rosemont's petition to revise critical habitat
for the jaguar).

Rosemont tries to ignore *Kempthorne's* unfavorable implications for its case,
framing the Service's 2014 decision to designate jaguar critical habitat as an
unsupported change of position. Rosemont's Br. at 37. It is the converse that is

---

[6] On January 21, 2010, the Service voluntarily dismissed its notice of appeal. *Ctr.
for Biological Diversity v. Salazar*, 9th Cir. Case No. 09-16138, Dkt. Entry
7202050.

true, as the Service's decision and arguments in *Kempthorne* for not designating critical habitat were the aberration. *Id*. at 1088-89; *see also* 4-ER-787, 792.

For example, in the Service's July 22, 1997 Final Listing Rule clarifying that the jaguar was listed as endangered in the United States, the Service explicitly rejected various challenges that Rosemont raises here. These challenges included assertions that the "United States was merely peripheral to the [jaguar's] historic range," the "species was never more than wandering individuals that occasionally crossed the border into the United States," and "[n]o breeding population of the jaguar exists in the United States." 4-ER-787. The Service responded, countering that jaguar are "native to the United States" and that evidence strongly indicated "that the historical range of the jaguar included portions of the southwestern United States." *Id.* The Service explained further that the "issue of whether a breeding population is wholly supported within the United States is not relevant," concluding that the mere "fact that individuals occur in the United States warrants their consideration for listing, evaluation of relevant threats, and development of appropriate conservation considerations." *Id.* Rosemont's rehashing of arguments about transience, similarly overlooks the strong evidence that jaguars were historically permanent residents of the United States. *Kempthorne*, 607 F. Supp.2d at 1090-91.

When designating jaguar critical habitat in 2014, the Service also provided a

43

rationale for parting with its overturned "not prudent" finding, contrary to Rosemont's representation. *See e.g.* 4-ER-682; 2-ER-218; Rosemont's Br. at 37. This process involved the Service evaluating "information and analysis that became available subsequent to the July 12, 2006 finding" that lead the Service to determine that "there were physical and biological features that can be used by jaguars in the United States" and following a review of the "best available scientific information" that critical habitat should be designated. *Id*. In the Final Rule, the Service further explained that additional information that was received during the critical habitat designation process between 2012 and 2014 informed its ultimate determination that designated Unit 3 and Subunit 4b as critical habitat. 2-ER-218. This included "multiple photos of a jaguar in the Santa Rita Mountains taken since [the] August 20, 2012 proposed designation." *Id*. When added to the information that supported critical habitat designation at the time of the *Kempthorne* decision, it is neither surprising nor unexplained as to why the Service designated Unit 3 and Subunit 4b as jaguar critical habitat.

## IV. The Service Properly Included Unoccupied Habitat in the Critical Habitat Designation.

Rosemont argues that a "two-step" analysis was required before the Service could include unoccupied jaguar habitat in the critical habitat designation. This argument was not presented in district court, Service's Br. at 50-51, has been rejected by this Court in *Bear Valley,* and the post-decision materials Rosemont

44

relies on should not be considered in reviewing the 2014 Final Rule. 790 F.3d 977, 994 (9th Cir. 2015); *Citizens to Preserve Overton Park*, 401 U.S. at 420.

### A. The Service's designation of Unit 3 and Subunit 4b as unoccupied critical habitat is consistent with the statute, regulation, and Ninth Circuit precedent.

Rosemont's challenge to the Service's inclusion of unoccupied jaguar critical habitat neglects that Congress defined critical habitat to include unoccupied habitat when the agency determines that unoccupied habitat is essential for the species' conservation. Rosemont's Br. at 46. 16 U.S.C. § 1532(5)(A)(ii). As explained, the Service here specifically determined in the Final Rule that Unit 3 and Subunit 4b are essential to the jaguar's conservation.

Despite the Service's compliance with the underlying statute and statutory definition, Rosemont claims that the Service violated its implementing regulation because it failed to take an explicit two-step analysis when designating unoccupied critical habitat. Rosemont's Br. at 46. The applicable regulation, however, requires no such process. The regulation required the Service to designate unoccupied critical habitat solely when a species' current range would be insufficient to ensure the species' conservation. 50 C.F.R. § 424.12(e) (2013).

The Service first promulgated this regulation in 1980 and when the agency's regulations were revised in 1984, this regulation remained the same. 45 Fed. Reg. 13,010, 13,023 (Feb. 27, 1980) (§ 424.12(f)); 49 Fed. Reg. 38,900, 38,909 (Oct. 1,

45

1984) (§ 424.12(e)). Thus, at the time of the 2014 Final Rule, the Service had been implementing and interpreting this regulation for nearly 35 years. Rosemont provides no evidence that during this period the Service had ever determined it was required to undertake an explicit two-step analysis prior to designating unoccupied critical habitat. To the contrary, Rosemont's argument had already been rejected at the time the Service was designating critical habitat for the jaguar.

In *Bear Valley Mutual Water Co. v. Salazar*, the plaintiffs challenged the Service's designation of unoccupied critical habitat for the Santa Ana sucker. 2012 U.S. Dist. LEXIS 160048 (C.D. Cal., Oct. 17, 2012). Just like Rosemont in this case, the plaintiffs argued that prior to designating unoccupied habitat, the Service's regulation required "two separate findings." *Id*. at *67. The district court disagreed, siding with the Service that in determining that the designation of unoccupied habitat was essential, the agency had thereby also determined that the designation of occupied habitat, by itself, was insufficient to conserve the species. *Id*.

> If certain habitat is essential, it stands to reason that if the Secretary did not designate this habitat, whatever the Secretary otherwise designated would be inadequate. The 2009 Proposed Rule and the 2010 Final Rule show the [Service] considered these two statements as two sides of the same coin. *Id*.

On appeal, this Court affirmed the district court's judgment. *Bear Valley*, 790 F.3d at 994. The Court first recognized that the ESA authorizes the Service to designate unoccupied areas upon the Service's determination that such areas are

46

essential for the conservation of the species. *Id*. at 993. As with the jaguar, the Service had explained in the final rule for the sucker that the unoccupied habitat was essential. *Id*. at 993-994. This Court found that in determining these areas were essential, the Service had thereby determined that the designation of occupied areas was inadequate to ensure the species' conservation. *Id*. at 994. "As the district court properly found, '[i]f certain habitat is essential, it stands to reason that if the [Service] did not designate this habitat, whatever the [Service] otherwise designated would be inadequate.'" *Id*. Because the final rule sufficiently explained why the unoccupied habitat was essential, it thereby also sufficiently explained why the designation of solely occupied habitat was inadequate for the conservation of the species. *Id*.

As Rosemont identifies, Rosemont's Br. at 52, the Service confirmed in the jaguar Final Rule that "[w]e designate critical habitat in areas outside the geographical area occupied by a species only when a designation limited to its range would be inadequate to ensure the conservation of the species." 2-ER-221. The Service then interpreted 50 C.F.R. § 424.12(e) consistent with its nearly 35-year implementing history and the applicable caselaw in this Circuit, determining that unoccupied habitat was essential for the conservation of the jaguar, and conversely determining that the occupied habitat, by itself, was insufficient.

47

Rosemont prefers its own "natural reading" of the regulation. Rosemont's Br. at 47. But, at the very least, the regulation does not on its face require an explicit two-step analysis. 50 C.F.R. § 424.12(e) (2012). At best, the regulation was ambiguous as to whether this two-step analysis was required, and the Court should defer to the Service's reasonable interpretation of its own regulation. *Nat'l Parks Conservation Ass'n v. FERC*, 6 F.4th 1044, 1050-51 (9th Cir. 2020) (under *Kisor*, deference to an agency's interpretation of its own regulation is warranted as long as the regulation is ambiguous, the interpretation is reasonable, the agency's authoritative position, and in some way implicates the agency's substantive expertise).

**B.     Contrary to Rosemont's arguments, the Court's review of the Service's 2014 Final Rule is limited to the record that was before the agency.**

It is fundamental that the Court's review is based on the record that was before the Service at the time of the March 5, 2014 Final Rule. *Citizens to Preserve Overton Park, Inc.*, 401 U.S. at 420. Rosemont disregards this principle, focusing on 2016 and 2019 post-decision revisions to the ESA regulations. Rosemont's Br. at 48. But Rosemont fails to establish that these subsequent rulemakings shed light on how the Service was interpreting the regulation at the time it issued the 2014 Final Rule.

48

In the 2016 and 2019 rulemakings, the Service was free to develop a new interpretation of section 424.12(e) and to provide a new explanation for when it is appropriate to designate unoccupied habitat. The Service's statements within the 2016 and 2019 rulemakings may be relevant to the Service's subsequent critical habitat designations and courts should defer to the Service's new interpretation if the qualifications of *Kisor v. Wilkie* are satisfied. 139 S.Ct. 2400 (2019). But this deference would be only for future agency decisions that rely on, and therefore, post-date these rulemakings. On the other hand, deferring to, or even considering, an interpretation of the regulation provided in the 2016 and 2019 rulemakings for a 2014 rule, is not appropriate. *See e.g., Citizens to Preserve Overton Park*, 401 U.S. at 420; *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Co.*, 463 U.S. 29, 50 (1983) ("An agency's action must be upheld, if at all, on the basis articulated by the agency itself.").

Similarly, Rosemont wrongly criticizes this Court's 2015 decision in *Bear Valley* for not considering the future 2016 and 2019 rulemakings. Rosemont's Br. at 49. The question of whether the Court's analysis was correct in that case does not turn on rationalizations buried in subsequent rulemakings. It turns on whether the Court found, which it did, that at the time the Service issued the 2010 critical habitat rule for the Santa Ana sucker, the Service's rationale and interpretation of 424.12(e) was adequately explained and supported within the 2010 rule itself. 790

49

F.3d at 994 (stating that "[t]he Final Rule sufficiently explained why the designation of unoccupied habitat in subunit 1A was essential, and conversely, why designation of solely occupied habitat was inadequate for the conservation of the species."). The Court should now do the same for the 2014 jaguar Final Rule. As in *Bear Valley*, the Service determined within the Rule that the designated unoccupied habitat was essential to the jaguar's conservation, which necessarily means that the occupied habitat, by itself, was insufficient to ensure the jaguar's conservation.

Even under Rosemont's novel *Brand X/Auer* argument, which, as the Service correctly identified is unnecessary to be decided here, Service's Br. at 53-55, upholding the Service's 2014 critical habitat designation for Unit 3 and Subunit 4b is consistent with the Supreme Court's decision in *National Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 982-984 (2005) ("*Brand* X") and the principles of APA judicial review. *See* Rosemont's Br. at 50. Agencies are allowed to change positions and develop new interpretations of both statutes and regulations, assuming they provide well-reasoned explanations, and their new positions are reasonable. *Brand X* at 981-82. But again, these new positions and interpretations only apply to subsequent agency decisions. Applying them to previous decisions, as Rosemont urges here, would constitute post-hoc,

50

post-decision rationalizations that the courts have consistently found is improper. *See e.g., Citizens to Preserve Overton Park*, 401 U.S. at 420.

None of the other cases Rosemont cites support diverging from the general principle that APA review of an agency action is based on the record before the agency at the time of the challenged decision. *Betansos v. Barr*, 928 F.3d 1133 (9th Cir. 2019), is an immigration case, and not an APA case. Rosemont's Br. at 50. In *Betansos*, the Board of Immigration Appeals ("BIA") had published an administrative decision in 2013 that contradicted an earlier decision from this Court. 928 F.3d at 1135-36. An immigration judge relied on the BIA's new decision in denying Betansos's request for relief. *Id*. at 1136. The BIA then relied on its new decision in denying Betansos's appeal in 2015. *Id*. Thus, had this case been an APA case, this sequence would have been proper, as the agency was relying on the facts and law at the time of its decision. What Rosemont seeks here, is again wholly different, asking the Court to consider the Service's s2014 decision in light of the *subsequent* interpretations of the 2016 and 2019 rulemakings.

The Third Circuit and Federal Circuit cases Rosemont relies on are similarly unpersuasive for justifying a divergence from standard APA review for agency actions. *Levy v. Sterling Holding Co.*, 544 F.3d 493 (3rd Cir. 2008), is not an APA case, but rather a shareholder derivative suit, and, as the Service identified, the Supreme Court in *Kisor* has rejected the principle that agency construction of

51

regulations receives greater deference than agency construction of statutes. Rosemont's Br. at 50; Service's Br. at 53-54, n. 12. And the Federal Circuit case, *In re Lovin*, 652 F.3d 1349 (Fed. Cir. 2011), is a patent case. Rosemont's Br. at 51. Again, the Center recognizes that agencies are allowed to change direction and issue new interpretations of statutes and regulations, so long as the agency explained why it changed course, and the new interpretations are reasonable. But using these interpretative statements to explain preceding agency action, as Rosemont is trying to here, is improper under the APA.

Rosemont also cites to *Center for Biological Diversity v. Zinke*, 900 F.3d 1053 (9th Cir. 2018), where, once again, the sequence of events is critically different from this case. Rosemont's Br. at 50. In *Zinke*, the plaintiffs challenged the Service's August 20, 2014 decision to not list the arctic grayling fish as threatened or endangered under the ESA. 900 F.3d at 1062. In its decision, the Service had relied on a new policy that it had adopted July 1, 2014, prior to the challenged decision. *Id*. at 1063. It was therefore proper for the Service to rely on this change in policy in its subsequent decision. By contrast, the Court rejected the Service's improper attempt to rely on information that post-dated the challenged decision, citing *State Farm*, 463 U.S. at 43, and stating that this "ex post rationalization" had "no force in evaluating [the Service's] listing decision." *Id*. at 1072 n. 17.

52

Rosemont also relies on the Tenth Circuit's decision in *New Mexico Farm & Livestock Bureau*, which is factually and legally distinguishable. 952 F.3d 1216 (10th Cir. 2020); Rosemont's Br. at 52. The Tenth Circuit case concerned two units of jaguar critical habitat in New Mexico (Units 5 and 6), while this case concerns two units in Arizona (Units 3 and Subunit 4b). For Units 5 and 6, there were three single sightings in 1995, 1996, and 2006, and the record lacked evidence that jaguars were present before 1995. *N.M. Farm & Livestock Bureau,* 952 F.3d at 1226. Moreover, the Tenth Circuit found that the Service did not make a finding about whether or not these units were essential to the conservation of the jaguar prior to including these units as unoccupied critical habitat. *Id*. at 1231.

By contrast, there are records of jaguars in the Santa Rita Mountains going back to 1917-1919, Center-SER-014, and there were so many sightings around the time of the Final Rule that it was determined to be occupied. 2-ER-236. The Service determined in the Final Rule that it met its established criteria for essential habitat (including recent occupancy and that it comprises all of the jaguar habitat features). 2-ER-225, 236. The Service also explicitly determined in the Final Rule that Subunit 4b is essential for the jaguar's conservation due to its important connectivity habitat, as recognized by the Tenth Circuit. *N.M. Farm & Livestock Bureau,* 952 F.3d at 1231 n. 17 (noting that the Final Rule included specific findings pertaining to Subunit 4b).

53

Although the Tenth Circuit held that the Service's regulation concerning the designation of unoccupied habitat "required a sequential, 'step-wise' approach, under which the Service must find designation of occupied areas inadequate as a prerequisite to designating unoccupied areas," none of the parties in that case briefed this issue. *Id*. at 1229-30. To the extent the Tenth Circuit's holding conflicts with this Court's holding in *Bear Valley*, the Court must follow *Bear Valley*. It was entirely appropriate and logical for this Court to hold in *Bear Valley* that when the Service determines that unoccupied habitat is essential for the conservation of a species, this necessarily means that the Service has also determined that designating solely occupied would be inadequate. *Bear Valley*, 790 F.3d at 994.

Rosemont claims that following *Bear Valley* instead of *New Mexico Livestock Bureau* would create an unnecessary conflict. Rosemont's Br. at 53-54. Yet *Bear Valley* came first, and thus it is the Tenth Circuit that created any arguable conflict. *N.M. Livestock Bureau*, 952 F.3d at 1228 (citing *Bear Valley*). This Court does not need to reverse itself each time another circuit may choose a different path. Rosemont points to *Kelton Arms Condo. Owners Association v. Homestead Insurance Co.*, but that case requires no such approach. 346 F.3d 1190 (9th Cir. 2003). This inapposite case involved a procedural rule for which five other circuits had already considered the same question and reached the same

conclusion. *Id*. at 1192-93. Accordingly, this Court acknowledged it would be best if the rule was applied uniformly. *Id*. at 1192.

In sum, it is inappropriate for Rosemont to challenge an agency rule and attack court decisions that predate 2016 and 2019 rulemakings for failing to consider them. The substantive validity of a regulatory action may be buttressed only by the reasons proffered at the time the action is taken. Here, the Service properly provided such reasons for designating Unit 3 and Subunit 4b as unoccupied jaguar critical habitat and Court should uphold this lawful designation.

## V.   The District Court Did Not Need to Remand the Economic Impact Analysis.

Rosemont argues that the district court erred by failing to remand to the Service the economic impact analysis within the Final Rule. Rosemont's Br. at 55. The Center agrees with the Service that Rosemont's economic impact argument should be rejected because Rosemont waived this argument and it is premature. Service's Br. at 56-58.

The general rule is that this Court will not consider arguments that were not properly raised in the district court. *In re E.R. Fegert, Inc.*, 887 F.2d 955, 957 (9th Cir. 1989). This standard requires arguments to be "raised sufficiently for the trial court to rule on it," affording "the district court opportunity to reconsider its rulings and correct its errors." *In re E.R. Fergert, Inc.*, 887 F.2d at 957 *citing Inland Cities Express, Inc. v. Diamond Nat'l Corp.*, 524 F.2d 753, 755 (9th Cir.

55

1975); *Whittaker Corp. v. Execuair Corp.*, 953 F.2d 510, 515 (9th Cir. 1992) *citing Morrow v. Greyhound Lines, Inc.*, 541 F.3d 713, 724 (8th Cir. 1976). Circuit Rules also required Rosemont to identify where in the record on appeal this issue was raised and ruled on. Circuit Rule 28-2.5. Rosemont failed to do so in its opening brief, and was unable to because this issue was never raised or at issue before the district court. Rosemont's Br. at 55.

This Court will review an issue that was not raised below in three narrow circumstances, none of which are applicable. The first is to prevent manifest injustice, and the burden is on the proponent to show exceptional circumstances why the issue was not raised below. *Int'l Union of Bricklayers & Allied Craftsman Local Union No. 20 v. Martin Jaska, Inc.*, 752 F.2d 1401, 1404 (9th Cir. 1984). Rosemont here does not even attempt to satisfy this burden in its opening brief, and is now precluded from doing so in its reply. *Id.* (stating that "we will not ordinarily consider matters on appeal that are not specifically and distinctly raised and argued in appellant's opening brief).

Rosemont's argument fairs no better under the other two exceptions, as this is not a new issue that arose while the appeal was pending due to a change of law, nor is the issue purely legal and where the record is fully developed. *Bolker v. Comm'r*, 760 F.2d 1039, 1042 (9th Cir. 1985). Rosemont was plainly on notice to make this argument in the district court, as the Center directly challenged the

Service's determination in the biological opinion that the Rosemont Mine was not likely to destroy or adversely modify the jaguar's critical habitat. 1-ER-13. Rosemont, however, made no mention of this argument in either its opposition to the Center's claims, or in its own cross-claim challenging the jaguar critical habitat Final Rule. Nor did Rosemont raise this issue in a motion for rehearing or reconsideration. The argument also derives from a hypothetical that is untethered from the record. Rosemont made no effort to argue or satisfy any of these exceptions and is precluded from doing so in its reply.

Even if the argument was not waived, it is an unripe theoretical argument because Rosemont is wrong that the district court "gutted the foundation" of the Service's economic analysis when it remanded the biological opinion for additional analysis. Rosemont's Br. at 55; Service's Br. at 57-58. The Service did rely in part on its determination that the Rosemont Mine would not adversely modify the jaguar's designated critical habitat. 2-ER-269. The district court, however, did not eliminate this predicate or factor in its February 10, 2020 Order and did not find that the Mine would destroy or adversely modify the jaguar's critical habitat. The court's remand only requires that the Service apply the correct "likely" standard for its adverse modification determination to determine whether or not the Mine may destroy or adversely modify the jaguar's critical habitat. 1-ER-14-16; Service's Br. at 57.

57

It is inappropriate for Rosemont to shoehorn this argument into an appeal when the claim is only potentially relevant if the Service determines on remand that the Mine would destroy or adversely modify the jaguar's critical habitat. If that happens, either the Service could revisit its economic analysis on its own, or Rosemont could petition it to do so. It certainly was not in err for the district court to avoid prematurely making this jump on its own prerogative, before the Service even applies the correct standard in a new determination regarding the Mine's impacts on remand.

## VI.  The Final Rule Should Not be Vacated Pending Remand Even if the Court Finds Flaws in the Jaguar Critical Habitat Designation.

If the Court finds flaws in the Service's inclusion of Unit 3 and Subunit 4b in the jaguar critical habitat designation, the Court should not vacate the designation pending remand as Rosemont asks. Rosemont's Br. at 54. "A flawed rule need not be vacated." *Cal. Cmtys. Against Toxics v. U.S. EPA*, 688 F.3d 989, 992 (9th Cir. 2012). "'[W]hen equity demands, the [rule] can be left in place while the agency follows the necessary procedures' to correct its action." *Id. quoting Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1405 (9th Cir. 1995).

Whether an agency action should be vacated depends on the seriousness of the agency's errors and the disruptive consequences of an interim change that may itself be changed. *Cal. Cmtys. Against Toxics*, 688 F.3d at 992, *citing Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir.

58

1993). Here, even if Unit 3 was not occupied at the time of listing, and regardless of whether the Service explicitly undertook a two-step analysis within the Final Rule, the Service still specifically determined that both Unit 3 and Subunit 4b are essential to the conservation of the jaguar. 2-ER-225, 2-ER-234; *supra* Section II, III. Thus, if the Service is required to conduct additional analysis on remand, it will likely reach the same conclusion that both units should be included since they are both essential to the species' conservation.

Rosemont emphasizes that the Service reached an opposite conclusion for two units in New Mexico. Rosemont's Br. at 54. This glosses over two critical distinctions. First, Unit 3 was occupied at the time the Final Rule was being developed, and "recent occupancy" is one of the factors the Service considered in determining what habitat is essential. 2-ER-225; 2-ER-236. Second, the Service determined within the Final Rule that both Unit 3 and Subunit 4b are in fact essential to jaguar conservation, and thus their inclusion as critical habitat was appropriate and compliant with the ESA. *Supra* III.

The consequences to essential jaguar habitat could be severe if the Final Rule were vacated. With the Rule in place, the Service is required to assess whether the proposed Rosemont Mine is likely to destroy or adversely modify jaguar critical habitat, and if so, the Mine may not proceed as currently proposed. While the Service determined in its 2016 biological opinion that the Mine is not

59

likely to adversely modify jaguar critical habitat, the district court held that the Service improperly relied on a heightened standard in reaching this determination, and the Service is required on remand to reconsider its determination under the proper standard. 1-ER-15-16. However, if the Final Rule is vacated, the Service will no longer be required to conduct this additional analysis, and the Mine would be able to proceed even if it would destroy and adversely modify the jaguar's habitat at and near the Mine site, which again the Service has determined is essential to the conservation of the jaguar.

In enacting the ESA, Congress has made it "abundantly clear that the balance has been struck in favor of affording endangered species the highest of priorities," and thus adopted a policy described as "institutionalized caution." *TVA*, 437 U.S. at 194; *see also Sierra Club v. Marsh*, 816 F.2d 1376, 1386 (9th Cir. 1987). The Service is generally required to designate critical habitat at the same time that it lists a species as threatened or endangered. 16 U.S.C. § 1533(a)(3)(A)(i). The jaguar was first listed in 1972. If the Final Rule is vacated, the jaguar will remain without critical habitat over 50 years after its listing as threatened with extinction, which is directly contrary to the purposes and intent of the ESA.

Significantly, Rosemont has not cited any scientific evidence that the Service failed to consider in developing the Final Rule. The Service relied on the

60

best scientific data available in determining that Unit 3 and Unit 4b are essential. Any errors with the current designation are not of the magnitude that would justify removing existing jaguar habitat protection while the Rule would be reconsidered on remand.

## CONCLUSION

The Service's decision to designate Unit 3 and Subunit 4b as jaguar critical habitat was the result of thoughtful and comprehensive evaluation of the best available science about the jaguar's conservation needs and therefore the district court's decision upholding of the Final Rule should be affirmed.

Dated April 4, 2022                    Respectfully submitted,

*s/ Allison N. Melton*
Allison N. Melton
Center for Biological Diversity
P.O. Box 3024
Crested Butte, CO 81224
(970) 309-2008
amelton@biologicaldiversity.org

*Counsel for Plaintiff-Appellee Center for Biological Diversity*

61

## STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Rule 28-2.6, Plaintiff-Appellee Center for Biological Diversity states that there is one related case that it is aware of that is currently pending before this Court: *Center for Biological Diversity v. United States Fish and Wildlife Service v. Rosemont*, Nos. 19-17585, 19-17586.


Dated: April 4, 2022                          *s/Allison N. Melton*
                                              Allison N. Melton

# CERTIFICATE OF COMPLIANCE

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

**9th Cir. Case Number(s)** 20-15654

I am the attorney or self-represented party.

**This brief contains 13,899 words**, excluding the items exempted by Fed. R. App. P. 32(f).  The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief (*select only one*):

[X] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because (*select only one*):
    [ ] it is a joint brief submitted by separately represented parties;
    [ ] a party or parties are filing a single brief in response to multiple briefs; or
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** *s/ Allison N. Melton*       **Date** April 4, 2022

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on April 4, 2022.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated April 4, 2022

*s/Allison N. Melton*
Allison N. Melton